UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| B Choice Limited, | § | |
| | § | |
| Plaintiff | § | C.A. NO. 4:14-cv-02096 |
| | § | |
| v. | § | |
| | § | |
| Epicentre Development Associates, LLC, et al., | § | |
| | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Plaintiff B Choice Limited ("BCL"), and, for its Third Amended

Complaint against Defendants Epicentre Development Associates, LLC, Epicentre Development

Associates II, LLC, Alianza Financial Services, Alianza Holdings, LLC, Vanguard Equity

Holdings, LLC, Vantage Equity Holdings, LLC, Vantage Financial Services, LLC, Vantage Plus

Corp., Vantage Plus Development Company, LLC, Vantage Realty Holdings VI-X, LLC, Omar

Botero, Jr. a/k/a Omar Botero, Albert F. Delaney, Gilberto Iragorri, Pierluigi Guiduzzi, PLG

Consulting Ltd., F & G Consultancy, Ltd., Andrea Frattini, individually and doing business as

Studio Andrea Frattini, Tommaso Caro, Jaime Pueche, Lilliana Real, and Lilliana Real, P.A.,

would respectfully show as follows:

**TABLE OF CONTENTS**

I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       A.    Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       B.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   Jurisdiction and Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.    Facts Relevant to Unlawful Scheme Encompassing RICO Predicate Acts,
       RICO Violations, and State Statutory and Common Law Claims. . . . . . . . . . . . . . . 22
       A.    Summary of Relevant Facts Regarding the Unlawful Scheme. . . . . . . . . . . . . 22
       B.    The Closure of AstroWorld and the Initial Sale of the Land. . . . . . . . . . . . . . 24
       C.    The Unlawful EpiCentre Development Scheme Begins. . . . . . . . . . . . . . . . . . 24
       D.    The Initial US$11,000,000 Investment by BCL. . . . . . . . . . . . . . . . . . . . . . . . 27
       E.    The €300,000 Loan by BCL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
       F.    The $13,650,000 Loan by BCL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
       G.    Further Attempts to Coerce and Obtain Additional Funds from BCL. . . . . . . . . 45
       H.    Syphoning Funds–Loans taken against the 11 Acres, and the Transfer
             of the 11 Acres to EDA II in Furtherance of the Defendants
             Co-Conspirators Scheme to Unlawfully Convert BCL's
             Money and Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
       I.    The End Result: No Money, No Land. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

V.     Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
       A.    First Cause of Action:  Violation of the Racketeer Influenced Corrupt
             Organizations Act, Pub.L. 91-452, Title IX, 84 Stat. 941, *as amended*, 18 U.S.C.
             §§ 1961 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
             1. Count One:  Violation of 18 U.S.C. § 1962(c). . . . . . . . . . . . . . . . . . . 51
                   a. The Rico Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
                   b. The Section 1962(c) RICO Enterprise(s). . . . . . . . . . . . . . . . 53
                   c. The RICO Predicate Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
                         (1) Mail and Wire Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . 57
                         (2) Unlawful Conversion. . . . . . . . . . . . . . . . . . . . . . . . . . 60
                         (3) Travel Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
                         (4) Money Laundering. . . . . . . . . . . . . . . . . . . . . . . . . . . 61
                         (5) Bank Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
                   d. Pattern of Racketeering Activity. . . . . . . . . . . . . . . . . . . . . . 63
                   e. Relatedness and Continuity of the Unlawful Activity. . . . . . . . 64
             2. Count Two:  Violation Of 18 U.S.C.§1962(d) by Conspiring
                   to Violate 18 U.S.C. § 1962(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.     Second Cause of Action:  Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
1. Facts Common to All Fraud Allegations. . . . . . . . . . . . . . . . . . . . . . 65
    a. Common Law Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
    b. Fraud by Non-Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . 69
    c. Statutory Fraud Pursuant to Texas Business &
       Commerce Code Section 27.01. . . . . . . . . . . . . . . . . . . . . . . 71

C.     Third Cause of Action:  Breach of Fiduciary Duty. . . . . . . . . . . . . . . . . . . 72
1. Guiduzzi and Caro. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
2. Frattini. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
3. Officers and Directors of EDA. . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

D.     Fourth Cause of Action:  Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . 75
1. The $11,000,000 Investment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
2. The Promissory Note for the €300,000 Loan. . . . . . . . . . . . . . . . . 76
3. The Promissory Note for the $13,650,000 Loan. . . . . . . . . . . . . . . 78

E.     Fifth Cause of Action:  Conversion Of Specific Chattel. . . . . . . . . . . . . . . 79

F.     Sixth Cause of Action:  Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
1. Real and Real, P.A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
2. Delaney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
3. Guiduzzi, F&G and PLG. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
4. Frattini and Studio Frattini. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
5. Botero. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
6. Iragorri. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
7. Vantage Realty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

G.     Seventh Cause of Action:  Negligent Misrepresentation. . . . . . . . . . . . . . . 88
1. Botero, Delaney and Iragorri. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
2. Guiduzzi. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
3. Frattini. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

H.     Eighth Cause of Action:  Liability Based On Disregard of the
Corporate Entities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

I.     Ninth Cause of Action:  Civil Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . 94

VI.    Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

VII.   Jury Demand. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

## I.      INTRODUCTION

1.1      BCL brings this action under the Racketeer Influenced Corrupt Organizations Act

("RICO"), Pub.L. 91-452, Title IX, 84 Stat. 941, *as amended* 18 U.S.C. §§ 1961-1968, for

violations of §§ 1962(c) and (d).  This action also includes supplemental state statutory and

common law claims for relief for common law fraud, fraud by non-disclosure, statutory fraud

under the Texas Business & Commerce Code, breach of fiduciary duty, breach of contract,

conversion of specific chattel, negligence, negligent misrepresentation, liability based on

disregard of the corporate entities, civil conspiracy, and exemplary damages under the Texas

Civil Practice & Remedies Code for injury resulting from defendants' actual fraud and malice.

1.2      This action involves an unlawful scheme in which the Defendants co-conspirators

engaged in a scheme constituting a pattern of unlawful conduct defrauding and converting BCL's

money or property through multiple unlawful RICO predicate acts.  The Defendants' conduct

underlying this unlawful scheme also gives rise to BCL's state law statutory and common law

claims.

1.3      The pattern of RICO predicate acts involved in the Defendants' unlawful scheme

includes related predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343; unlawful

conversion, 18 U.S.C. §§ 2314 and 2315; Travel Act violations, 18 U.S.C. money laundering, 18

U.S.C. §§ 1956 and 1957; and bank fraud, 18 U.S.C. § 1344.

1.4      This pattern of unlawful RICO predicate acts constitutes RICO violations of 18

U.S.C. §§ 1962(c) (RICO substantive violation) and 1962(d) (RICO conspiracy) for conducting

and conspiring to conduct the affairs of the RICO § 1962(c) enterprise(s) alleged herein through a

pattern of racketeering activity.

1.5     As alleged herein, the Section 1962(c) RICO enterprise that was unlawfully infiltrated by the RICO Defendants co-conspirators is the "EDA Primary Section 1962(c) Enterprise." Epicentre Development Associates, LLC ("EDA") is a Texas limited liability company, which does business in the State of Texas for the purpose of accumulating monetary profit.

1.6     As alleged herein, the alternative Section 1962(c) enterprise that was unlawfully infiltrated by the RICO Defendants co-conspirators is the "EDA and EDA II Alternative Section 1962(c) Association-in-Fact Enterprise."  Epicentre Development Associates II, LLC ("EDA II") is a Texas limited liability company, which does business in the State of Texas for the purpose of accumulating monetary profit.

1.7     BCL suffered injury to its business or property as a result of Defendants' unlawful RICO predicate acts and violations and is entitled to recover treble damages under 18 U.S.C. § 1964(c).  BCL seeks monetary relief for injury to its business or property and equitable relief to prevent Defendants from engaging in such further unlawful conduct.  Furthermore, BCL seeks equitable relief, including permanent injunctions and other orders for disgorgement of unlawful proceeds.  The legal relief BCL seeks includes actual, treble, and punitive damages, pre-and post-judgment interest, costs and attorney's fees.

## II.     PARTIES

### A.     Plaintiff

2.1     BCL is a private limited company organized under the laws of England and Wales. BCL invests in real estate, directly or indirectly.

      2.1.1    BCL is a "person" pursuant to 18 U.S.C. section 1964(c), and was induced to invest in, and loan to, certain Defendants over US$25,000,000 in order to purportedly secure a partial ownership (stock) interest in EDA which was represented would purchase approximately 104 acres of land in Houston, Texas, the entirety of the property where previously the "AstroWorld" theme park was located (the "AstroWorld Property").

      2.1.2    Over a period of approximately three years, BCL was induced to (i) invest US$11,000,000, (ii) lend €300,000, and, finally, (iii) lend US$13,650,000, all in connection with the AstroWorld Property Investment scheme.

      2.1.3    The investment made by BCL was lost in its entirety.  The money loaned by BCL was spent by Defendants, and has not been repaid.  None of the AstroWorld Property is owned by BCL or any entity in which BCL has an equity or other interest, and BCL has not obtained any equivalent or substitute property for its investment or loans.

      2.1.4    Instead of buying the AstroWorld Property as was represented to BCL that it would, EDA, infiltrated by the RICO Defendants, ultimately acquired only a small part of the AstroWorld Property, amounting to 11.34 acres (the "11 Acres").  EDA then borrowed approximately US$3.5M against the 11 Acres, transferred the 11 Acres to EDA II, whereupon EDA II sold the 11 Acres to a third party not a defendant in this action. BCL neither was advised of the loans or the sale, nor received any of the borrowed funds or sales proceeds.

      B.    Defendants

2.2    Epicentre Development Associates, LLC ("EDA") is not a defendant for purposes of BCL's RICO allegations. EDA is a Texas limited liability company, which does business in

the State of Texas for the purpose of accumulating monetary profit, and may be served through its counsel of record who have previously appeared in this action.

2.2.1   EDA was at all relevant times involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.3   Epicentre Development Associates II, LLC ("EDA II") is not a defendant for purposes of BCL's RICO allegations. EDA II is a Texas limited liability company, which does business in the State of Texas for the purpose of accumulating monetary profit, and may be served through its counsel of record who have previously appeared in this action.

2.3.1   EDA II was at all relevant times involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.3.2   EDA II was formed by Botero, Delaney, and Iragorri and certain of the other Entity Defendants (defined below), and without valid reason acquired the 11 Acres from EDA, borrowed approximately US$4.75M against it, and then sold the 11 Acres to a third party, not a defendant herein. BCL neither was advised of the loans or the sale, nor received any of the borrowed funds or sales proceeds.

2.4   Alianza Financial Services ("Alianza Financial") was at all relevant times a manager of EDA. Alianza Financial is a Florida limited liability company doing business in Texas for purposes of accumulating monetary profit. Alianza Financial may be served with process through its counsel of record who have previously appeared in this action.

7

2.4.1   Alianza Financial was at all relevant times involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.4.2   Alianza Financial conducted business in Texas on behalf of EDA related to the AstroWorld Property investment scheme as more fully pled herein.

2.5   Alianza Holdings, LLC ("Alianza Holdings") was at all relevant times a manager of EDA.  Alianza Holdings is a Florida limited liability company doing business in Texas for purposes of accumulating monetary profit. Alianza Financial may be served with process through its counsel of record who have previously appeared in this action.

2.5.1   Alianza Holdings was at all relevant times involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.5.2   Alianza Holdings conducted business in Texas on behalf of EDA related to the AstroWorld Property investment scheme as more fully pled herein.

2.6   Vanguard Equity Holdings, LLC, ("Vanguard") is a Texas limited liability company, which did business in Texas for the purpose of accumulating monetary profit. It may be served through its counsel of record who have previously appeared in this action.

2.6.1   Vanguard was at all relevant times involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.6.2   Vanguard conducted business in Texas on behalf of EDA related to the AstroWorld Property investment scheme as more fully pled herein.

8

2.7     Vantage Equity Holdings, LLC ("Vantage Equity") was at all relevant times represented to be a limited liability company and manager of EDA.  It may be served through its counsel of record who have previously appeared in this action.

2.7.1     Vantage Equity at all relevant times was involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.7.2     Vantage Equity conducted business in Texas on behalf of EDA related to the AstroWorld Property investment scheme as more fully pled herein, either as a limited liability company, or as an unincorporated association consisting of the Defendants herein, singly or in combination.

2.8     Vantage Financial Services, LLC ("Vantage Financial") is a Florida limited liability company doing business in Texas for the purposes of accumulating monetary profit.  It may be served with process through its counsel of record who have previously appeared in this action.

2.8.1     Vantage Financial was at all relevant times involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.8.2     Vantage Financial conducted business in Texas on behalf of EDA related to the AstroWorld Property investment scheme as more fully pled herein, and in that contact on that basis of misrepresentations of material facts by Vantage Financial, caused BCL to lend it money.

2.9     Vantage Plus Corp. ("VPC") is a Florida corporation which does business in the State of Texas for the purpose of accumulating monetary profit.  It may be served with process through its counsel of record who have previously appeared in this action.

      2.9.1    VPC at all relevant times was involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

      2.9.2    VPC made false representations to BCL in a subscription agreement about the AstroWorld Investment as further alleged herein, and to induce BCL to invest in and loan funds to EDA.

2.10    Vantage Plus Development Company, LLC ("VPDC") is a Texas limited liability company which does business in the State of Texas for the purpose of accumulating monetary profit, and may be served through with process through its counsel of record who have previously appeared in this action.

      2.10.1  VPDC at all relevant times was involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

      2.10.2  VPDC made representations about the AstroWorld Investment as further alleged herein, including in a status report sent to BCL by email, representing it would take title to the real estate at issue on or before October 15, 2008.  VPDC also committed to ongoing due diligence to provide investors in EDA "the benefit of their investment as projected," which due diligence was promised to continue until "EDA has clear and insured title to the land."

2.11     Vantage Realty Holdings VI-X, LLC ("Vantage Realty") is a Florida limited liability company that does business in the State of Texas for the purpose of accumulating monetary profit.  It may be served with process through its counsel of record who have previously appeared in this action.

2.11.1  Vantage Realty at all relevant times was involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.11.2  Vantage Realty conducted business in Texas on behalf of EDA related to the AstroWorld Property investment scheme as more fully pled herein.

2.12     Omar Botero, Jr., a/k/a Omar Botero ("Botero") is a citizen of the State of Florida. He does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States.  He may be served with process through his counsel of record who has previously appeared in this action.

2.12.1  Botero at all relevant times was involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.12.2  On information and belief, Botero is chairman and chief executive officer, or is otherwise an officer and agent of EDA, EDA II, Vanguard, Vantage Realty, Vantage Financial, Vanguard Equity, Alianza Holdings and Alianza Financial.  On information and belief, Botero handles the finances of these entities, and co-manages and runs them as well.

2.12.3  Botero visited Houston, Texas, on multiple occasions in connection with the AstroWorld Property investment scheme at issue in this litigation, specifically on September

11

23 to 24, 2009, and on July 26, 2011, to meet representatives of BCL in advance of closing on a small portion of the AstroWorld Property.

2.13    Albert F. Delaney ("Delaney") is a citizen of the state of Florida.  He does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States.  He may be served with process through his counsel of record who has previously appeared in this action.

2.13.1  Delaney at all relevant times was involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.13.2  On information and belief, Delaney also handles the finances of EDA, EDA II, Vanguard, Vantage Realty, Vantage Financial, Vanguard Equity, Alianza and Alianza Financial, and co-manages and runs them as well.

2.13.3  Delaney regularly works, and represents that he works, from 9001 Kirby Drive, Houston, Texas, and 50 Scarlet Woods, Spring, Texas, specifically in connection with the AstroWorld Property investment scheme at issue in this litigation.

2.14    Gilberto Iragorri ("Iragorri") is a citizen of Florida.  He does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States.  He may be served with process through his counsel of record who has previously appeared in this action.

2.14.1  Iragorri was at all relevant times involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

12

2.14.2  On information and belief, Iragorri, a self-styled "international real estate broker," is or at all relevant times was, the Chief Business Development Officer of EDA II, and also handles the finances of EDA, EDA II, Vanguard, Vantage Realty, Vantage Financial, Vanguard Equity, Alianza and Alianza Financial, and co-manages and runs them as well.

2.14.3  Iragorri purposefully availed himself of the privilege of conducting business in Texas by actively directing sales, marketing, and other efforts into and/or in Texas, all in an effort to manage the sales process of EpiCentre Houston from presentation through execution. Because this dispute arises out of those efforts directed at the Texas Market, Irragori could reasonably expect to be subject to suit in Texas.

2.15   Pierluigi Guiduzzi ("Guiduzzi") is a citizen of Italy and a resident of the United Kingdom.  He does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States.  He may be served with process through his counsel of record who has previously appeared in this action.

2.15.1  Guiduzzi at all relevant times was involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.15.2  Guiduzzi was a Director of BCL at all relevant times, but resigned on June 10, 2014.  Until his resignation, he was entrusted with fiduciary obligations under applicable law, but repeatedly failed and refused to faithfully discharge those obligations, and acted at all relevant times for or in his own interest, in the interests of the AstroWorld Property investment scheme, or in the interests of Defendants PLG and F&G, but not for the interest of BCL.

13

Guiduzzi's actions were so incompatible with the purpose and interests of BCL as to destroy the agency between them, and his actions were entirely for his own purposes.

        2.15.3   Guiduzzi acted as the intermediary, middleman and facilitator of the fraudulent information and misrepresentations passed to or made by the Defendants.  He made, or participated in making, individually and in concert with the other Defendants, false or untrue representations of material facts to BCL about the AstroWorld Property investment scheme at issue in this litigation.

        2.15.4 Guiduzzi has also visited Houston, Dallas and Fort Worth, Texas, on multiple occasions in furtherance of  the AstroWorld Property investment scheme at issue in this litigation.  Specifically, he was in Houston, Texas, on September 23 to 24, 2009, in connection with the AstroWorld Property investment scheme, in Fort Worth, Texas, on or about July 26, 2011, to attend the closing of the sale of a portion of the AstroWorld Property, and again specifically in Houston and Dallas, Texas, from September 18 to 21, 2012, also in connection with the AstroWorld Property investment scheme. In each instance, Guiduzzi obtained and transmitted information about the scheme to BCL and BCL relied upon such representations to its detriment.

        2.15.5   Guiduzzi also visited Miami, Florida, on multiple occasions in furtherance of the AstroWorld Property investment scheme at issue in this litigation.  Specifically, he was in Miami, Florida, on March 14-16, 2012, to attend a meeting with EDA, Botero, Delaney, and Iragorri in connection with the AstroWorld Property investment scheme.  In each instance, Guiduzzi obtained and transmitted information about the fraudulent scheme to BCL and BCL relied upon such representations to its detriment.

14

2.16    PLG Consulting Ltd. ("PLG"), is a private limited company organized under the laws of England and Wales.  It may be served with process in accordance with FRCP 4(f)(h).  Upon information and belief, it is managed, directed, owned and controlled by Guiduzzi.

2.16.1  PLG at all relevant times was involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.16.2  PLG does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States, and in particular Houston, Texas, and Fort Worth, Texas.

2.16.3  Specifically, PLG acted through Guiduzzi, its principal, in Houston, Texas, on September 23 to 24, 2009, in connection with the AstroWorld Property investment scheme, in Fort Worth, Texas, on or about July 26, 2011, to attend the closing of the sale of a small portion of the AstroWorld Property, and again specifically in Houston and Dallas, Texas, from September 18 to 21, 2012, also in connection with the AstroWorld Property investment scheme.  In each instance, PLG, through Guiduzzi, obtained and transmitted information about the scheme to BCL and BCL relied upon such representations to its detriment.

2.16.4  PLG also represented itself on its internet site at least as far back as 2011 that it engaged in "Real Estate Consultancy," and that "thank [sic] to its network and special cooperation with F&G Consultancy Ltd, can assist at an International level clients who wish to invest in property both Commercial and residential."

2.17    F & G Consultancy, Ltd. ("F&G"), is a private limited company organized under the laws of England and Wales.  It may be served with process through its counsel of record who

15

have previously appeared in this action. Upon information and belief, it is managed, directed, owned and controlled in part by Guiduzzi.

2.17.1   F&G at all relevant times was involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.17.2   On July 7, 2009, F&G entered into a contractual relationship with EDA, wherein it agreed to serve as BCL's consultant in connection with the AstroWorld Property investment. Under the contract F&G was empowered, *inter alia*, to provide "any … professional assistance for the best result of the transaction" of "acquiring an area in Houston to be developed and resold."

2.17.3   Accordingly, F&G conducted business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States, and in particular Houston, Texas, and Fort Worth, Texas.

2.17.4   Specifically, it acted through Guiduzzi, its principal, and its shareholders Guiduzzi, Frattini, and Tommaso Caro, in Houston, Texas, on September 23 to 24, 2009, in connection with the AstroWorld Property investment scheme, in Fort Worth, Texas, on or about July 26, 2011, to attend the closing of the sale of a portion of the AstroWorld Property, and again specifically in Houston and Dallas, Texas, from September 18 to 21, 2012, also in connection with the AstroWorld Property investment scheme.  In each instance, Guiduzzi, Frattini, and/or Tommaso Caro obtained and transmitted information about the scheme to BCL and BCL relied upon such representations to its detriment.

2.18     Andrea Frattini is a professional accountant and operates as required by Italian law as Studio Andrea Frattini ("Frattini"). References to "Studio Frattini" denote Frattini's individual professional activities, rather than the activities of a separate entity.  Frattini, individually and doing business as Studio Andrea Frattini, is a citizen and resident of Italy.  He does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States.  He may be served with process through his counsel of record who has previously appeared in this action.

2.18.1  Frattini at all relevant times was involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.18.2  Frattini is a partner, co-venturer or business associate of Guiduzzi, and is or at all relevant times was a shareholder of F&G along with Guiduzzi and Tommaso Caro, and together with Guiduzzi and Caro, assists foreign investors with real estate and other investments in the United States.   At all relevant times, Frattini was entrusted with fiduciary obligations towards BCL under applicable law, but repeatedly failed and refused to faithfully discharge those obligations, and acted at all relevant times for or in his own interest, in the interests of the AstroWorld Property investment scheme, or in the interests of Defendants PLG, Studio Frattini, or F&G, but not for the interest of BCL.  Frattini's actions were so incompatible with the purpose and interests of BCL as to destroy the agency between them, and his actions were entirely for his own purposes.

2.18.3  Frattini acted as the intermediary, middleman and facilitator of the fraudulent information and misrepresentations passed to or made by the Defendants to BCL.  He

17

made, or participated in making, individually and in concert with the other Defendants, false or untrue representations of material facts to BCL about the AstroWorld Property investment scheme at issue in this litigation, and acted contrary to the interests of BCL.

        2.18.4  Frattini also visited Houston, Dallas and Fort Worth, Texas, on multiple occasions in furtherance of the AstroWorld Property investment scheme at issue in this litigation. Specifically, he was in Houston, Texas, on September 23 to 24, 2009, in connection with the AstroWorld Property investment scheme, in Fort Worth, Texas, on or about July 26, 2011, to attend the closing of the sale of a portion of the AstroWorld Property, and again specifically in Houston and Dallas, Texas, from September 18 to 21, 2012, also in connection with the AstroWorld Property investment scheme. In each instance, Frattini obtained and transmitted information about the scheme to BCL and BCL relied upon such representations to its detriment.

        2.18.5  Frattini also visited Miami, Florida, on multiple occasions in furtherance of the AstroWorld Property investment scheme at issue in this litigation.  Specifically, he was in Miami, Florida, on March 14-16, 2012, to attend a meeting with EDA, Botero, Delaney, Iragorri and Guiduzzi in connection with the AstroWorld Property investment scheme.  In each instance, Frattini obtained and transmitted information about the fraudulent scheme to BCL and BCL relied upon such representations to its detriment.

        2.19    Tommaso Caro ("Caro") is a citizen of Italy and a resident of the United Kingdom.  He does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States.  He may be served with process in accordance with FRCP 4(f).

2.19.1  Caro at all relevant times was involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.19.2  Caro was a Director of BCL at all relevant times, but resigned on April 8, 2013.  Until his resignation, he was entrusted with fiduciary obligations under applicable law, but repeatedly failed and refused to faithfully discharge those obligations, and acted at all relevant times for or in his own interest, in the interests of the AstroWorld Property investment scheme, or in the interests of Defendants PLG, Studio Frattini, or F&G, but not for the interest of BCL. Caro's actions were so incompatible with the purpose and interests of BCL as to destroy the agency between them, and his actions were entirely for his own purposes.

2.19.3  Caro introduced Guiduzzi to John Pyle and Pyle Owen LLP ("Pyle" and "Pyle Owen", respectively), non-parties to this suit who initially provided information on the AstroWorld Property investment. Prior to Caro's appointment as a Director in BCL, and before his involvement with B Choice, was instrumental in making the initial misrepresentations which BCL relied on to fund its initial investment, and thereafter, as a Director, Caro acted as the intermediary, middle man and facilitator of the fraudulent information and misrepresentations passed to or made by the Defendants.  He made, or participated in making, individually and in concert with the other Defendants, false or untrue representations of material facts to BCL about the AstroWorld Property investment scheme at issue in this litigation.

2.19.4  Once a Director, Caro failed to use exercise due (or any) diligence in investigating the status of the AstroWorld Property Investment, when he knew, or should have

19

known, the Investment was not proceeding as he or others were representing to BCL.  Caro's acts and failures to act in this regard caused damage to BCL as further alleged herein.

2.20    Jaime Pueche ("Pueche") is on information and belief a citizen and resident of Spain.  He may be served with process in accordance with FRCP 4(f).

2.20.1  Pueche at all relevant times was involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.20.2  On information and belief, Pueche acts as a real estate and investment broker or procurer and he made, or participated in making, false or untrue representations of material facts to BCL, and in concert with Guiduzzi, Frattini, Studio Frattini, PLG, F&G and Caro, introduced Delaney, Botero and Iragorri to BCL, and failed to carry out reasonable due diligence, or otherwise failed to carry due diligence out fully or in a reasonable and prudent manner, on the scheme at issue in this litigation.

2.20.3  In addition, Pueche does business in the State of Texas for the purpose of accumulating monetary profit, and otherwise has contacts with the United States. On information and belief, Pueche is a member of EDA and has an equity and profit interest in EDA and received value and/or compensation by EDA, Botero, Delaney or Iragorri from Texas in connection with his efforts to procure the investment by BCL in EDA through false or untrue representations of material facts made to BCL, made with the intent to defraud BCL.

2.21    Lilliana Real ("Real") is a citizen of the state of Florida, and a member of the Bar of the State of Florida.  She may be served through her counsel of record who has previously appeared in this action.

2.21.1  Real at all relevant times was involved in interstate commerce, and directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.22  Lilliana Real, P.A. ("Real, P.A.") is a professional corporation for the practice of law organized under the laws of the State of Florida. Upon information and belief, it is managed, directed, owned and controlled by Real. It may be served with process through its counsel of record who has previously appeared in this action.

2.22.1  Real, P.A., at all relevant times was involved in interstate commerce, and it directly engaged in the production, distribution or acquisition of goods and services in interstate commerce, and by use of interstate mail or wires.

2.22.2  Real, P.A., at all relevant times, maintained a client trust account controlled by Real.  BCL funds were directed by Delaney, Botero, Iragorri, Pyle, and Guiduzzi to Real and Real, P.A's trust account.  BCL has not been advised as to where those funds have gone.

2.22.3  As a professional corporation for the practice of law, Real, P.A. was required at all relevant times to abide by all law practice and professional conduct rules, including, without limitation, any such rules relating to the administration of attorney trust accounts, as does Real.

2.23  For purposes of the RICO Causes of Action, Alianza Financial, Alianza Holdings, Vanguard, Vanguard Equity, Vantage Equity, Vantage Financial, VPC, VPDC, and Vantage Realty are sometimes referred to herein as the "Entity Defendants."

### III.    JURISDICTION AND VENUE

3.1    This Court has subject matter jurisdiction over this lawsuit as it arises under the

laws of the United States, *i.e.*, 18 U.S.C. section 1961, *et seq.*, The Organized Crime Control Act

of 1970, Pub. L. No. 91-452, section 910(a), 84 Stat. 941, Racketeer Influenced and Corrupt

Organizations ("RICO").

3.2    This Court has jurisdiction over the claims for relief under RICO pursuant to 18

U.S.C. sections 1964(a) and 1965(c).

3.3    This Court has supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a),

over all other claims that are so related to the claims within such original jurisdiction that they

form part of the same case or controversy under Article III of the United States Constitution.

3.4    Personal jurisdiction and venue are proper pursuant to 18 U.S.C. sections 1965(a)

and (b) (RICO Nationwide Service of Process) and 28 U.S.C. section 1391(b)(2) (a substantial

part of property that is the subject of the action is situated in this District and Division).

### IV.    FACTS RELEVANT TO UNLAWFUL SCHEME ENCOMPASSING RICO PREDICATE ACTS, RICO VIOLATIONS, AND STATE STATUTORY AND COMMON LAW CLAIMS

A.    Summary of Relevant Facts Regarding the Unlawful Scheme

4.1    This case is the culmination of an unlawful scheme, pattern and practice devised,

organized, managed, contributed to, facilitated and directed by Delaney, Botero, Iragorri,

Guiduzzi, Frattini, Caro, Pueche and the Entity Defendants, by each of them and as Defendants

co-conspirators, and carried out beginning in the spring of 2008.  BCL discovered the scheme in

June 2014 through a conversation and meeting with one of the Defendants who confirmed that

the investment was lost and no re-payment, reimbursement, or benefit was to be paid BCL for its

investment and loans.  To the extent some or all claims are alleged to be barred by the statute of limitations, BCL asserts the injuries it sustained were inherently undiscoverable, meaning by their nature the injuries were unlikely to be discovered within the prescribed limitations period, despite due diligence, as more fully pled herein, and so BCL pleads application of the discovery rule as to those claims, as well as fraudulent concealment and the principles of equitable tolling, for the claims that are alleged to be barred by the statute of limitations.

4.2     The scheme, in its essential terms, consisted of the Defendants co-conspirators attracting equity investments and loans by BCL on the false pretense and express material misrepresentations and/or material omissions that the funds invested or loaned by BCL would be in turn invested, directly or indirectly, in the AstroWorld Property, so as to acquire and develop the same and resell it for monetary gain.

4.3     Defendants, alone and as co-conspirators, knew the true facts regarding the falsity of their representations, but kept those true facts from BCL, which exercised due diligence to learn the status of the investment, and the use of its loans, but Botero, Delaney, Iragorri, Guiduzzi, Frattini, Caro, Pueche and the Entity Defendants had actual knowledge of the falsity of their representations, concealed the wrong (here the status of prior investment by others in the AstroWorld Property, and its ownership) by making misrepresentations to BCL about that status, or remaining silent when they should have spoken, all with the fixed purpose of keeping from BCL knowledge of the true status of the AstroWorld Property ownership.  BCL reasonably relied on the material misrepresentations, or material omissions through silence, to believe the project was 90% subscribed by other investors, and that its investment had been used for the purposes represented, *i.e.*, to provide the last missing capital to acquire the AstroWorld Property and

23

develop it into EpiCentre Houston.  BCL, through the prompting of Defendants Guiduzzi, Frattini, Studio Frattini, Caro, Pueche, PLG and F&G, relied upon these material false statements and/or material omissions to support its earlier investment with further loans.

4.4     Contrary to these representations, the Defendants, individually and collectively, unlawfully converted, utilized, and spent the funds invested, and loaned, for their own purposes and their own benefit, such that BCL now, directly or indirectly, neither has the benefit of the funds nor the ownership of any portion of the AstroWorld Property, nor of any other property.

4.5     The unlawful scheme resulted in Defendants causing and deceiving BCL to invest and lend a total amount in excess of US$25,000,000, which injured it in its business or property, the damages flowing from which BCL now seeks to recover in this litigation, in addition to any interest, damages or other penalties to which it may be entitled.

B.     The Closure of AstroWorld and the Initial Sale of the Land

4.6     The AstroWorld amusement park closed on October 30, 2005.  On or around May 2006, the AstroWorld Property reportedly sold for approximately US$77,000,000 by its then-owner Six Flags Theme Parks, Inc., to Houston 8th Wonder Property, LP ("H8W").

C.     The Unlawful EpiCentre Development Scheme Begins

4.7     Beginning in June 2008, the Entity Defendants,  Botero, Delaney and Iragorri, and Pyle began promoting an investment scheme in which it was represented that EDA would acquire ownership of the AstroWorld Property for further development as "EpiCentre Houston," an ambitious mixed-use project of high density residential, retail, hotel, and event spaces, with mass transit tie-ins.

24

4.8     The Entity Defendants, and Pyle, Botero, Delaney, Iragorri, Caro and Pueche solicited investments and loans through Guiduzzi and Frattini from BCL by in-person meetings, emails and mail, Skype, other digital communications, and interstate and international telephone and eventually obtained from BCL an equity investment of US$11,000,000 plus loans of over US$14,000,000.

4.9     On June 30, 2008, Pyle, and following an introduction to Guiduzzi by Caro, and with the assistance of Pueche, provided a summary of the investment related to the AstroWorld Property to PLG, acting through Guiduzzi. From that point forward, Pyle, Botero, Delaney, Iragorri and Pueche provided F&G, Studio Frattini, Frattini, PLG, and Guiduzzi, with marketing materials, misinformation and propaganda related to the AstroWorld Property Investment scheme. F&G, Studio Frattini, Frattini, Caro, PLG and Guiduzzi then acted as a conduit of the misinformation to BCL and facilitated the fraudulent scheme.

4.10    From the beginning of the solicitation until BCL learned in June 2014 that it owned no interest in the AstroWorld Property and that none of its over US$25,000,000 investment remained, Delaney, Botero, Iragorri, Pueche, Guiduzzi, PLG, F&G, Studio Frattini, Frattini and the Entity Defendants misrepresented to BCL on multiple occasions that closings on the AstroWorld Property were imminent.

4.11    These closings, represented to be "certain," "guaranteed," or "99% prepared" to conclude, were repeatedly postponed and never realized.  Such misrepresentations were done in furtherance of the scheme with the purpose of inducing BCL into believing that its investments and loans would be utilized for actually closing on the AstroWorld Property.

4.12    Instead, while BCL was strung along and lulled into believing its investment and loans would be utilized for the purchase and development of the AstroWorld Property, the land was sold to entities in which BCL had no interest, until only a small parcel was purchased by EDA, then repeatedly mortgaged, then transferred by EDA to EDA II, mortgaged once more, and finally sold to another third party.  The nature and purpose of these sales, mortgages, and transfers were either withheld or obscured by Delaney, Botero, Iragorri, Pueche, Guiduzzi, PLG, F&G, Studio Frattini, Frattini and the Entity Defendants, so that BCL would not know of them, or of their true purpose to effectuate the scheme or artifice to defraud, and in any event BCL received no value from the sales, transfers or mortgages.

4.13    These lulling misrepresentations include, but are not limited to: an April 28, 2011 email from Delaney to Guiduzzi wherein Delaney purports that he can "confirm that we have many interested parties in the land for purchase, for development, for joint ventures and for investment." This communication was made to induce BCL's parent company to issue a bank letter of credit, and was instrumental in BCL's decision to loan $13.65 million to EDA; an August 3, 2011 EDA Status Report from Delaney stating "[a]s of July 26, 2011, EDA consummated agreements to purchase and sale for all the 104.2 acres of land that will become EpiCentre Houston…So now our task moves seamlessly to a new dynamic, that being one of sales while in a position of control;" and, a July 16, 2013, Status Report purporting to discuss the sale and development of 50 to 56 acres of the EpiCentre Houston property by EDA to identified third parties.

4.14    By employing this scheme, Botero, Delaney, Iragorri, Guiduzzi, Frattini, and Pueche, through EDA, obtained millions of dollars from BCL.  BCL never actually obtained any

interest in EDA, and EDA never acquired ownership, or even control of, the AstroWorld
Property, as was variously represented to BCL that it had done, or would do.

4.15    In July 2011, EDA acquired the 11 Acres, but within six months it mortgaged the
11 Acres twice, transferred it to a related entity, EDA II, which mortgaged it again and then sold
it to a third party.  The nature and purpose of these sales, mortgages, and transfers were either
withheld or obscured by Delaney, Botero, Iragorri, Pueche, Guiduzzi, PLG, F&G, Studio Frattini,
Frattini and the Entity Defendants, so that BCL would not know of them, or of their true purpose
to effectuate the scheme or artifice to defraud, and in any event BCL received no value from the
sales, transfers or mortgages.

4.16    Despite knowing the true facts, Botero, Delaney, and Iragorri through the
Defendant entities they controlled, using EDA as the enterprise, falsely represented to BCL via
"status reports" and other communication transmitted in-person and by email, mail and phone
and Skype, to Guiduzzi and Frattini, that EDA owned all or at least a part of AstroWorld
Property when in fact it did not have title to the land, and until June 2014 never admitted these
true facts.  Botero and Delaney made this representation of ownership on multiple occasions, and
specifically, but not limited to, on July 9, 2008; March 18, 2009; August 3, 2011; May 5, 2012;
and, July 16, 2013.  Such false representations through "status reports" and other
communications to BCL via email, phone, Skype and in-person false representations are
specifically pled below.

D.      The Initial US$11,000,000 Investment by BCL

4.17    On June 30, 2008, Pyle, first presented via email an "investment opportunity" to
Guiduzzi as director of PLG and F&G, but also as a director of BCL, *i.e.*, a chance to obtain a

"final 10%" of a "land break-up" for US$11,000,000. Guiduzzi and Frattini then misrepresented to BCL that the City of Houston would pay for "infrastructure costs" in order to see "this old theme park redeveloped."  In fact, the other 90% was not then, nor ever, funded. The intent was to obtain BCL's money.

4.18    On July 9, 2008, Guiduzzi forwarded BCL's questions related to the proposed investment to Pyle for response, including who the other investors were; who the Board of Directors would be; whether the company they were investing in was an LLC; whether the investment came with any warranties; whether there was a business plan; and, how the sale of the land was proceeding.  Pyle forwarded BCL's questions to Botero.

4.19    In a July 9, 2008, memo, Botero and Delaney acting on behalf of the Defendant entities they then controlled, used interstate communications and responded with further misrepresentations regarding the proposed investment, and represented that EDA was the "owner of the real estate" and that purchasing the last 10% interest in EDA would provide BCL a directorship position within EDA.

4.20    The misrepresentations continued on July 10, 2008, when Delaney acting on behalf of VPC, sent Guiduzzi, Pyle and Botero a Brochure, Sales Book, "Marketing Precis," "Inner Loop Sales Report," and a "Land Values Memo" to be forwarded to BCL regarding EDA and the proposed investment scheme and sales that could be anticipated when BCL entered the EpiCentre project.

4.21    On July 22, 2008, Botero, through Pueche, instructed Guiduzzi that BCL's investment should be wired to the account of Real P.A.  After a meeting with Botero and Delaney, and in reliance on their representations, BCL executed a "Capital Subscription

Agreement" ("Subscription Agreement") on July 23, 2008, and EDA, by Vantage Financial and

Vantage Plus, executed by its CEO Botero, accepted the investment, all as more fully alleged

herein.

      4.22    Based on the representations of Botero and Delaney, BCL then reasonably

believed that EDA would, as stated in the Subscription Agreement, use the invested funds to

"acquire title to the real estate formerly known as AstroWorld and to be known as EpiCentre

Houston, a 104.19 acre assemblage of land" in Houston, Texas.  BCL relied on these

representations, and the written agreement, to make its initial investment.

      4.23    On July 28, 2008, BCL wired US$11,000,000, pursuant to the Subscription

Agreement and at the direction of Botero and Pueche, to the trust account of Real, of Real, P.A.,

in Miami, Florida, and thus affected interstate (and indeed international) commerce.

      4.24    Botero, through EDA and Vantage Plus represented to BCL that its

US$11,000,000 investment would be used to purchase 10% of EDA, who was the "owner of the

real estate."  However, contrary to the misrepresentations published and transmitted to BCL, the

AstroWorld Property was owned entirely by H8W, a third party not named in this action.

      4.25    Following BCL's $11,000,000 initial investment, EDA, through its managing

entities and Defendants herein, Vantage Equity Holdings, LLC, and Vantage Realty Holdings

VI-X, LCC, entered into a contractual relationship and Operating Agreement with BCL on or

about August 1, 2008, to develop, in accordance to a "Master Plan" the "EpiCentre" property,

defined as "the 3 parcels of land aggregating 104.19 acres located in Houston, Texas at 9001

Kirby Drive."  In the Agreement, EDA represented to BCL that "EpiCentre [was] the primary

asset of EDA."

4.26     BCL's initial $11,000,000 investment was intended to purchase a 10% interest in EDA, which as noted, represented that "EpiCentre [was already] the primary asset of EDA." Nothing could have been further from the truth.  BCL's money was instead used to pay EDA's pre-existing debts unrelated to the development of the EpiCentre property, and to cancel an existing loan on the property, the existence of which was not disclosed to BCL until litigation commenced.  Indeed, EDA never acquired the AstroWorld Property.  Years later, in 2011, EDA acquired only the 11 Acres, which was then mortgaged repeatedly, and sold and unlawfully converted  "out from under" BCL, which now has lost its entire investment, which has not been repaid its loans, or interest, and owns no interest in any land related to the AstroWorld Property.

4.27     On August 21, 2008, EDA, acting through Vantage Realty, and Vantage Plus, by Delaney, entered into a Capital Subscription Agreement with H8W, and for $10,000,000 EDA acquired a 13.333% interest in H8W, the then-owner of the AstroWorld Property.  This interest was purchased using BCL's investment without its consent or knowledge and was hidden from BCL until after the initiation of litigation. As contractual managing members of EDA, Vantage Realty and Vantage Plus, its officers and managers owed BCL a duty to disclose this and other subsequent transactions that were purposely withheld, hidden or obscured from BCL.

4.28     BCL invested $11,000,000 for use only in relation to the acquisition of the AstroWorld Property, but only $10,000,000 was ostensibly so used.  The additional $1,000,000 of BCL's investment was misapplied and misappropriated by Real and Real, P.A., at the direction of Botero, Delaney, Iragorri, or the Vantage entities, specifically: On July 29, 2008, a $100,000 payment was made to "Southchase Dos," and a $50,000 payment was made to the law firm of Berger Singerman. On August 4, 2008, additional payments from the $11,000,000 investment

were made, specifically:  $50,000 to Jaime Pueche, a defendant in this action; $120,000 to TJ

Estavillo; and another payment to "Southchase Dos" for $50,000.  On August 12, 2008, a

$25,000 payment to Maryanne Rosenbaum was made; and on August 13, 2008, a $291,815

payment to Vantage Southchase was made. There was no legitimate, authorized, or appropriate

EDA-related business purpose for these payments made, and thus Defendants co-conspirators

Real and Real, P.A., at the direction of Botero, Delaney, Iragorri, or the Vantage entities,

misapplied and misappropriated these funds.

4.29    But on July 30, 2008, BCL, believing the investment would be used as

represented, inquired about the timeframe for the closing on the AstroWorld Property.  On

August 31, 2008, Delaney, knowing about the existence of the agreement with H8W, responded

that the closing was scheduled for October 1, 2008.  On October 6, 2008, Delaney, acting

through VPC, told Guiduzzi, acting through PLG, that: financing for the acquisition was in the

closing process with a scheduled closing date of October 15, 2008; that a majority of the equity

commitments were closed and funded; that he was in contact with developers with regard to

energy services and sanitary mains; and that he expected to start preliminary excavation in

November 2008.  Each of these statements was materially false, and were intended to convey the

impression that development activities were underway, when in fact this was not true.

4.30    After the October 1, 2008 closing date passed, Delaney advised Guiduzzi, acting

through PLG, that he was going to Houston for "pre-closing preparations" and that the deal was

expected to close on October 16, 2008. A week later, on October 24, 2008, Delaney again

announced another closing date to Guiduzzi, and stated that "we can be assured that the closing

will culminate by 10/31."

31

4.31     From November 3, 2008, to November 27, 2008, Guiduzzi acting through PLG followed up with Delaney acting through VPC at least three times to check on the status of the closing.  Each time, Delaney acting through VPC misrepresented that there were issues involved but that closing should occur in "a few days" and there was "some, albeit small, progress" occurring daily.  On November 27, 2008, Guiduzzi acting through PLG again followed up with Delaney acting through VPC because he had "been asked by [their] Italian investor what the situation [was] and this [was] the reason [for his] email."  Delaney acting through VPC misrepresented that the closing process was continuing but scheduled to conclude by December 5, 2008.  On December 1, 2008, Guiduzzi acting through PLG was informed by Pueche that they were at the end of the acquisition and that all were "happy and confident," and would be in touch.  On or about December 17, 2008, Delaney acting through VPC wrote to Guiduzzi acting through PLG, while copying Botero and Iragorri, explaining that closing was to begin December 18, 2008.  Each of these transmissions were reported to BCL by Guiduzzi acting through PLG, and each were false and intended to lull BCL into believing its investments and loans would be utilized for closing as represented, or that the investment and loans were otherwise placed with a viable development project that was progressing as represented.

4.32     The closing did not happen in 2008 and never happened for the entire property.

4.33     This pattern of Defendants misrepresenting closings were certain, then cancelling those closings, identifying new investors then alternatives to those investors when the original ones backed out, the need for funds in one amount then the need for funds in a different amount, continued throughout the duration of the AstroWorld investment scheme until BCL ultimately discovered the fraud perpetrated on it in June 2014.

4.34    Botero, Delaney, Iragorri, Guiduzzi, Frattini, Pueche through the use of the Entity Defendants were masters at "moving the finish line" when the end was almost in sight, all while making lulling and false representations of past and present material facts with actual awareness of their falsity, for the purposes of inducing BCL to make further loans to EDA, and to keep BCL from discovering the true facts, which were known to Botero, Delaney, Iragorri, Guiduzzi, Frattini, Pueche and relied on by BCL, which at all relevant times was unable to exercise diligence to determine the status of the AstroWorld Property investment due to the corruption and involvement of its directors in the AstroWorld Property investment scheme.

4.35    Following the initial failed closing in 2008, this pattern continued in 2009 during which BCL requested information, and Botero, Delaney, Iragorri, Guiduzzi, Frattini, Pueche and the Entity Defendants spun stories of potential new investors, failed closings, and phantom transactions.  For example, on February 26, 2009, Delaney acting at least for VPC emailed Botero and Iragorri, and later that day forwarded the same email to Guiduzzi acting through PLG, stating funding from another investor had not occurred despite assurances from them, and that this was delaying closing.  Delaney acting on behalf of EDA through VPC stated they had negotiated all involved to a better, less costly position by finding two other ways to fund the purchase and development of the project.   These representations were knowingly and materially false, and were intended to lull BCL into believing its investment was protected.

4.36    On March 12, 2009, Guiduzzi inquired as to the status of closing.  Delaney represented a closing had occurred with yet another investor in a temporary partnership whereby the funds acquired thus far had been invested into the partnership (one BCL had no knowledge of, and was not a party to).  Delaney assured Guiduzzi that no real time had been lost since the

market was poor and therefore costs would be lower. Delaney also stated he would continue to

negotiate with two other joint venture candidates.  Finally, Delaney referenced an additional loan

to "out the reserves in place now so as to maintain equilibrium for the lender," so that EDA could

"[b]e assured of closing out the temporary partnership . . . without any pressure from the lender."

All of these representations were knowingly and materially false, and were intended to lull BCL

and ultimately to induce BCL into providing additional capital.

4.37    On March 18, 2009, Botero and Delaney authored, and using interstate

communications, transmitted a status report stating EDA had closed on a portion of the land by

purchasing a minority ownership partnership and securing an option on the balance of the

partnership. They spoke of the need for a loan of $4,000,000 which they said was necessary to

"capture the discount" on the land they negotiated.  These fraudulent and false missives were

designed to induce BCL to part with more funds.

4.38    In fact, on April 3, 2009, Botero represented to Guiduzzi that closing was

scheduled for June 3, 2009, and again expressed the need for the $4,000,000 loan (later reduced

to $2,250,000) which he stated would be refunded at closing. Botero requested a short term

(75-day) loan from BCL and giving 4% of Vantages shares in the real estate project as collateral

(upon information and belief, these shares never existed). Guiduzzi –looking out for himself,

PLG, and F&G– bit.

4.39    On April 6, 2009, Guiduzzi told Botero he had found an investor to cover at least

€1,000,000 of the $2,250,000 needed, but that the potential investor had questions about the

investment.

34

4.40     Soon, the Guiduzzi and Frattini involvement became even more personal and conflicted with their fiduciary duties to BCL.  On July 7, 2009, BCL was compelled to enter into a consulting agreement with F&G, of which Guiduzzi, Frattini and Caro are principals, whereby F&G could receive compensation based on the value of BCL's investment in the AstroWorld property.  By entering into this agreement, F&G's compensation, and subsequently that of Guiduzzi, Frattini and Caro, became directly tied to the amount of money BCL and others invested in the scheme.

4.41     In addition to this consulting agreement, F&G, by signature of Guiduzzi, became party to an additional "Relationship Management Agreement" with Vantage Financial and EDA, through which F&G (and thus Frattini, Guiduzzi and Caro) would be compensated for bringing additional investors and capital into the EDA AstroWorld investment scheme, including BCL's own investment, thus further corrupting EDA by inducing Frattini, Guiduzzi and Caro to breach their fiduciary duties to BCL by incentivizing them to act contrary to BCL's interests, and for their own interests, and those of Botero, Delaney, Iragorri and Vantage Financial, at a minimum.

4.42     Not surprisingly, soon thereafter, on August 10, 2009, Guiduzzi acting through PLG, and Guiduzzi now also acting for and on behalf of F&G, asked Delaney whether a meeting in Houston or Miami with Guiduzzi, Delaney, Botero, and Frattini would be possible to review the investment situation.  Botero said a meeting was possible and the meeting was scheduled for September 23 through September 24, 2009, in Houston, Texas. The meeting in Houston with Botero, Delaney, Guiduzzi and Frattini took place on September 23, 2009, and September 24, 2009, in furtherance of the AstroWorld Property Investment scheme.

4.43    On November 3, 2009, Guiduzzi, acting in his many roles, again inquired into the status of closing, to which Delaney responded closing should occur in under 30 days. On December 18, 2009, Delaney informed Guiduzzi that progress was being made and they were getting closer.  On April 20, 2010, Guiduzzi inquired into the status of closing. Delaney informed Guiduzzi they were close to the final details of financing. On or around April 30, 2010, Guiduzzi again inquired into the status of closing. Delaney responded that they had reached a verbal agreement with a "gentleman in Madrid," a client of Pueche's, who would contribute real property to EDA, and that closing was now estimated to be 30 to 45 days from May 5, 2010.

4.44    However, on or about May 2010, Delaney, acting on behalf of EDA, Vantage Realty and Vantage Financial executed a certificate of consent to permit H8W to sell the entire 104 acre tract of land to MHB Asset, LP ("MHB") for $74 million.  By consenting to H8W's sale of the property, EDA lost any interest it, and thus any interest BCL may have had in the property. No proceeds from this sale were received by BCL, and the effect and consequences of this sale were never fully disclosed to BCL.

4.45    Despite knowing otherwise, Botero, Delaney, Iragorri, through the use of the Entity Defendants, continued to report that the acquisition of the AstroWorld Property was always soon to conclude.  These misrepresentations were intended to lull BCL into believing its investment was working and protected, to prevent BCL from discovering the loss of its initial investment and ultimately in order to solicit additional funds.

36

E.      The €300,000 Loan by BCL

4.46     In early 2010, Botero, Delaney, Iragorri, Guiduzzi individually and through  the

Entity Defendants continued to report that they were pushing for closings, but still those never

occurred.

4.47     On May 26, 2010, Guiduzzi, Delaney, Botero, and Frattini participated in a

conference call in which they discussed the status of the investments. Guiduzzi, acting in his

many roles, emailed Delaney and Botero later to summarize the call. In his email, Guiduzzi

explained that he would "do his best" to promote transactions they discussed "wherever possible

in order to start marketing the land as soon as possible."  Guiduzzi requested monthly conference

calls to discuss the status of investments they were all participating in.

4.48     On July 1, 2010, Guiduzzi acting individually and on behalf of PLG and F&G

emailed Botero to inform him BCL would consider loaning more money to the project.  On

March 24, 2011, a meeting of the Board of Directors for EDA took place in Miami, with  Botero,

Guiduzzi, Iragorri, Delaney, and Frattini attending and participating. At the meeting they

discussed the status of the investment and issues regarding future development of the land in

Houston.  But now, Botero, Delaney, Iragorri, Guiduzzi, Frattini, Studio Frattini, and the Entity

Defendants "upped the ante" and began to make material misrepresentations both to BCL, with

knowledge of their falsity, and also to BCL's external auditors, who were beginning their audit

process for the year 2009.

4.49     Nearly two years after the initial investment, and despite receipt of BCL's

investment, Delaney represented to BCL in an email on February 1, 2010, that EDA had no

37

"income or expenses of the ordinary kind," would not be filing any US tax returns, and that there was no need for EDA to go to the expense of an external audit.

4.50    Ten days later, on February 11, 2010, Delaney further reported via email to Norman Pursglove, BCL's external auditor in the United Kingdom, that EDA has never been independently valued, but in EDA's opinion of itself, it had a value greater than it did at the time of BCL's investment because EDA had received more capital, increased its assets, and had incurred only limited debt.

4.51    Despite the ongoing misrepresentations to BCL and its auditors of receipt of additional capital, an increase in assets, and progress towards pending closing dates that never came, on May 21, 2010, H8W, with the knowledge and participation of EDA, sold the AstroWorld Property to MHB not a party to this action.   As managing members of EDA, Vantage Realty, Vantage Equity, its officers and mangers all owed a duty to BCL to disclose this information, but failed to do so.

4.52    The sale of the AstroWorld Property to MHB did not deter Defendants co-conspirators Botero, Delaney, Iragorri and the Entity Defendants from their fraudulent scheme.  On May 27, 2010, in a memorandum from EDA and Vantage Financial to BCL, each of EDA and Vantage Financial again represented to BCL that EDA was "poised to take over control and then ownership" of the AstroWorld Property.

4.53    EDA had supposedly negotiated a contract to take over the AstroWorld Property that would require them to come up with $1,500,000 which would enable EDA to control the acquisition of the land until closing.

38

4.54    On July 1, 2010, unknown to BCL and without its consent, Defendants co-conspirators Guiduzzi, PLG, Frattini, Studio Frattini and F&G began a separate scheme on their own to continue funding EDA with BCL's money but without BCL's knowledge or consent.

4.55    Defendants co-conspirators Guiduzzi's and Frattini's separate scheme was aided by the ongoing acts of Defendants co-conspirators Botero, Delaney, Iragorri, Pueche and the Entity Defendants, through a pattern of racketeering activity, specifically mail and wire fraud and other RICO predicate acts as more specifically pled herein. The scheme was intended to injure BCL, and Defendants co-conspirators Guiduzzi and Frattini, acting on their own behalves and for their own interests, agreed to loan EDA €300,000, to fund part of the $1,500,000 allegedly needed by EDA for operating expenses.

4.56    Defendants co-conspirators Botero, Delaney, Iragorri and the Entity Defendants accepted the €300,000 loan, and agreed to treat the funds as a loan to EDA and to Vantage Financial, jointly and severally.

4.57    On July 21, 2010, €200,000 was wired from BCL's account in the United Kingdom to Vantage Financial's bank in Ft. Lauderdale, Florida.

4.58    On July 21, 2010, Delaney was forwarded confirmation of the payment to Vantage Financial.

4.59    On September 8, 2010, Guiduzzi and Frattini, acting through F&G and PLG, and on behalf of BCL, using electronic mediums of communication, requested that Delaney issue documentation from EDA for BCL's auditors, stating that no loss in investment had occurred. Of course there had been a loss, so Guiduzzi and Frattini caused knowingly false representations to be prepared and directed to BCL's auditors, which representations were intended to prevent

discovery of the scheme being perpetrated on BCL by Delaney, Botero, Frattini, Guiduzzi, and the Entity Defendants.

4.60    On September 14, 2010, Frattini used interstate communications to provide a letter on Studio Frattini letterhead with a F&G signature block wherein he made representations to BCL's auditors that "the American company we have invested in, is regularly dealing with the development in Houston according to our expectations. Consequently there is no loss in value for our investment in Houston."  This was false.

4.61    In October 2012, an additional advance of BCL's money in the amount of €100,000 was made by Guiduzzi, acting on his own behalf.  This brought the total loan up to €300,000.  An additional promissory note, this time for the entire €300,000 investment, stated in Pounds, was later entered into, and remade, as further alleged herein.

4.62    Shortly after EDA received the €300,000 in total from BCL, Delaney continued to report on potential investment opportunities and offers. A multitude of investors were again referred to, all of whom Delaney represented were close to committing to invest within a short time. Again, none of these closings ever occurred.

F.    The $13,650,000 Loan by BCL

4.63    In early 2011, co-conspirators Botero, Delaney and Iragorri, all by and through the Entity Defendants, as well as Frattini, Guiduzzi, F&G, and PLG, devised another scheme to receive funds from BCL by again falsely representing that they had the intention to acquire ownership of the AstroWorld Property and develop it.

4.64    On March 24, 2011, when EDA still did not have control of the AstroWorld Property, Defendants co-conspirators Guiduzzi, Frattini, Botero, Delaney and Iragorri all met in

40

Miami, Florida, for an EDA Board of Directors meeting to address possible solutions to the acquisition of, or control of, the AstroWorld Property.

4.65    At this meeting, Defendants co-conspirators Botero and Delaney represented that a purported Mexican lender had lost its credibility and it was unlikely that they would be able to provide financing (although this was the same lender that Delaney had previously represented to be "99% prepared" to execute the documents required to close).

4.66    At this meeting, the participants discussed other potential investors. Defendants co-conspirators Botero and Delaney represented that International Bank of Commerce ("IBC") would give EDA more time to fund its acquisition because of EDA's good relationship with IBC. This good relationship was reportedly based upon EDA's previous cooperation with IBC that allowed IBC to restructure their loan and avoid adverse action by the federal bank regulators.

4.67    EDA's board noted that the federal regulators were going to make their annual loan review on April 28, 2011, and that any financial terms would need to be presented to them before that date.

4.68    In the early summer of 2011, Defendants co-conspirators Botero, Delaney, Iragorri, and the Entity Defendants finally, but wrongfully, represented to BCL that EDA had acquired the AstroWorld Property.

4.69    But now, in order to urbanize the land and proceed with development, Defendants co-conspirators Botero, Delaney, Iragorri, and the Entity Defendants falsely represented EDA would need at least $10,000,000, in addition to other operating funds, in order finally to move forward with the EpiCentre development on the AstroWorld Property.  When Defendants co-conspirators Botero, Delaney, Iragorri and the Entity Defendants made this representation to

BCL, it intended the wires would be used to transfer any funds resulting from this request, from BCL's account to EDA.

4.70   At the March 28, 2011 EDA Directors' Meeting, Frattini suggested that a bank letter of credit be issued whereby additional funding could be secured in furtherance of the scheme. On this same date, however, Frattini and Guiduzzi communicated via email and acknowledged that the only money invested in EDA in connection with the AstroWorld property scheme was BCL's $11,000,000 investment. Nonetheless Frattini and Guiduzzi continued to solicit funds from BCL to fund the scheme.

4.71   On April 7, 2011, while still attempting to obtain a letter of credit, Guiduzzi at the direction of Frattini, acting by and through PLG and F&G, respectively, used interstate communications to discuss the letter with Delaney. Delaney directed Frattini should not mention any specific amounts for letters of credit when speaking to BCL's parent company.  Delaney further represented that by obtaining letter of credit or other loan from, by or through BCL, that EDA would achieve control immediately, and then ownership of the AstroWorld Property in less than 3 months, but also represented sales of parcels would also be completed as part of this ownership.   These representations were knowingly false when made, as EDA never sold any parcels as it had none to sell, nor did it acquire ownership in the time stated, or at all, as it was represented that it would.

4.72    BCL, relying on these misrepresentations, made by Delaney with knowledge of the falsity of the representations, agreed to lend $13,650,000 to EDA.

4.73     BCL, relying on these misrepresentations, presented by Delaney through Vantage Financial, Frattini and Guiduzzi acting by and through PLG and F&G, and with knowledge of the falsity of the representations, agreed to lend $13,650,000 to EDA.

4.74     These loans, obtained from BCL through false and deceptive means and misrepresentations, were made in two tranches.  First, on July 11, 2011, BCL wired US$13,300,000 from its account in the United Kingdom to Fidelity National Title Company ("Fidelity") in Houston, Texas, on behalf of EDA, and pursuant to an escrow agreement.

4.75     Second, on July 12, 2011, BCL wired an additional US$350,000 from its account in the United Kingdom to EDA at Fidelity in Houston, Texas, and pursuant to an escrow agreement.

4.76     Following receipt of the two wires totaling US$13,650,000, an employee of Fidelity asked co-conspirator Guiduzzi to confirm that US$50,000 will be distributed to EDA in accordance with the escrow agreement, ostensibly to cover the "formation of the escrow agreement, the agreement of purchase and sale, the surveys required of the land and the environmental assessment of the land."

4.77     Co-conspirator Delaney later represented to BCL in a spreadsheet prepared for BCL to show expenditures of EDA against capital and loans, that $13,911,036 had been spent on "Site Work-Infrastructure," when in fact it was not true, as, on information and belief, no "site work" was ever done, and no "infrastructure" was ever developed for property, the vast majority of which EDA never owned.

4.78    However, following receipt of these two wires totaling US$13,650,000, on July 27, 2011, EDA purchased the 11 Acres from MHB, the same entity to which EDA, through H8W had sold the entire tract on May 2010.

4.79    Of the US$13,650,000 loaned to EDA by BCL, some was used to acquire the 11 Acres, but $610,181.92 were misapplied and misappropriated as follows: a $50,000 bank wire was made to Vantage Financial Services on July 12, 2011, followed by a bank wire to Vantage Financial Services totaling $568,181.92 on July 27, 2011.

4.80    There was no legitimate purpose or reason for the transfer of these funds to Vantage Financial Services.

4.81    On July 28, 2011, EDA, by Vantage Financial its co-manager, by Delaney, its co-manager, all as Borrower, and BCL, as Lender, entered into a Promissory Note for US$13,650,000.  The maturity date contained in the Promissory Note was the earliest of the "stated maturity date" or the date upon which the lender elected to accelerate the indebtedness. The stated maturity date on the loan was stated as 365 days from the date the funds were advanced to Borrower, which was July 28, 2011, so the Promissory Note became due on or about July 27, 2012.

4.82    EDA and BCL also entered into a Credit Facility Agreement. The Agreement stated that "Repayment of the Credit Facility is scheduled for one (1) year from issuance and partial payments shall be made in the interim as a high priority use of funds available to the Company whether from equity capital contributions, secured debt or from sales proceeds."

44

4.83    The Agreement was signed on July 28, 2011, by co-conspirator Delaney on behalf of EDA and also by co-conspirator Guiduzzi on behalf of BCL. None of the funds so loaned, nor any interest, were ever paid back, on the July 28, 2012, maturity date, or at any other time.

4.84    Despite purchasing only the 11 Acres, on August 3, 2011, Defendants co-conspirators Botero, Delaney and Iragorri, represented to BCL not that EDA had purchased the 11 Acres, but rather that EDA had in fact consummated agreements of the purchase and sale "for all of the 104.2 acres of land that will become EpiCentre Houston."

4.85    As of December 2011, co-conspirator Delaney again represented to BCL that EDA was "in complete control" of all of the land, and in fact questioned the honesty of a real estate broker who had discovered MHB was the record title owner, in an email to Guiduzzi.

G.    Further Attempts to Coerce and Obtain Additional Funds from BCL

4.86    Following the $13.65 million loan, on September 21, 2011, Guiduzzi, acting through F&G, used interstate communications purporting to increase the fees F&G would charge in connection with its services to the Astroworld property investment.

4.87    On May 5, 2012, EDA's officers used interstate communications to issue a project status report wherein they affirmed the "Company consummated a new purchase and sale agreement with MHB Asset LP to acquire the entire balance of the Astroworld/EpiCentre real estate. Closing is set for on or before July 12, 2012." The report went on to list ten "capitalization and site sales opportunities" for the property.

4.88    On May 8, 2012, Delaney, acting with and on behalf of Frattini, used interstate communications to provide a report, on Studio Frattini letterhead, to BCL's principal wherein the principal was provided with misrepresentations intended to induce a belief EDA's plans for

EpiCentre were going according to schedule. These representations were made with the intent that BCL act upon them with the purpose of continuing to invest additional funds and/or not discover the truth behind Defendants' investment scheme.

4.89    On July 26, 2012, Iragorri used interstate communications to transmit a letter directed at Guiduzzi wherein he requested additional money for "the last round of funding necessary for the success of the entire project," adding that "[t]his will finally allow us to have the entire authority and ownership of the 104 acres" and that "I find it very difficult for anyone other than Mr. Robuschi, to act as expeditiously as required regarding this matter."

4.90    On September 26, 2012, Guiduzzi in concert with Delaney, agreed to create an invoice totaling €100,000 that would be passed onto BCL. Additionally Guiduzzi requested €145,000 for "professional services rendered in connection to the transaction in Houston where the company has an interest in the American company (attending meetings in Houston, Miami, Dallas in 2012 with the project leader company as well as banks and other entities)."

4.91    On October 23, 2012, Frattini used interstate communication to provide Guiduzzi blank letterhead for Siusi, S.p.A., BCL's parent company ("Siusi"), for further use in providing false information to a U.S. bank in Houston, Texas as well as to representatives of MHB.

4.92    After receiving the letter, Guiduzzi used interstate communications to provide the letter to Delaney, Delaney used interstate communications to provide suggested language to be included in the letter.  Delaney, Guiduzzi, and Frattini exchanged numerous interstate communications to ultimately craft a false letter purportedly authored by BCL's parent company pledging an intercompany loan to BCL for €40,000,000.  The letter was a forgery and its contents were false.

46

4.93     Despite knowing the falsity of its contents, Frattini used interstate communications with Guiduzzi and Delaney regarding the letter purportedly signed by the Chairman of BCL's parent company.  Guiduzzi in turn used interstate communications to transmit this letter to Delaney who also used interstate communications to distribute the letter to a U.S. bank. This letter was authored and disseminated in furtherance of the AstroWorld Property Investment scheme.

4.94     On October 31, 2012, Frattini used interstate communications to send to Guiduzzi an email containing false information about a bank meeting in Italy that never occurred, intended to be relayed to recipients in Houston and Ft. Worth, Texas, in connection with EDA's attempts to purchase additional AstroWorld property.

4.95     Highlighting its falsity, Guiduzzi used interstate communications to provide the email to Delaney, noting "Andrea [Frattini] told me that this version is very believable." Delaney in turn revised the letter, and, using interstate communications, returned the letter to Guiduzzi so Guiduzzi could provide to recipients in Houston and Ft. Worth, Texas.  This email, containing known and false representations was authored and disseminated in furtherance of the AstroWorld investment scheme.

4.96     Frattini, Delaney, and Guiduzzi additionally agreed, without the legitimate knowledge or consent of BCL, to mortgage the 11 Acres in order to obtain more of BCL's money and property.  On September 28, 2012, Guiduzzi used interstate communications to inform Delaney that Frattini was "happy" to "increase the mortgage on our land" in order to obtain more funding.

4.97     On November 4, 2012, Delaney, Guiduzzi, and Frattini used interstate communications to discuss obtaining a loan from a private lender for the 11 Acres.  Again on November 15, 2012, discussion of a $2 million loan on the 11 acres was discussed, using interstate communications, between Guiduzzi and Delaney. These mortgages and proposed loans were done in furtherance on the AstroWorld investment scheme and would ultimately be done to the detriment of BCL.

4.98     On January 16, 2013, Frattini provided a report to BCL's parent company, advising EDA had finalized the development of portions of the EpiCentre project, and further assured BCL's parent company that the value of its investment and loans in the project, through BCL and into EDA, was protected and intact.  These representations were false, and Frattini knew them to be false when made, and he intended to lull BCL's parent into believing BCL's investment was protected, and to further forestall discovery of the loss of investment and the complicity of Botero, Delaney, Iragorri, Guiduzzi, and Frattini, in that loss.

4.99     On February 7, 2013, Defendant co-conspirator Guiduzzi acting in concert with Defendants co-conspirators Delaney and Frattini, used interstate communications to falsify invoices to procure payment totaling €100,000, for presentation to BCL. In this communication Guiduzzi specifically asks that the invoice be from an entity "but not EDA" that "charges B Choice and as before B Choice charge[s] Siusi." When the invoice was received by BCL for payment "per agreement," BCL's agents responsible for payment questioned Guiduzzi about the nature of these payments who responded "there is no agreement in place" but "Frattini…has already spoken to the client and this expense has been approved."

48

4.100   The contents of the email and the invoice were false and Frattini, Guiduzzi and Delaney knew they were false when made and the expense had not been approved. The purpose of the statements was to continue to mislead and misrepresent material facts to BCL as to the status of its investment and loans, and the activities of Defendants co-conspirators.

4.101   On May 14, 2014, Frattini provided a further report to BCL's parent company, and with knowledge of the falsity of his statements, described a positive outlook for the AstroWorld Property Investment, and represented that urbanization was ongoing.   These representations were false and Frattini knew they were false when he provided them, and he intended by them to lull BCL's parent into believing BCL's investment was protected, and to further forestall discovery of the loss of investment and the complicity of Botero, Delaney, Iragorri, Guiduzzi, and Frattini, in that loss.

> H.   Syphoning Funds–Loans taken against the 11 Acres, and the Transfer of the 11 Acres to EDA II in Furtherance of the Defendants Co-Conspirators Scheme to Unlawfully Convert BCL's Money and Property

4.102   After purchasing the 11 Acres, EDA mortgaged the 11 Acres twice for over $3,500,000.  These loans were not included in status reports and BCL was not made fully aware that the 11 Acres were actually encumbered or the amounts of the mortgages, or the ultimate reasons for those mortgages.  None of the funds so borrowed were used for the benefit of BCL.

4.103   On information and belief, Botero gave the direction to keep the fact of the loans and the amounts out of status reports to BCL, in order to keep these facts hidden from BCL.

4.104   The first loan occurred on January 23, 2012, when EDA secured a loan for US$1,019,093 against the 11 Acres.

49

4.105   The second loan occurred on March 26, 2012, when EDA secured a loan for US$2,550,000 against the 11 Acres.

4.106   While the mortgages were being made, Defendants co-conspirators Botero, Delaney and Iragorri, acting through yet another entity, "EpiCentre Houston Land Company" ("EHLC"), engaged in negotiations with a principal of MHB, Michael Mallick ("Mallick"), to attempt the purchase of an additional 48 acres of the AstroWorld Property.  However, EHLC was unable to raise the capital to fund this acquisition.

4.107   On November 29, 2012, Defendants co-conspirators Botero, Delaney and Iragorri formed EDA II.  The next day, on November 30, 2012, Mallick informed EHLC that because EHLC were unable to fund the closing of the 48 acres, Mallick was unable and unwilling to continue any negotiations with EHLC.  Mallick further requested on December 4, 2012, that any party related to Delaney cease communication regarding the AstroWorld Property to avoid interference with MHB's binding agreement with an unrelated purchaser.

4.108   Then, on December 4, 2012, and without informing BCL or obtaining its consent, EDA transferred and converted the 11 Acres to EDA II. This transaction was not reported to BCL in any status reports.

4.109   Also on December 4, 2012, EDA II, at the direction of co-conspirator Botero, secured the third and final loan against the 11 Acres for US$4,750,000.  None of the funds so borrowed were used for the benefit of BCL.

4.110   Thus, in December 2012, EDA had mortgaged the property twice, and sold it to an entity related to EDA, but without BCL's knowledge and consent, thus essentially selling and converting the 11 Acres "out from under" BCL.

4.111   On March 18, 2013, EDA II, in furtherance of the Defendants co-conspirators' unlawful conversion scheme sold and converted the 11 Acres to a third party not named in this action.  None of the funds obtained from said sale were used for the benefit of BCL.  BCL now had nothing. BCL was never told of the mortgages on the 11 Acres, or of the sale from EDA to EDA II, or the sale by EDA II to a third party.

4.112   Now that once again there was no money and no land, Delaney and Botero continued to hide or misrepresent the true facts in their ongoing status reports.  On May 31, 2013, in minutes from a board meeting sent by email to BCL, Delaney still referred to the 11 Acres as the "portion we already own."

> I.       The End Result: No Money, No Land

4.113   On June 4, 2014, co-conspirator Delaney agreed to meet and met with representatives of BCL in Houston.  At that meeting, Delaney admitted there was no longer any money remaining of the BCL investment or loans, and that EDA no longer had any ownership interest in any property, in part because of, according to Delaney, co-conspirator Botero's mismanagement.

> V.    **CLAIMS FOR RELIEF**

> > A.    First Cause of Action:  Violation of the Racketeer Influenced Corrupt Organizations Act, Pub.L. 91-452, Title IX, 84 Stat. 941, *as amended*, 18 U.S.C. §§ 1961 *et seq*.

> > > 1. Count One: Violation of 18 U.S.C. § 1962(c)

5.1     BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.2     RICO violation 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

5.3     The relevant time period for Defendants' unlawful scheme and pattern of unlawful activity stems from at least 2008 to June 4, 2014.  Despite due diligence on BCL's part, BCL did not discover the unlawful scheme and its injury and claim resulting from Defendants' RICO pattern of unlawful activity and RICO violations until at least June 4, 2014.  The conspiracy by the Defendants to deny and cover-up the true nature and agreement to the objectives of the unlawful scheme nevertheless continues.

5.4     Defendants are, and at all times relevant to this action, were RICO "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

a.      The RICO Persons

5.5     RICO Persons Alianza Financial, Alianza Holdings, Vanguard, Vanguard Equity, Vantage Financial, VPC, VPDC, Vantage Realty, PLG, F&G, Studio Frattini and Real, P.A., are all co-conspirator entities capable of holding a legal or beneficial interest in property.

5.6     RICO Persons Botero, Delaney, Iragorri, Guiduzzi, Frattini, Caro, Pueche, and Real are all co-conspirator individuals capable of holding a legal or beneficial interest in property.

5.7     RICO Persons, co-conspirators Alianza Financial, Alianza Holdings, Vanguard, Vanguard Equity, Vantage Financial, VPC, VPDC, Vantage Realty, Botero, Delaney, Iragorri,

52

Guiduzzi, Frattini, Caro, Pueche, PLG, F&G, Studio Frattini, Real, and Real P.A., are collectively referred to as the "RICO Persons," or each a "RICO Person," or "Defendants co-conspirators."

5.8     The RICO Persons have each violated 18 U.S.C. section §§ 1962 and 1962(d), and by reason of their violations, BCL has been injured in its property.

5.9     RICO Persons Botero, Delaney, Iragorri, Guiduzzi, Frattini, Caro, Pueche, PLG, F&G, Studio Frattini, Alianza Financial, Alianza Holdings, Vanguard, Vanguard Equity, Vantage Financial, VPC, VPDC, and Vantage Realty, as persons within the meaning of 18 U.S.C. section 1961(3), and as persons associated with the enterprise, have conducted, or participated in the conduct of the enterprise, through a pattern of racketeering activity, as pled herein, which enterprise(s) at all relevant times engaged in, and affected, both interstate and foreign commerce, all in violation of 18 U.S.C. section 1962(c).

5.10    RICO Persons Botero, Delaney, Iragorri, Guiduzzi, Frattini, Caro, Pueche, PLG, F&G, Studio Frattini, Real, Alianza Financial, Alianza Holdings, Vanguard, Vanguard Equity, Vantage Financial, VPC, VPDC, Vantage Realty, and Real, P.A., as pled herein, have conspired to violate 18 U.S.C. section 1962(c), in violation of 18 U.S.C. 1962(d).

b.      The Section 1962(c) RICO Enterprise(s)

5.11    The Section 1962(c) Enterprises consist of a Primary Enterprise and Alternative Section 1962(c) Enterprises.

5.12    The Primary Section 1962(c) Enterprise for RICO COUNT ONE is comprised of EDA.  EDA was engaged in interstate and foreign commerce.  EDA was formed by Defendant co-conspirator Botero, and its legitimate purpose was to acquire ownership in the AstroWorld

Property, in part using the investment and loans of BCL.  EDA has an ascertainable structure, and at all relevant times operated as a continuing unit.

5.13    Prior to its formation as a Texas limited liability company, EDA was operated as an unincorporated enterprise and association by Defendants Botero, Delaney, and Iragorri, operating and promoting a generic "Epicentre Houston" investment.  All references herein to EDA as to BCL's RICO allegations are to EDA as an enterprise, whether incorporated, formed, organized, or not.  The individual Defendants and Entity Defendants acted in concert as Defendants co-conspirators to fraudulently induce BCL to invest and loan funds to or on behalf of EDA.

5.14    EDA, through Defendant EDA II, in fact did acquire, for a short time, an interest in the 11 Acres, those being a small portion of the AstroWorld Property, although it was represented to BCL by Defendants co-conspirators Botero, Delaney and Iragorri to have acquired the entirety of the AstroWorld Property.  Despite being promised 10% of the ownership interest of EDA, BCL received nothing from the loans or sale of the property by EDA.

5.15    On information and belief, Defendants co-conspirators Botero and Delaney are at the top of the command structure, and had a regularized manner of dealing with BCL and on behalf of EDA, either themselves, or through the other RICO co-defendants "person[s]" that committed substantive RICO § 1962(c) RICO violations.

5.16    EDA, as alleged above, is a Texas limited liability company, and is entirely separate and distinct from the RICO Defendants.

5.17    The Defendants "person[s]" unlawfully conducted and participated in the conduct, the management and the operation of the EDA Primary Section 1962(c) Enterprise's affairs,

54

directly or indirectly, through a pattern of unlawful activity in violation of 18 U.S.C. § 1962(c).

Defendants engaged in such unlawful conduct by using the Enterprise to conduct lawful activities

as well as to further their unlawful scheme to defraud BCL by unlawfully obtaining BCL's money

and property under false pretenses and by unlawfully converting BCL's money and property.

5.18    Similarly, under the Count Two RICO Section 1962(c) conspiracy claim, the

Defendants co-conspirators conspired to conduct and participate in the conduct, the management

and the operation of the EDA Primary Section 1962(c) Enterprise and the EDA and EDA II

Alternative Section 1962(c) Association-in-Fact Enterprise's affairs, directly or indirectly,

through a pattern of unlawful activity in violation of 18 U.S.C. § 1962(d).  Defendants engaged

in such unlawful conspiratorial conduct in violation of RICO to further their unlawful scheme to

defraud and injure BCL by unlawfully obtaining BCL's money and property and by unlawfully

converting BCL's money and property.

5.19    The alternative Section 1962(c) enterprise for Count One is the EDA and EDA II

Alternative Section 1962(c) Association-in-Fact Enterprise that is comprised of  EDA and EDA

II.  Under this alternative enterprise, EDA II is not a defendant as it is under the Count One EDA

Primary Section 1962(c) Enterprise.

5.20    EDA and EDA II were formed by Defendant co-conspirator Botero, and the

association-in-fact enterprise's legitimate purpose was to acquire ownership in the AstroWorld

Property, in part using the investment and loans of BCL.  The EDA and EDA II Alternative

Section 1962(c) Association-in-Fact Enterprise has an ascertainable structure and at all relevant

times operated as a continuing unit.

5.21    EDA, through EDA II, in fact did acquire, for a short time, an interest in the 11 Acres, those being a small portion of the AstroWorld Property, although it was represented to BCL by Defendants co-conspirators Botero, Delaney and Iragorri to have acquired the entirety of the AstroWorld Property.  Despite being promised 10% of the ownership interest of EDA, BCL received nothing from the loans or sale of the property by EDA and EDA II.

5.22    On information and belief, Defendants co-conspirators Botero and Delaney are at the top of the  alternative enterprise's command structure, and had a regularized manner of dealing with BCL and on behalf of EDA and EDA II, either themselves, or through the other RICO Defendants co-conspirators "person[s]" that committed substantive § 1962(c) RICO violations.

5.23    EDA and EDA II, as alleged above, are Texas limited liability companies, and they are entirely separate and distinct from the RICO Defendants.

5.24    The Defendants "person[s]" unlawfully conducted and participated in the conduct, the management and the operation of the EDA and EDA II Alternative Section 1962(c) Association-in-Fact Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity in violation of § 1962(c).  Defendants engaged in such unlawful conduct by using the association-in-fact enterprise to conduct lawful activities as well as to further their unlawful scheme to defraud BCL of money and property and by unlawfully converting BCL's money and property.

c.    The RICO Predicate Acts

(1)  Mail and Wire Fraud

5.25    For the purpose of devising or intending to devise and carry out their scheme and artifice to defraud BCL by means of false and fraudulent pretenses, representations and promises or fraudulent acts, Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited with private commercial interstate carriers and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters for the purpose of executing their scheme, in violation of 18 U.S.C. § 1341.

5.26    For the purpose of devising or intending to devise and carry out their schemes and artifice to defraud BCL by means of false and fraudulent pretenses, representations and promises or fraudulent acts, Defendants caused to be transmitted by means of wire communication in interstate commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or facsimiles, telephone calls or any other forms of communications or information transmitted by wire in violation of 18 U.S.C. § 1343.

5.27    RICO Defendants co-conspirators participated in a plan, scheme or artifice to defraud BCL, and with intent to so defraud, and used or caused the mails or the wires to be foreseeably used to implement that scheme.

5.28    As alleged more fully above, RICO Defendants co-conspirators effectuated the plan, scheme or artifice to defraud by making misrepresentations and/or omissions of material fact, with reasonable foreseeability that the mail or wires will or would be used, and there was actual use of the mail or wires to further this scheme, all for the purposes of influencing BCL to act.

5.29    In making each of the material misrepresentations and/or material omissions sent by the mail or wires, or caused to be sent by the mail or wires, each of the RICO Defendants co-conspirators knew or believed the misrepresentations to be untrue, as it in fact was, and BCL believed and relied on the misrepresentation.

5.30    Examples of these predicate acts of mail and wire fraud include, but are not limited to, the mails and wires set out below.  Upon information and belief, BCL will continue to identify numerous other predicate acts of mail and wire fraud –now known only to Defendants who have proof of them in their possession– in the discovery process:

    a.    Multiple uses of the mails and wires with material misrepresentations and/or material omissions by the Defendants co-conspirators to lull BCL into believing the Defendants would be closing on the AstroWorld Property with BCL's loans and investments and providing BCL its rightful interest in the property in furtherance of Defendants' fraudulent scheme to unlawfully obtain BCL's money and property and unlawfully convert BCL's money and property.

    b.    Multiple uses of the mails and wires by the Defendants co-conspirators with material representations and/or material omissions, including status reports and other communications to lull BCL into believing the Defendants had already secured ownership of all the approximately 104 acres of the AstroWorld Property or part of the property in furtherance of Defendants' fraudulent scheme to unlawfully obtain BCL's money and property and unlawfully convert BCL's money and property;

    c.    Multiple uses of the mails and wires by the Defendants co-conspirators with material misrepresentations and/or omissions regarding ownership of at least 11 acres of the AstroWorld Property when in fact the Defendant co-conspirators had already converted the 11 acres to their own benefit in furtherance of Defendants' fraudulent scheme to unlawfully obtain BCL's money and property and unlawfully convert BCL's money and property  ;

    d.    Multiple uses of the mails and wires with material misrepresentations that the Defendants co-conspirators were still involved to attempting to close on the AstroWorld Property when the property had already been sold to a third party in furtherance of Defendants' fraudulent scheme to unlawfully

obtain BCL's money and property and unlawfully convert BCL's money and property;

e.   Multiple foreseeable uses of the mails and wires in furtherance of Defendants' fraudulent scheme to unlawfully obtain BCL's money and property and unlawfully convert BCL's money and property;

f.   Particular examples of mail fraud, alleged more fully herein, include, but are not limited to:

(1)  Letter dated July 9, 2008 (Vantage represented that EDA was the "owner of the real estate," referring to the 104.2 acres making up the AstroWorld property)

(2)  March 18, 2009 (status report on ownership)

(3)  April 3, 2009 (correspondence representing closing would occur in 60 days)

(4)  Email dated February 11, 2010 (Defendant co-conspirator Delaney to BCL's auditor representing that EDA had received additional capital and only had limited debt);

(5)  Email dated September 9, 2010 (Defendant co-conspirator Guiduzzi asking Delaney to issue documentation to provide to auditors that no loss in value of BCL's investment had occurred)

(6)  Email dated September 21, 2011 (Defendant co-conspirator Guiduzzi regarding transfer of loan and/or investment proceeds and F&G's new fees to be derived from said transaction)

(7)  Letter dated May 8, 2012 (Delaney writing to BCL's beneficial owner, using Frattini letterhead, informing him EDA's plans for EpiCentre were going according to schedule)

(8)  Letter dated August 27, 2012 (F&G letter informing Mallick that BCL will take over negotiations and contracting processes from EDA)

(9)  Telephone call on August 27, 2012 (manipulation of BCL, by Frattini, Guiduzzi, Delaney individually and through EDA, into dealing directly with third party MHB on behalf of EDA)

(10)  Letter dated October 23, 2012 (forged letter from BCL's parent company committing an additional €40,000,000 to the AstroWorld Property investment scheme)

(11)  Email dated October 31, 2012 (Defendant co-conspirator Frattini providing false information about a bank meeting that did not occur for purposes of transmitting this information to recipients in Texas and in furtherance of the scheme)

(12)  Email dated November 13, 2012 (Defendant co-conspirator Frattini, again providing false information about a bank meeting that did not occur for purposes of transmitting this information to recipients in Texas and in furtherance of the scheme)

(13)  Letter dated January 16, 2013 (Frattini to BCL's beneficial owner represented his 'confirmation of the soundness of the investment");

(14)  Email dated February 7, 2013 (Defendant co-conspirator Guiduzzi instructing Delaney to issue false invoices to BCL)

(15)  Letter dated July 16, 2013 (EDA Status Report discussing the sale and development of 50 to 56 acres of the EpiCentre Houston property by EDA to identified third parties)

### (2)  Unlawful Conversion

5.31     On multiple occasions the Defendants co-conspirators transported, transmitted or transferred money or property in interstate or foreign commerce with a value of $5,000 or more, knowing the money or property to be converted, stolen or taken by fraud or stolen from BCL. Furthermore, the Defendants co-conspirators, having devised a scheme or artifice to defraud, or for obtaining BCL's money or property by means of false or fraudulent pretenses, representations, or promises, transported or caused to be transported, or induced BCL to travel in, or be transported in interstate or foreign commerce in the execution of their scheme or artifice to defraud BCL of money or property having a value of more than $5,000.

(3)  Travel Act

5.32    The Defendant co-conspirators traveled in interstate or foreign commerce and/or used the mails or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of any unlawful activity or to distribute the proceeds of any unlawful activity, including the aid and furtherance of their scheme to obtain BCL's money or property and to convert BCL's money or property to their own benefit through money laundering and other unlawful acts, and thereafter performed or attempted to perform the promotion, management, establishment, or carrying on of such unlawful activity in violation of 18 U.S.C. § 1952.

5.33    Specifically, the Defendants co-conspirators traveled to meetings and used the mails and facilities of interstate or foreign commerce to aid their unlawful predicate act racketeering scheme, including but not limited to facilitating money laundering associated with their scheme to unlawfully obtain and convert BCL's money or property to their own benefit.

(4)  Money Laundering

5.34    The Defendants co-conspirators engaged in unlawful money laundering predicate acts in violation of 18 U.S.C. § 1956(a)(1)(A)(i) by knowing that property involved in a financial transaction(s) represented the proceeds of some form of unlawful activity and by attempting to and conducting such financial transaction that involved the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity.

5.35    The Defendants co-conspirators engaged in unlawful money laundering predicate acts in violation of 18 U.S.C. § 1956(a)(2) by transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds from a place in the

United States to or through a place outside the United States or to a place in the United States from a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

5.36    The Defendants co-conspirators  engaged in unlawful money laundering predicate acts in violation of 18 U.S.C. § 1956(a)(1)(A)(i), since the "financial transaction(s)" defined under § 1956(c)(4)(A) affected interstate or foreign commerce and the money or property involved the movement of funds by wire or other means, or involved the transfer of title to any real property under § 1956(c)(4), or the "financial transaction(s)" defined by § 1956(c)(4)(B) involved the use of a financial institution engaged in interstate or foreign commerce, and under § 1956(a)(1)(A)(i) by involving some form of unlawful activity and Defendants' intent to promote the carrying on of "specified unlawful activity."

5.37    "Specified unlawful activity" under 18 U.S.C. § 1956(c)(A) required under 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(2) includes any RICO predicate acts provided under 18 U.S.C. § 1961(1), including but not limited to the unlawful activity involved in the Defendants' co-conspirators unlawful scheme such as stolen property and conversion under 18 U.S.C. § 2314, mail and wire fraud under 18 U.S.C. §§ 1341 and § 1343, Travel Act predicate acts under 18 U.S.C. § 1952, and bank fraud predicate acts under 18 U.S.C. § 1344.

5.38    The Defendants co-conspirators conspired to commit the above § 1956(a)(1)(A)(i) and § 1956(a)(2) money laundering RICO predicate act offenses.  Section 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offenses the commission of which was the object of the conspiracy."

(5)  Bank Fraud

5.39    The Defendants co-conspirators engaged in bank fraud in violation of 18 U.S.C. §
1344 by knowingly executing, or attempting to execute, a scheme or artifice to defraud a
financial institution, or to obtain any of the monies, funds, credits, assets, securities, or other
property owned by, or under the custody or control of, a financial institution, by means of false or
fraudulent pretenses, representations, or promises.

d.      Pattern of Racketeering Activity

5.40    Defendants' previously alleged predicate acts in furtherance of their fraud and
conversion scheme against BCL constituted a pattern of unlawful activity within the meaning of
18 U.S.C. § 1961(5) because the predicate acts were related and continuous.  Each predicate act
had the same or similar purpose: the related predicate acts stolen property and conversion, mail
and wire fraud, Travel Act violations, money laundering and bank fraud.

5.41    The Defendants were associated with the enterprises and did conduct or
participate, directly or indirectly, in the management or operation of the conduct of the affairs of
the enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§
1961(1)(B), 1961(5) and 1962(c), to wit:

•       Multiple instances of stolen property and conversion of property in violation of 18
        U.S.C. § 2314;

•       Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

•       Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;

•       Multiple instances of money laundering in violation of 18 U.S.C. §§ 1956;

•       Multiple instances of Travel Act violations in violation of 18 U.S.C. § 1952;

- Multiple instances of bank fraud in violation of 18 U.S.C. § 1344.

5.42    BCL suffered injury to its business or property as a proximate result of the pattern of unlawful activity and violations engaged in by Defendants.

> e.    Relatedness and Continuity of the Unlawful Activity

5.43    All of the predicate acts alleged above relate to the Defendants co-conspirators' unlawful fraud and conversion scheme described herein.  The unlawful activity demonstrates continuity by the predicate acts alleged above, because the pattern of unlawful activity involves multiple predicate acts and related predicate acts that have taken place over several years, threaten to continue into the future indefinitely unless the Court intervenes, and constitute the regular way of doing business by the Defendants.

5.44    As a proximate result of the pattern of unlawful activity and violations engaged in by Defendants, BCL suffered injury to its business or property.

> 2.  Count Two:  Violation Of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)

5.45    BCL repeats and re-alleges all previous paragraphs as though fully set forth herein.

5.46    18 U.S.C. § 1962(d) provides: "[I]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

5.47    Defendants violated 18 U.S.C. § 1962(d) by conspiring with each other to engage in the predicate acts alleged to form the violation of 18 U.S.C. § 1962(c), as described above. Defendants agreed to the objective of this conspiracy. None of the Defendants ever withdrew

from the conspiracy.  The objective of the conspiracy continues, and unless this Court intervenes, the objective of this conspiracy will not suffer frustration.

5.48    As a proximate result of the predicate acts in violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), BCL suffered injury to its business or property.

5.49    But for the ongoing material misrepresentations and/or material omissions made to BCL by the RICO Defendants co-conspirators through the alleged pattern of racketeering activity, BCL would not have been deceived into making those investments and loans.  As legal (proximate) cause of making those investments and loans, BCL was injured in its business and property, in that its investment was lost, as well as the opportunity BCL had to invest those funds in a legitimate venture, and its loans were not repaid, or any interest-all in violation of 18 U.S.C. § 1964(c), § 1962(c), and § 1962(d).

        B.      Second Cause of Action:  Fraud

          1. Facts Common to All Fraud Allegations

5.50    BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.51    Botero, Delaney, Iragorri, Guiduzzi, Frattini, Caro, Pueche, PLG, F&G, the Entity Defendants, EDA, and EDA II are all liable to BCL for common law fraud in that each made false representations of past and existing material fact with actual awareness or recklessness as to the falsity thereof, for the purpose of inducing BCL to enter into contracts to invest and to loan money to EDA, and BCL relied on those representations to enter into those contracts, and so made the investments and loaned the money.

5.52    Specifically, Botero, Delaney, Iragorri, Guiduzzi, Frattini, Caro, Pueche, PLG, F&G, the Entity Defendants, and EDA, individually and collectively represented, at various

times, that EDA owned and/or would purchase, or had purchased, the entire AstroWorld Property, and did so intending BCL to rely on their omissions and concealment in order to make the investment, and further loans. These representations include, but are not limited to: the July 8, 2008, Memo; the March 18, 2009 Memo; the August 3, 2011 email; the May 5, 2012 Memo; the July 16, 2013 Memo; and, the May 14, 2014, Memo.

5.53    When EDA, through the Entity Defendants and its officers, represented they owned the entirety of the AstroWorld property, which they did not, they represented they needed additional funds to urbanize and develop the property, and did so intending BCL to rely on their omissions and concealment in order to make further loans.

5.54    After Delaney, Guiduzzi, Frattini, and Botero knowingly mortgaged and sold the property, purchased with BCL's money, they further represented the AstroWorld Property was still owned, all in order to hide the facts from BCL, or with reckless disregard of the facts, and to keep BCL from discovering the truth.

5.55    Botero, Delaney, Iragorri, Guiduzzi (individually and acting through PLG and F&G), Frattini acting individually and through F&G, Caro, Pueche, and the Entity Defendants, and each of them (the "Fraud Defendants") represented to BCL on many occasions that EDA would secure control of the AstroWorld Property and acquire ownership over the entire AstroWorld Property.

5.56    In addition to falsely representing that the land had or would be acquired and developed, as noted in the aforementioned memos, emails, and letters, the Fraud Defendants also falsely and/or recklessly represented that other investors had, were, or were about to participate

in the development, all in order to attract BCL to invest, and to keep BCL appeased, and willing to loan further funds, once its initial investment had been procured.

5.57    The Fraud Defendants' representations to BCL were material because such representations induced BCL to invest and loan over US$25,000,000 in the AstroWorld Property land development project.

5.58    Each investment and loan made by BCL was made based on reliance of the continuing representations that the Fraud Defendants made wherein the Fraud Defendants, individually and collectively, intended  to control, acquire, and develop the entire AstroWorld Property, or had already done so.

5.59    In addition, the investment and loans were induced and made due to BCL's reliance on the numerous representations made in the aforementioned memos, emails, and letters, that such investments were necessary to obtain control or ownership of the AstroWorld Property, or to develop it.

5.60    The Fraud Defendants' representations made in the aforementioned memos, emails, and letters, to BCL were false promises of future performance.  The Fraud Defendants, individually and collectively made a clear promise that they were working towards acquiring control, ownership, and ultimately developing the entire AstroWorld Property. However, the Fraud Defendants knew or should have known the representation made regarding the acquisition and control of the property was false.

5.61    The Fraud Defendants, issued memorandums, status reports, and emails containing material and false representations knowing they were false.  BCL relied on these representations and acted upon them to its detriment.

5.62    Moreover, the pattern of behavior Botero, Delaney, Iragorri, Guiduzzi, and Frattini engaged in after finally acquiring a small portion of the land only to mortgage it repeatedly and then sell it demonstrates they did not intend to develop or acquire the entire tract of land.

5.63    BCL justifiably relied on The Fraud Defendants' false representations when it made investments and loans of US$11,000,000, €300,000 and US$13,650,000.

5.64    The Fraud Defendants knowingly provided BCL with numerous documents, materials, and positive assurances of presently occurring closings such that it was reasonable for BCL to believe that their investment and loans would go towards gaining control and eventual ownership of the land.

5.65    The Fraud Defendants' false representations directly and proximately caused injury to BCL, which resulted in the following damages: loss of investment and loss of opportunity, and loss of loans and the interest owed, in an amount to be proven at trial.

5.66    BCL seeks damages within the jurisdictional limits of this Court.

5.67    BCL's injury resulted from defendant's actual fraud or malice, which entitles BCL to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

a.      Common Law Fraud

5.68    BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.69    The Fraud Defendants made multiple representations made in the aforementioned memos, emails, and letters, to BCL regarding acquisition of the AstroWorld Property, as more fully alleged herein.

5.70    The representations made were material, and knowingly false when made.

68

5.71     When the Fraud Defendants made the representations, each of them knew, individually and collectively that the representation was false, or made the representation recklessly, as a positive assertion.

5.72     The Fraud Defendants, individually and collectively  made these representations to BCL with the intent that BCL invest and loan money to or for the benefit of EDA.

5.73     BCL relied on these representations, invested in, and loaned money to, EDA.

5.74     The representations made to BCL caused it injury, in that it was induced to make an investment in EDA, and loan it money, but the investment was lost, and the loans were not repaid, or any interest.

5.75     BCL seeks damages within the jurisdictional limits of this Court, as more fully pled herein.

b.       Fraud by Non-Disclosure

5.76     BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.77     Delaney, Guiduzzi, Frattini, Botero, Pueche, and Iragorri, individually and collectively concealed or failed to disclose material facts related to the AstroWorld Property investment scheme.

5.78     As officers of EDA Delaney, Botero, Pueche, and Iragorri, individually and collectively had a duty to disclose the information to BCL because the information was new, and it made their earlier representations to BCL, false and misleading, all as more fully alleged herein.  As shareholders and principals of F&G and representatives of BCL, Frattini and Guiduzzi had a duty to disclose the information to BCL because the information was new, and it

69

made their earlier representations to BCL, false and misleading, all as more fully alleged herein in the aforementioned memos, emails, and letters.

5.79    Alternatively, Delaney, Botero, Pueche, Iragorri, Frattini, and Guiduzzi, individually and collectively created substantially false impressions in BCL by making partial disclosures, as more fully alleged herein.

5.80    Alternatively, Delaney, Botero, Pueche, Iragorri, Frattini, and Guiduzzi, individually and collectively voluntarily disclosed some information, and therefore had a duty to disclose the whole truth, as more fully alleged herein in the aforementioned memos, emails, and letters.

5.81    Alternatively, Guiduzzi had a duty to disclose the information to BCL because he had a fiduciary relationship to BCL as its director and officer, and in each of those capacities he owed BCL the duty of loyalty and utmost good faith; the duty of candor; the duty to act with integrity of the strictest kind; the duty of fair, honest dealing; and the duty of full disclosure.

5.82    Delaney, Botero, Pueche, Iragorri, Frattini, and Guiduzzi, individually and collectively knew BCL was ignorant of the facts, and did not have an equal opportunity to discover the facts, but rather as previously shown in the aforementioned memos, emails, and letters., knowingly transmitted false and misleading information to BCL.

5.83    Delaney, Botero, Pueche, Iragorri, Frattini, and Guiduzzi, individually and collectively were deliberately silent when they had a duty to speak, and by failing to disclose the facts, intended to induce BCL into making the investment, and the loans, which BCL did.

5.84     BCL relied on Delaney, Botero, Pueche, Iragorri, Frattini, and Guiduzzi, individual and collective nondisclosures, and was injured as a result of making the investment, and the loans, without knowledge of the undisclosed facts.

5.85     BCL seeks damages within the jurisdictional limits of this Court, as more fully pled herein.

c.     Statutory Fraud Pursuant to Texas Business & Commerce<br>Code Section 27.01.

5.86     BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.87     Botero, Delaney, Iragorri, Guiduzzi individually and through F&G and PLG, Frattini, individually and through F&G, Caro, Pueche, the Entity Defendants and EDA are liable to BCL for common law fraud and statutory fraud, in that each made false representations of past and existing material fact with actual awareness of the falsity thereof, as more fully alleged herein in the aforementioned memos, emails, and letters , for the purpose of inducing it to enter into the contracts to loan money to EDA, and BCL relied on those representations to enter into those contracts for the purchase of stock or ownership in EDA and real estate.

5.88     Botero, Delaney, Iragorri, Guiduzzi individually and through F&G and PLG, Frattini, individually and through F&G, Caro, Pueche, the Entity Defendants, and EDA are liable to BCL making false promises to BCL, with actual awareness of the falsity thereof, which were material, made with the intention of not fulfilling those promises, made to BCL for the purpose of inducing BCL to enter into those contracts, and relied on by BCL in entering into that contract.

5.89     In addition to their actual awareness of the falsity of their representations and promises, Botero, Delaney, Iragorri, Guiduzzi individually and through F&G and PLG, Frattini,

71

individually and through F&G, Caro, Pueche, and the Entity Defendants failed to disclose the falsity of the representations and promises to BCL, and benefitted from the false representation or promises.

C.     Third Cause of Action: Breach of Fiduciary Duty

1.  Guiduzzi and Caro

5.90     BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.91     BCL had a fiduciary relationship with Guiduzzi and Caro, by virtue of their status as directors and officers of BCL. This fiduciary relationship consisted of the duty of loyalty and utmost good faith; the duty of candor; the duty to act with integrity of the strictest kind; the duty of fair, honest dealing; and the duty of full disclosure.

5.92     Guiduzzi and Caro breached these duties by participating in, and making, along with Delaney and Frattini, the fraudulent and other misrepresentations pled herein.

5.93     In addition, Guiduzzi breached these duties by failing to disclose information pertaining to the 11 Acres to the shareholders of BCL, and by knowingly permitting the further indebtedness of BCL's property. After receiving the status report in May 2013 noting that EDA no longer owned the 11 Acres, Guiduzzi had a duty to disclose this information. Because he failed to disclose this information and other material information, Guiduzzi breached his fiduciary duties to BCL.

5.94     Guiduzzi through PLG and F&G, was entrusted with the utmost care and management of BCL also by reason of a services agreement dated July 7, 2009, between BCL and F&G.

5.95    Guiduzzi individually and through F&G breached their duty of care and loyalty in managing BCL by: (i) authoring and participating in the creation and distribution of false information using F&G letterhead; (ii) agreeing to extending loans from BCL to EDA and Vantage Financial, (iii) concocting and paying invoices from Delaney, when there was no reason, consideration or justification for so paying; and, (iv) agreeing to the additional indebtedness of BCL's 11 acres.

5.96    In addition to the above, Guiduzzi authored and participated in the creation and distribution of false documents purporting to obligate BCL to further investment when Guiduzzi knew such further investment was not in the best interest of BCL (although it would have benefitted Guiduzzi), and further authored and participated in the creation and distribution of documents containing knowingly false or materially misleading representations, intended to further investment and to delay discovery of the loss of investment, and to delay discovery of Guiduzzi's complicity in the loss, and of his breaches of fiduciary duty

5.97    In addition, by signature of Guiduzzi, F&G became party to an additional "Relationship Management Agreement" with Vantage Financial and EDA, through which F&G (and thus Guiduzzi and Caro) would be compensated for bringing additional investors and capital into the EDA AstroWorld investment scheme, including BCL's own investment, thus further corrupting EDA by inducing Guiduzzi and Caro to breach their fiduciary duties to BCL by incentivizing them to act contrary to BCL's interests, and for their own interests, and those of Botero, Delaney, Iragorri and Vantage Financial, at a minimum.

2.  Frattini

5.98    BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

73

5.99    Frattini, individually and through F&G, were entrusted with the utmost care and management of BCL due to Frattini's role as "spokesman" of BCL's parent company and role as representative of BCL and F&G before EDA, and also by reason of a services agreement dated July 7, 2009, between BCL and F&G.

5.100   Frattini, individually and through F&G, breached his duty of care and loyalty in managing BCL by: (i) authoring and participating in the creation and distribution of false information using F&G letterhead; (ii) agreeing to extending loans from BCL to EDA and Vantage Financial, (iii) concocting and paying invoices from Delaney, when there was no reason, consideration or justification for so paying, (iv) agreeing to the additional indebtedness of BCL's 11 acres; and (v) authoring and participating in the creation and distribution of false documents purporting to obligate BCL to further investment when Frattini knew such further investment was not in the best interest of BCL (although it would have benefitted Frattini), and further authoring and participating in the creation and distribution of documents containing knowingly false or materially misleading representations, intended to further investment and to delay discovery of the loss of investment, and to delay discovery of Frattini's complicity in the loss, and of his breaches of fiduciary duty

5.101   In addition, by signature of Guiduzzi, F&G became party to an additional "Relationship Management Agreement" with Vantage Financial and EDA, through which F&G (and thus Frattini) would be compensated for bringing additional investors and capital into the EDA AstroWorld investment scheme, including BCL's own investment, thus further corrupting EDA by inducing Frattini, Guiduzzi and Caro to breach their fiduciary duties to BCL by

74

incentivizing them to act contrary to BCL's interests, and for their own interests, and those of Botero, Delaney, Iragorri and Vantage Financial, at a minimum.

5.102   BCL seeks damages within the jurisdictional limits of this Court, and as

5.103   BCL's injury resulted from defendant's intentional act, which entitles BCL to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### 3. Officers and Directors of EDA

5.104   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.105   BCL entered into a Subscription Agreement whereby it was promised a 10% stake in EDA.  As a stockholder (shareholder) of EDA, the officers and directors of EDA, including Delaney, Botero, and Iragorri, owed to BCL a fiduciary duty to provide BCL with truthful and accurate information and updates as to EDA's operations.  By engaging in activities with the intent of defrauding BCL, the Officers and Directors of EDA, individually and collectively, clearly failed in that regard and have breached their fiduciary duties to BCL.

### D.      Fourth Cause of Action:  Breach of Contract

### 1.  The $11,000,000 Investment

5.106   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.107   On July 23, 2008, EDA, by its manager Vantage Financial, by its manager Vantage Plus, by its CEO Botero, entered into a Capital Subscription Agreement with BCL, as a "subscriber," for the purchase by BCL of ten membership units in EDA, for the price of US$11,000,000.

5.108    On July 29, 2008, the wire of BCL's investment pursuant to the Capital Subscription Agreement was confirmed into the trust account of Real, P.A., referenced as "[c]apital contribution as per agreement dated 23 July 2008."

5.109    The Capital Subscription Agreement explicitly provides the "funds required by this Agreement are paid by the Subscriber and are fully collected and the Company [EDA, acting by Vantage Plus] accepts this subscription for the purpose of acquiring title to the real estate formerly known as AstroWorld and to be known as EpiCentre Houston, a 104.19 acre assemblage of land located at 9001 Kirby Drive, Houston, TX, (the ?Real Estate') is acquired by the Company."

5.110    The US$11,000,000 investment was not used to acquire "title to the real estate formerly known as AstroWorld and to be known as EpiCentre Houston," nor for any related purpose.

5.111    Instead, EDA purchased only 11 Acres, and with other additional money borrowed from BCL on July 28, 2011, and so breached the Capital Subscription Agreement.

5.112    The breach of the Capital Subscription Agreement, and Defendants' other actions as further pled herein, caused BCL to lose its investment.

5.113    BCL seeks damages for breach of the Capital Subscription Agreement within the jurisdictional limits of this Court, as further pled herein.

### 2.  The Promissory Note for the €300,000 Loan

5.114    BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.115    On July 5, 2010, Vantage Financial entered into a Promissory Note with BCL for the amount of €200,000, part of an eventual €300,000 loan.

5.115.1       The maturity date contained in the €200,000 Promissory Note was the earliest of the "stated maturity date" or the date upon which the lender elected to accelerate the indebtedness. The stated maturity date on the loan was "the later of 90 days from the date the funds are used for the closing of title to land in Houston, Texas formerly known as AstroWorld, or, October 1, 2010." The promissory note was signed by Delaney on behalf of EDA and Vantage Financial.

5.115.2       EDA and Vantage Financial did not pay then, and has not paid, the full outstanding principal balance due under the note, or all or any interest accrued, despite express agreement to do so.

5.115.3       This breach actually and legally caused BCL damage.

5.115.4       BCL seeks recovery of the money loaned, plus interest at the applicable rate.

5.115.5       BCL seeks restitution damages as further alleged herein, to be put into the same economic position it would have occupied if no contract had been made.

5.116   Delaney, EDA and Vantage Financial also breached their agreement with BCL to repay a loan made to or on behalf of EDA for €100,000, which was paid to Delaney, EDA and Vantage Financial in October 2012.

5.116.1       Effective January 1, 2013, EDA, by Vantage Financial, its co-manager, by Delaney, its co-manager, as borrower, executed a promissory note ?244,307, in favor of BCL, as lender, which was intended to, and did, document the obligation to repay the loan of €300,000 previously made, and funded to BCL in one tranche of €200,000, and another tranche of €100,000 .

5.116.2     This promissory note matured on January 1, 2014.  On the maturity date, the borrower agreed to "pay in full the outstanding principal balance hereunder, together with all accrued interest under this Note."

5.116.3     EDA did not pay then, and has not paid, the full outstanding principal balance due under the note, or all or any interest accrued, despite express agreement to do so.

5.116.4     This breach actually and legally caused BCL damage.

5.116.5     BCL seeks recovery of the money loaned, plus interest at the applicable rate.

5.116.6     BCL seeks restitution damages as further alleged herein, to be put into the same economic position it would have occupied if no contract had been made.

### 3.     The Promissory Note for the $13,650,000 Loan

5.117   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.118   On July 28, 2011, EDA, by Vantage Financial, by Delaney, as borrower, executed a Promissory Note in favor of BCL, as lender, for the amount of $13,650,000.

5.119   The Promissory Note provided BCL intended "to finance Borrower for the same amount, in order to allow Borrower to finalize the contract with [MHB], that should take place within the end of July 2011 for the purpose of contracting and buying land in Houston formerly known as AstroWorld."

5.120   EDA breached the Promissory Note by accepting the loan, but not using it to contract and buy land in Houston formerly known as AstroWorld.

5.121   In addition, the "Stated Maturity Date" of the Promissory Note was "365 days from the date the funds are advanced to" EDA.

5.122   The funds were advanced on or about July 28, 2011.

5.123   The Promissory Note matured on July 27, 2012 (the "Maturity Date").  "On the Maturity Date, the Borrower [EDA] shall pay in full the outstanding principal balance hereunder, together with all interest under this Note."

5.124   EDA did not pay then, and has not paid, the full outstanding principal balance due under the note, or all or any interest accrued, despite express agreement to do so.  On December 3, 2012, Delaney acknowledged EDA "was in default of the repayment and EDA takes advantage of the fact that B Choice is also a partner in [the EpiCentre] project."

5.125   This breach actually and legally caused BCL damage.

5.126   BCL seeks recovery of the money loaned, plus interest at the applicable rate.

5.127   BCL seeks restitution damages as further alleged herein, to be put into the same economic position it would have occupied if no contract had been made.

> E.   Fifth Cause of Action:  Conversion Of Specific Chattel

5.128   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.129   Delaney, Botero, Pueche, Real and Real, P.A., acting individually and in concert converted BCL's $11M investment, which was specific chattel.

5.129.1   By email dated July 22, 2008, Botero, through Pueche, instructed BCL to wire its US$11,000,000 investment to the trust account of Real, P.A.

5.129.2   On July 23, 2008, EDA, by its manager Vantage Financial, by its manager Vantage Plus, by its CEO Botero, entered into a Capital Subscription Agreement with

BCL, as a "subscriber," for the purchase by BCL of ten membership units in EDA, for the price of US$11,000,000.

> 5.129.3    On July 29, 2008, the wire of BCL's investment was confirmed into the trust account of Real, P.C., referenced as "[c]apital contribution as per agreement dated 23 July 2008."

> 5.129.4    The Capital Subscription Agreement explicitly provides the "funds required by this Agreement are paid by the Subscriber and are fully collected and the Company [EDA, acting by Vantage Plus] accepts this subscription for the purpose of acquiring title to the real estate formerly known as AstroWorld and to be known as EpiCentre Houston, a 104.19 acre assemblage of land located at 9001 Kirby Drive, Houston, TX, (the ?Real Estate') is acquired by the Company."

> 5.129.5    The US$11,000,000 investment was intended to be kept segregated for the purpose stated in the Capital Subscription Agreement, substantially in the form in which it was received or in an intact fund, and neither Real, nor Real, P.A., had any claim to title to those funds.

> 5.129.6    The US$11,000,000 investment was never used by EDA to acquire all or any portion of the AstroWorld Property.

> 5.129.7    On information and belief, Real, and Real, P.A., converted the U$11,000,000 investment, and diverted it to others, including Botero, Delaney, and/or their related or controlled entities, but disbursed little or none of the US$11,000,000 investment to EDA, and certainly none went to EDA for the purposes agreed in the Subscription Agreement.

80

Real and Real, P.A.'s wrongful acts proximately caused injury to BCL, which resulted in the damages as pled herein.

        F.       Sixth Cause of Action:  Negligence

           1. Real and Real, P.A.

5.130   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.131   Real and Real, P.A. owed BCL a duty to exercise reasonable care in performing services for it, specifically holding its US$11,000,000 investment in trust, because Real and Real, P.A., knew, or should have know, that exercising reasonable care was necessary for the protection of BCL, and its property.

5.132   Specifically, Real and Real, P.A., owed BCL a duty to exercise due care when they received a wire of BCL's US$11,000,000, on July 28, 2008, pursuant to the Capital Subscription Agreement.

5.133   Real and Real, P.A., failed to use reasonable care to determine the proper disposition of these funds, particularly as those funds were directed to the trust account of Real, and Real, P.A., by Botero, who, together with Delaney and Vantage Plus, had on October 31, 2007, been cast in judgment for US$1,542,000, on claims arising out of a failed real estate deal involving civil theft by Botero, Delaney and Vantage Plus (see *Infante v. Vantage Plus Corp.*, Case No. 07-29723 CA 40, In the Circuit Court for the 11th Judicial Circuit In and For Miami-Dade County, Florida), in the same locale where Real practices law, and where Real, P.A., does business.

5.134   Had Real and Real, P.A., exercised due care on receipt of the US$11,000,000 and following, they would have known, or in the exercise of reasonable diligence should have

discovered, that Botero, Delaney and Vantage Plus had recently been involved in such litigation, and indeed had a default judgment rendered against them.

5.135   Alternatively, and on information and belief, Real and Real, P.A., had actual awareness of the *Infante* judgment, and were aiding and abetting Botero, Delaney and/or Vantage Plus in diverting the US$11,000,000 investment for improper purposes.

5.136   In any event, Real and Real, P.A., as RICO Persons, conducted, or participated in the conduct of the enterprise through a pattern of racketeering activity, first by receiving this wire, and then subsequently by disbursing it for purposes other than stated in the Capital Subscription Agreement, in at least one disbursement, but on information and belief, over time, and with knowledge the disbursements were not being used for the purposes stated in the Capital Subscription Agreement, and this injured BCL in its business and property.

5.137   But for Real and Real, P.A.'s breach of duty, BCL's investment would not have been disbursed, except for the purposes stated in the Subscription Agreement.  Real and Real, P.A.'s breach of duty legally (proximately) caused BCL's loss of investment.

5.138   BCL seeks damages within the jurisdictional limits of this Court as further pled herein.

### 2. Delaney

5.139   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.140   Delaney, individually and as an officer of EDA, owed BCL, a member of EDA, a duty to use ordinary care in managing EDA's affairs, especially those that would materially affect BCL and its investments and loans to EDA in connection with acquisition of the AstroWorld property.

5.141   Specifically, Delaney, individually and as an officer of EDA, owed BCL a duty to exercise due care with the $11,000,000 investment, the €300,000 loans, and the $13,650,000 loan made to EDA by BCL.

5.142   But for Delaney's breach of duty, BCL's investment and loans would not have been misapplied, misappropriated, and eventually lost in its entirety.

5.143   As a result of Delaney's breach, individually and as an officer of EDA, BCL was damaged.  Furthermore, Delaney's actions were done with a conscious indifference or reckless disregard to BCL's interests.  BCL thus seeks damages within the jurisdictional limits of this Court as further pled herein, and further pleads it is entitled to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### 3. Guiduzzi, F&G and PLG

5.144   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.145   Guiduzzi, individually and as director of BCL, and as a principal of F&G and PLG, owed BCL a duty of care in managing BCL's affairs, especially those that would materially affect BCL's investments and loans to EDA in connection with acquisition of the AstroWorld property.

5.146   Specifically, Guiduzzi, individually and as director of BCL, and as a principal of F&G and of PLG, owed BCL a duty to exercise due care to ensure BCL's $11,000,000 investment, €300,000 loans, and $13,650,000 loan made to EDA not be misapplied or misappropriated.

5.147   Guiduzzi, individually and as director of BCL, and as a principal of F&G and PLG, owed BCL a duty to exercise due care in performing due diligence on EDA, its officers,

83

and all transactions related to EpiCentre and the purported acquisition of the AstroWorld property.

5.148   Guiduzzi, individually and as director of BCL, and as a principal of F&G and PLG, owed BCL a duty to not provide false or misleading information detrimental to BCL's interests.

5.149   But for Guiduzzi's breach of duty, BCL's investment and loans would not have been misapplied, misappropriated, and eventually lost in its entirety.

5.150   As a result Guiduzzi's breach, individually and as director of BCL and as a principal of F&G and PLG, BCL was damaged. Furthermore, Guiduzzi's actions were done with a conscious indifference or reckless disregard to BCL's interests.  Thus, BCL seeks damages within the jurisdictional limits of this Court as further pled herein, and further pleads it is entitled to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### 4. Frattini and Studio Frattini

5.151   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.152   Frattini, individually and as Studio Frattini, as a spokesperson for BCL's parent company, as a representative of BCL within EDA, and as a shareholder of F&G, owed BCL a duty of care in managing BCL's affairs, especially those that would materially affect BCL and its investments and loans to EDA in connection with acquisition of the AstroWorld property.

5.153   Specifically, Frattini, individually and as Studio Frattini, as a spokesperson for BCL's parent company, as a representative of BCL within EDA, and as a shareholder of F&G, owed BCL a duty to exercise due care to ensure BCL's $11,000,000 investment, €300,000 loans, and $13,650,000 loan made to EDA not be misapplied or misappropriated.

84

5.154   Frattini, individually and as Studio Frattini, as a spokesperson for BCL's parent company, as a representative of BCL within EDA, and as a shareholder of F&G, owed BCL a duty to exercise due care in performing due diligence on EDA, its officers, and all transactions related to EpiCentre and the purported acquisition of the AstroWorld property.

5.155   Frattini, individually and as Studio Frattini, as a spokesperson for BCL's parent company, as a representative of BCL within EDA, and as a shareholder of F&G, owed BCL a duty to not provide false or misleading information detrimental to BCL's interests.

5.156   But for Frattini's breach of duty, BCL's investment and loans would not have been misapplied, misappropriated, and eventually lost in its entirety.

5.157   As a result of Frattini's breach, individually and as Studio Frattini, as a spokesperson for BCL's parent company, as a representative of BCL within EDA, and as a shareholder of F&G, BCL was damaged.  Furthermore, Frattini's actions were done with a conscious indifference or reckless disregard to BCL's interests.  Thus, BCL seeks damages within the jurisdictional limits of this Court as further pled herein, and further pleads its entitlement to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### 5.  Botero

5.158   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.159   Botero, individually and an officer of EDA, owed BCL, a member of EDA, a duty to use ordinary care in managing EDA's affairs, especially those that would materially affect BCL and its investments and loans to EDA in connection with acquisition of the AstroWorld property.

5.160   Specifically, Botero, individually and as an officer of EDA, owed BCL a duty to exercise due care with the $11,000,000 investment, the €300,000 loans, and the $13,650,000 loan made to EDA by BCL.

5.161   But for Botero's breach of duty, BCL's investment and loans would not have been misapplied, misappropriated, and eventually lost in its entirety.

5.162   As a result of Botero's breach, individually and as an officer of EDA, BCL was damaged.  Furthermore, Botero's actions were done with a conscious indifference or reckless disregard to BCL's interests.   Thus, BCL seeks damages within the jurisdictional limits of this Court as further pled herein, and BCL further pleads its entitlement to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### 6. Iragorri

5.163   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.164   Iragorri, individually and an officer of EDA, owed BCL, a member of EDA, a duty to use ordinary care in managing EDA's affairs, especially those that would materially affect BCL and its investments and loans to EDA in connection with acquisition of the AstroWorld property.

5.165   Specifically, Iragorri, individually and as an officer of EDA, owed BCL a duty to exercise due care with the $11,000,000 investment, the €300,000 loans, and the $13,650,000 loan made to EDA by BCL.

5.166   But for Iragorri's breach of duty, BCL's investment and loans would not have been misapplied, misappropriated, and eventually lost in its entirety.

86

5.167   As a result of Iragorri's breach, individually and as an officer of EDA, BCL was damaged.   Furthermore, Iragorri's actions were done with a conscious indifference or reckless disregard to BCL's interests.   Thus, BCL seeks damages within the jurisdictional limits of this Court as further pled herein, and BCL further pleads entitlement to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

7. Vantage Realty

5.168   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.169   As the managing member of EDA, Vantage Realty, as an entity and through its officers, owed BCL, a member of EDA, a duty to use ordinary care in managing EDA's affairs, especially those that would materially affect BCL and its investments and loans to EDA in connection with acquisition of the AstroWorld property.

5.170   Specifically, Vantage Realty, as an entity and through its officers, as the managing member of EDA, owed BCL a duty to exercise due care with the $11,000,000 investment, the €300,000 loans, and the $13,650,000 loan made to EDA by BCL.

5.171   But for Vantage Realty's breach of duty, as an entity and through the actions of its officers, BCL's investment and loans would not have been misapplied, misappropriated, and eventually lost in its entirety.

5.172   As a result of Vantage Realty's breach of duty, as an entity  and through the actions of its officers, BCL was damaged.

5.173   BCL seeks damages within the jurisdictional limits of this Court as further pled herein.

G.      Seventh Cause of Action:  Negligent Misrepresentation

1.  Botero, Delaney and Iragorri

5.174   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.175   Botero, Delaney, and Iragorri, individually and as officers of EDA, made numerous representations to BCL, including, but not limited to the July 9, 2008 Memo, the August 3, 2011 email, the May 5, 2012 project status report and the September 2012 and February 2013 invoices. Each of these representations contained false information intended to guide BCL in its business transactions with EDA.

5.176   Botero, Delaney and Iragorri failed to exercise reasonable care or competence in obtaining or communicating each of these representations.

5.177   BCL justifiably relied on these representations, and trusted the representations of Botero, Delaney, or Iragorri, individually and as officers or agents of of EDA, in deciding to proceed with the investment, and in fact made an investment of US$11,000,000, and loans of €300,000, and US$13,650,000.

5.178   BCL's justifiable reliance on the representations of Delaney, Botero and Iragorri, and those induced BCL to so invest, which actually and legally caused BCL damage.

2.  Guiduzzi

5.179   Guiduzzi, individually and as director of BCL and F&G, made numerous representations on behalf and to BCL, including but not limited to the August 27, 2012 letter, and the September 2012 and February 2013 invoices.  Each of these representations contained false information intended to guide BCL in its business transactions with EDA.

5.180   Guiduzzi, individually and as director of PLG, without doing any reasonable due diligence made numerous representations to BCL regarding the AstroWorld Property investment opportunity presented by John Pyle in 2008. These representations were made in the course of Guiduzzi and PLG's role as business and real estate investment advisors.

5.181   Guiduzzi failed to exercise reasonable care or competence in obtaining or communicating each of these representations.

5.182   BCL justifiably relied on these representations, and trusted the representations made by Guiduzzi individually and as director of BCL and F&G, and member of EDA, in deciding to proceed with the investment, and in fact made an investment of US$11,000,000, and loans of €300,000, and US$13,650,000.

5.183   BCL's justifiable reliance on Guiduzzi's representations induced BCL to so invest, which actually and legally caused BCL damage.

### 3.  Frattini

5.184   Frattini, individually and as a member of F&G, made numerous representations to or on behalf of BCL, including, but not limited to, the September 14, 2010 letter, the January 16, 2013 letter, and the August 27, 2012 letter.

5.185   Frattini, individually, through Studio Andrea Frattini, and as a representative of F&G, without doing any reasonable due diligence made numerous representations to BCL regarding the AstroWorld Property investment opportunity and the progress, or lack thereof, being made on the EpiCentre project. These representations were made in the course of Frattini's role as business and real estate investment advisors.

5.186   Frattini failed to exercise reasonable care or competence in obtaining or communicating each of these representations.

5.187   BCL justifiably relied on these representations, and trusted the representations made by Frattini individually and as representative of BCL through F&G, and in his undue influence towards the director of F&G, in deciding to proceed with the investment, and in fact made an investment of US$11,000,000, and loans of €300,000, and US$13,650,000.

5.188   BCL's justifiable reliance on Frattini's representations induced BCL to so invest, which actually and legally caused BCL damage.

> H.     Eighth Cause of Action:  Liability Based on Disregard of the Corporate Entities

5.189   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.190   The forms of EDA, EDA II, Vantage Financial, Vantage Plus, PLG, and F&G (the "Pierced Corporations") should be disregarded because:

5.190.1     The forms of the Pierced Corporations were used as a sham to perpetrate multiple fraudulent schemes on BCL. As more fully pled herein, the forms of the Pierced Corporations were repeatedly used ostensibly for legitimate business opportunities but in reality were used to perpetrate a fraud on BCL, induce it into making investments and loans to EDA, and to shield from discovery fraudulent transactions ultimately causing, actually and legally, the inequitable result of BCL losing all of its investment, loaned money, and interest due thereon.

5.191   The Pierced Corporations were organized and operated as a mere tool or business conduit of one another, and of Delaney, Botero, Iragorri, Frattini, and Guiduzzi. On information

and belief, Botero ran his associated companies as if they were his "own backyard," often co-mingling his personal funds with those of the Pierced Corporations. Botero in fact has testified, under oath, that EDA "normally" funded transactions for Alianza Financial Services, at least, and upon information and belief EDA funded transactions for the other Botero-controlled entities as well.

5.192   The Pierced Corporations were used to evade existing legal responsibilities. The Pierced Corporations through Botero, Delaney, Iragorri, Guiduzzi or Frattini, entered into contracts with BCL, only to later be emptied of assets for the direct personal gain of Botero, Delaney Iragorri, Guiduzzi or Frattini, or by them, alone or in combination, allowed to be forfeited for failure to observe the laws and rules affecting their formation, all to evade the legal responsibilities and liabilities of the Pierced Corporations.

5.192.1        In particular, on July 23, 2008, EDA, by its manager Vantage Financial, by its manager Vantage Plus, by its CEO Botero, entered into a Capital Subscription Agreement with BCL, as a "subscriber," for the purchase by BCL of ten membership units in EDA, for the price of US$11,000,000.  Both Vantage Financial and Vantage Plus were allowed to be forfeited, and are no longer in good standing.

5.192.2        Beginning in June 2008, Guiduzzi held himself out as acting on behalf of PLG in connection with his involvement in the AstroWorld Property investment scheme, even when he was a Director of BCL, with communication to and from him flowing almost exclusively through his PLG email address.  Email communication from him was likewise almost exclusively done with a PLG "auto signature," which Guiduzzi knew how to

change, but yet did not, and so identified himself as acting as PLG in his communications with

BCL, the other Defendants, and third parties.

        5.192.3      Guiduzzi is the sole shareholder and director of PLG.  When PLG

acts, there is no one who acts for PLG except for Guiduzzi.  Consequently, the actions of

Guiduzzi, and the allegations against him, may rightfully be deemed the actions of PLG, and the

allegations against Guiduzzi treated as allegations against PLG.

        5.192.4      Guiduzzi's identification of himself as acting for PLG continued

even after July 7, 2009, when BCL was compelled to enter into a consulting agreement with

F&G, of which Guiduzzi is a principal, and Guiduzzi, Frattini and Caro are shareholders,

whereby F&G could receive compensation based on the value of BCL's investment in the

AstroWorld property.  The success of the AstroWorld Property investment scheme, which

Guiduzzi, Frattini and Caro participated in, is now directly related to F&G's compensation, in

which Guiduzzi, Frattini and Caro would share.  Guiduzzi and Frattini then used F&G (as well as

Guiduzzi's company PLG) as a conduit to funnel representations and misrepresentations to BCL

to induce it to act, and to keep it from discovering the disposition of its investment and loans.

        5.192.5      On July 5, 2010, Delaney, on behalf of EDA and Vantage

Financial, executed a promissory note for €200,000 in favor of BCL, but EDA and Vantage

Financial failed to repay this loan prior to or after the stated maturity date, and none of the

interest, and therefore breached this contract with BCL.  Vantage Financial was allowed to be

forfeited, and is no longer in good standing.

        5.192.6      On July 28, 2011, Delaney, on behalf of EDA and Vantage

Financial,  executed a Promissory Note for $13,650,000 in favor of BCL, but EDA and Vantage

Financial failed to repay this loan at or after the stated maturity date, and none of the interest, and therefore breached this contract with BCL.  Vantage Financial was allowed to be forfeited, and is no longer in good standing.

       5.192.7      Effective January 1, 2013, EDA, by Vantage Financial, its co-manager, by Delaney, its co-manager, as borrower, executed a promissory note ?244,307, in favor of BCL, as lender, which was intended to, and did, document the obligation to repay the loan of €300,000 previously made.  EDA and Vantage Financial failed to repay this loan at or after the stated maturity date, and none of the interest, and therefore breached this contract with BCL.  Vantage Financial was allowed to be forfeited, and is no longer in good standing.

       5.193   The Pierced Corporations were also used to protect their members or managers against the discovery of a crime or to justify a wrong.  For example, EDA II was created in order to convey title of the 11 Acres out of EDA, and so away from BCL, but in a way that prevented BCL from discovering the ongoing fraud being perpetrated against it.  Further for example, Guiduzzi held himself out as PLG nearly exclusively during his involvement, but now attempts to identify himself with F&G to avoid his liability to BCL created while acting as and through PLG.

       5.194   The Pierced Corporations were also inadequately capitalized so as to work an injustice. As more fully pled herein, the US$11,000,000 investment in EDA was diverted from BCL, for the direct personal gain of Botero, Delaney and Iragorri, and never used in accordance with the terms of the Capital Subscription Agreement.

       5.195   Delaney, Botero, Iragorri, Guiduzzi, Frattini and Caro used the Pierced Corporations for the purpose of perpetrating an actual fraud on BCL and perpetrated this fraud on

BCL primarily for the direct personal benefit of Delaney, Botero, Iragorri, Guiduzzi, Frattini and Caro, alone or in combination.

5.196   The form of the Pierced Corporations must be ignored and Delaney, Botero, Iragorri, Guiduzzi, Frattini and Caro held individually and vicariously liable for debts and liabilities of the Pierced Corporations, owed to BCL.

I.       Ninth Cause of Action:  Civil Conspiracy

5.197   BCL re-alleges paragraphs 1.1 through 4.113 as though fully again set forth.

5.198   Botero, Delaney, Iragorri, and Pueche, in combination with Real, Guiduzzi, Caro and Frattini, agreed to perpetrate an actual fraud on BCL, an unlawful purpose.

5.198.1       To accomplish the object of their agreement, Botero, Delaney, Iragorri and Pueche solicited equity investment and loans from BCL, without the intent to use the invested funds or the loans for the purposes represented, *i.e.*, to acquire the entire portion of the AstroWorld property.  Real received the equity investment, but assisted Botero, Delaney, Iragorri and Pueche in diverting the investment from its intended purpose, while Guiduzzi, Caro and Frattini failed to ensure the investment was properly received and applied, and then failed to learn the facts, and upon learning the facts kept BCL from learning the facts, of the diverted investment, either to protect themselves, or to harm BCL.

5.199   Guiduzzi and Caro, in combination with Frattini, agreed to breach their fiduciary duties to BCL, an unlawful purpose.

5.199.1       To accomplish the object of their agreement, Guiduzzi and Caro assisted others in presenting the AstroWorld Property investment to Frattini, who in turn ensured the flow of capital into BCL, to be invested and loaned as part of the investment.  However,

94

neither Guiduzzi nor Caro did sufficient, or any, due diligence, and failed to properly advise BCL or represent its interests, instead acting for themselves, and on behalf of F&G, in which they all participated as shareholders.

5.200   Based on these conspiracies to perform unlawful acts, BCL prays for judgment as hereafter set forth.

## VI.   DAMAGES

6.1   As a direct and proximate result of Defendants' actions, violations, breach and/or negligence, Plaintiff is entitled to damages as follows:

6.1.1   On its claims under RICO

a.   Actual damages for the injury caused by BCL by the pattern of racketeering activity, including lost profits, return of investment, return of loans, with interest at the applicable rates;

b.   Treble damages pursuant to statute;

c.   Attorney's fees pursuant to statute;

d.   Costs of suit.

6.1.2   On its claims for Fraud

a.   Common Law Fraud

i.   Actual damages for economic injury, including out of pocket damages, and benefit of the bargain damages;

ii.   Exemplary Damages;

iii.   Attorney's fees based on inter-relatedness of fraud to claims for breach of contract on the US$11,000,000 investment, the €300,000 loan, and the US$13,650,000 loan;

iv.   Pre-judgment and post-judgment interest;

        v.       Costs of suit.

    b.      Fraud by Non-Disclosure

        i.       Actual damages for economic injury, including out of pocket damages, and benefit of the bargain damages;

        ii.      Exemplary Damages;

        iii.     Attorney's fees based on inter-relatedness of fraud to claims for breach of contract on the US$11,000,000 investment, the €300,000 loan (and as represented by the £244,307 note), and the US$13,650,000 loan;

        iv.     Pre-judgment and post-judgment interest;

        v.       Costs of suit.

    c.      Statutory Fraud

        i.       Actual damages;

        ii.      Exemplary damages;

        iii.     Attorney's fees, expert witness fees and deposition copy costs;

        iv.     Pre-judgment and post-judgment interest;

        v.       Costs of suit.

6.1.3   On its claims for Breach of Fiduciary Duty

    a.      Actual Damages

    b.      Exemplary Damages for intentional conduct;

    c.      Fee Forfeiture for amounts paid to Guiduzzi and F&G;

    d.      Pre-judgment and post-judgment interest;

    e.      Attorneys fees;

       f.      Costs of suit.

6.1.4   On its claims for Breach of Contract

       a.      US$11,000,000

             i.      Actual damages, including damages for its expectation interest, its reliance interest, and its restitution interest;

             ii.     Attorneys' fees by law and contract;

             iii.    Pre-judgment and post-judgment interest;

             iv.    Costs of suit.

       b.      €300,000

             i.      Actual damages, including damages for its expectation interest, its reliance interest, and its restitution interest;

             ii.     Attorneys' fees by law and contract;

             iii.    Pre-judgment and post-judgment interest;

             iv.    Costs of suit.

       c.      US$13,650,000

             i.      Actual damages, including damages for its expectation interest, its reliance interest, and its restitution interest;

             ii.     Attorneys' fees by law and contract;

             iii.    Pre-judgment and post-judgment interest;

       iv.    Costs of suit.

6.1.5   On its claim for Conversion of Specific Chattel

       a.      Return of US$11,000,000 investment;

       b.      Actual damages, including loss of use and loss of use;

    c.        Exemplary damages on proof of malice, *i.e.*, that Real, and Real, P.A.'s actions were wanton and malicious;

    d.        Pre-judgment and post-judgment interest;

    e.        Costs of suit.

6.1.6   On its claims for Negligence

    a.        Actual damages, including lost profits and loss of use;

    b.        Exemplary damages;

    c.        Pre-judgment and post-judgment interest;

    d.        Costs of suit.

6.1.7   On its claim for Negligent Misrepresentation

    a.        Actual damages for pecuniary loss;

    b.        Pre-judgment and post-judgment interest;

    c.        Costs of suit.

6.1.8   As a Consequence of Disregarding the Corporate Forms of EDA, EDA II, Vantage Financial Vantage Plus, PLG and F&G, an order that Delaney, Botero, Iragorri, Guiduzzi, Frattini and Caro are individually liable to BCL for the debts and liabilities of the Pierced Corporations, according to proof.

6.1.9   On its claim for Civil Conspiracy

    a.        Actual damages for the underlying fraud and breach of fiduciary duty;

    b.        Exemplary damages for all underlying claims in which allowed;

    c.        A finding that each co-conspirator is jointly and severally liable for the acts done by any of them in furtherance of the unlawful combination.

## VII.  JURY DEMAND

7.1     Plaintiff demands a trial by jury herein.

WHEREFORE, BCL prays for the following relief:

On its claims under RICO:

     a.     Actual damages for the injury caused by BCL by the pattern of racketeering activity, including lost profits, return of investment, return of loans, with interest at the applicable rates;

     b.     Treble damages pursuant to statute;

     c.     Attorney's fees pursuant to statute;

     d.     Costs of suit.

On its claims for Fraud:

     a.     Common Law Fraud

          i.     Actual damages for economic injury, including out of pocket damages, and benefit of the bargain damages;

          ii.     Exemplary Damages;

          iii.     Attorney's fees based on inter-relatedness of fraud to claims for breach of contract on the US$11,000,000 investment, the €300,000 loan, and the US$13,650,000 loan;

          iv.     Pre-judgment and post-judgment interest;

          v.     Costs of suit.

     b.     Fraud by Non-Disclosure

          i.     Actual damages for economic injury, including out of pocket damages, and benefit of the bargain damages;

          ii.     Exemplary Damages;

    iii.  Attorney's fees based on inter-relatedness of fraud to claims for breach of contract on the US$11,000,000 investment, the €300,000 loan (and as represented by the £244,307 note), and the US$13,650,000 loan;

    iv.  Pre-judgment and post-judgment interest;

    v.  Costs of suit.

  c.  Statutory Fraud

    i.  Actual damages;

    ii.  Exemplary damages;

    iii.  Attorney's fees, expert witness fees and deposition copy costs;

    iv.  Pre-judgment and post-judgment interest;

    v.  Costs of suit.

On its claims for Breach of Fiduciary Duty:

  a.  Actual Damages

  b.  Exemplary Damages for intentional conduct;

  c.  Fee Forfeiture for amounts paid to Guiduzzi and F&G;

  d.  Pre-judgment and post-judgment interest;

  e.  Attorneys fees;

  f.  Costs of suit.

On its claims for Breach of Contract:

  a.  US$11,000,000

    i.  Actual damages, including damages for its expectation interest, its reliance interest, and its restitution interest;

    ii.  Attorneys' fees by law and contract;

        iii.     Pre-judgment and post-judgment interest;

        iv.     Costs of suit.

b.     €300,000

        i.     Actual damages, including damages for its expectation interest, its reliance interest, and its restitution interest;

        ii.     Attorneys' fees by law and contract;

        iii.     Pre-judgment and post-judgment interest;

        iv.     Costs of suit.

c.     US$13,650,000

        i.     Actual damages, including damages for its expectation interest, its reliance interest, and its restitution interest;

        ii.     Attorneys' fees by law and contract;

        iii.     Pre-judgment and post-judgment interest;

        iv.     Costs of suit.

On its claim for Conversion of Specific Chattel:

a.     Return of US$11,000,000 investment;

b.     Actual damages, including loss of use and loss of use;

c.     Exemplary damages on proof of malice, *i.e.*, that Real, and Real, P.A.'s actions were wanton and malicious;

d.     Pre-judgment and post-judgment interest;

e.     Costs of suit.

On its claims for Negligence:

a.     Actual damages, including lost profits and loss of use;

101

      b.        Exemplary damages;

      c.        Pre-judgment and post-judgment interest;

      d.        Costs of suit.

On its claim for Negligent Misrepresentation:

      a.        Actual damages for pecuniary loss;

      b.        Pre-judgment and post-judgment interest;

      c.        Costs of suit.

As a Consequence of Disregarding the Corporate Forms of EDA, EDA II, Vantage Financial Vantage Plus, PLG and F&G, an order that Delaney, Botero, Iragorri, Guiduzzi, Frattini and Caro are individually liable to BCL for the debts and liabilities of the Pierced Corporations, according to proof.

On its claim for Civil Conspiracy:

      a.        Actual damages for the underlying fraud and breach of fiduciary duty;

      b.        Exemplary damages for all underlying claims in which allowed;

      c.        A finding that each co-conspirator is jointly and severally liable for the acts done by any of them in furtherance of the unlawful combination.

BCL further prays for all such other and other relief to which it may show itself justly entitled, in law or in equity.

                        Respectfully submitted,

                        */s/ David S. Toy*
                        David S. Toy
                        Texas SBN 24048029 / SDTX ID 588699
                        401 Louisiana Street, 8th Floor
                        Houston, TX 77002
                        Telephone:    713 653 5600
                        Facsimile:    713 653 5656
                        Email:        dtoy@spaglaw.com

**OF COUNSEL**:

**SPAGNOLETTI & CO.**
Francis I. Spagnoletti
Texas SBN 18869600 / SDTX ID 5369
Jerry C. von Sternberg
Texas SBN 20618150 / SDTX ID
401 Louisiana Street, 8th Floor
Houston, TX 77002
Telephone:      713 653 5600
Facsimile:      713 653 5656
Email:          fspagnoletti@spaglaw.com
                jvs@spaglaw.com

**VALLA & ASSOCIATES, INC., P.C.**
Antonio Valla (admitted *pro hac vice*)
California SBN 136256
Stefano Abbasciano (admitted *pro hac vice*)
California SBN 277680
333 Bush Street, Suite 2020
San Francisco, CA 94104
Telephone:      415 856 9001
Facsimile:      415 856 9002
Email:          antonio.valla@vallalaw.com
Email:          stefano.abbasciano@vallalaw.com

*Attorneys for Plaintiff, B Choice Limited*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing was automatically accomplished on all counsel of record through the CM/ECF Notice of Electronic filing, in accordance with the Federal Rules of Civil Procedure on this 6th day of October, 2015.

*/s/ David S. Toy*
David S. Toy