United States District Court
Southern District of Texas

**ENTERED**

March 03, 2017

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| B CHOICE LIMITED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-2096 |
| | § | |
| EPICENTRE DEVELOPMENT | § | |
| ASSOCIATES, LLC, et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Defendant Andrea Frattini's ("Frattini") Motion for Summary Judgment (Doc. 208), Defendants EpiCentre Development Associates, LLC ("EDA"), EpiCentre Development Associates II, LLC ("EDA II"), Alianza Financial Services, LLC, Alianza Holdings, LLC, Vanguard Equity Holdings, LLC ("Vanguard Equity"), Vantage Equity Holdings, LLC, Vantage Financial Services, LLC ("Vantage Financial"), Vantage Plus Corp. ("VPC"), Vantage Plus Development Company, LLC, Vantage Realty Holdings VI-X, LLC, Omar Botero, Jr. ("Botero"), Albert F. Delaney ("Delaney"), and Gilberto Iragorri's ("Iragorri") (collectively, the "EpiCentre Defendants") Motion for Summary Judgment (Doc. 217), and Defendants PLG Consulting, Ltd. ("PLG") and Pierluigi Guiduzzi's ("Guiduzzi") Motion for Summary Judgment (Doc. 218). The court has considered the motions, the responses, the replies,

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 7, Ord. Dated July 23, 2014.

all other relevant filings, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Frattini's motion for summary judgment be **DENIED**, the EpiCentre Defendants' motion for summary judgment be **DENIED**, and PLG and Guiduzzi's motion for summary judgment be **DENIED**.

## I.   Case Background

B Choice Ltd. ("Plaintiff") brought this action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as claims for fraud, breach of fiduciary duty, civil conspiracy, and breach of contract arising out of its participation in the attempted purchase and planned development of approximately 104 acres of land, the former site of the "AstroWorld" theme park.

## A.   <u>Factual Background</u>

These transactions began in June 2008 with a meeting where Botero and Delaney[2] presented the opportunity of investing in the "EpiCentre Houston" development on the former site of Astroworld to

---

[2]     According to Plaintiff's third amended complaint, Botero was an investor from Florida, as well as the chairman and CEO of EDA, EDA II, Vanguard, Vantage Realty, Vantage Financial, Vanguard Equity, Alianza Holdings, and Alianza Financial.  <u>See</u> Doc. 149, Pl.'s 3$^{d}$ Am. Compl. p. 11.  Delaney was an investor from Florida who helped run EDA, EDA II, Vanguard, Vantage Realty, Vantage Financial, Vanguard Equity, Alianza, and Alianza Financial.  <u>See</u> <u>id.</u> p. 12.  Iragorri was also associated with these entities.  <u>See</u> <u>id.</u> p. 13.  Plaintiff alleges that he was the chief business development officer of EDA II and handled the finances of EDA, EDA II, Vanguard, Vantage Realty, Vantage Financial, Vanguard Equity, Alianza, and Alianza Financial.

Guiduzzi and Frattini[3] in Parma, Italy.[4] Guiduzzi and Frattini testified that they were told that any investment would account for the final ten percent of the deal to purchase the land because the other ninety percent was already subscribed.[5] Frattini brought this potential investment to a client of his, Antonio Robuschi[6] ("Robuschi").[7] Throughout the process of this series of transactions, Frattini was the only one who relayed information to Robuschi.[8] Robuschi selected Plaintiff, a shelf company, to be the instrument for investment, and Frattini asked Guiduzzi to be the director of Plaintiff.[9] Robuschi owned Plaintiff's parent company, Siusi S.p.A.[10] Guiduzzi testified that Frattini directed Guiduzzi's actions while Guiduzzi was director of Plaintiff.[11]

---

[3] Guiduzzi was the director of Plaintiff, F&G, and PLG. See Doc. 149, Pl.'s 3$^d$ Am. Compl. pp. 13-16. Frattini was a shareholder of F&G. See Doc. 241-1, Ex. 3 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Dep. of Frattini p. 28.

[4] See Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Guiduzzi p. 48.

[5] See id. pp. 48-49; Doc. 241-1, Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Dep. of Frattini pp. 92-93.

[6] Robuschi is not a party to this lawsuit.

[7] Doc. 241-1, Ex. 3 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Dep. of Frattini p. 96.

[8] See Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Guiduzzi p. 24-29.

[9] See id. pp. 22-30; Doc. 241-1, Ex. 3 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Dep. of Frattini pp. 95-96.

[10] See Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Guiduzzi, pp. 24-29.

[11] See id. p. 29.

VPC, an entity associated with Botero and Delaney, later sent Guiduzzi a memorandum answering questions related to the project as a follow-up to the June 2008 meeting.[12]  An ownership grid was also provided that listed the capital from each investor and showed a highlighted portion for Robuschi's potential investment.[13]  None of the capital listed on the ownership grid was actually invested at the time that the memorandum was sent to Guiduzzi.[14]

On July 23, 2008, a capital subscription agreement was signed by Guiduzzi and Botero.[15]  Under this contract, Plaintiff agreed to invest $11,000,000 in the EpiCentre project in exchange for a ten-percent equity interest in EDA.[16]  The funds were provided by Plaintiff "for the purpose of acquiring title to the real estate formerly known as AstroWorld and to be known as EpiCentre Houston, a 104.19 acre assemblage located at 9001 Kirby Drive, Houston, TX."[17]  EDA was subsequently registered as a limited liability

---

[12]    See Doc. 217-1, Ex. B to EpiCentre Defs.' Mot. for Summ. J., July 9, 2008 Memo pp. 19-21; Doc. 217-7, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 182-96.

[13]    See Doc. 241-1, Ex. 20 to Pl.'s Resp. to EpiCentre Def.'s Mot. for Summ. J., Ownership Grid pp. 149-50; Doc. 217-6, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Botero pp. 130-31; Doc. 217-7, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 182-96.

[14]    See Doc. 217-7, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 182-96; Doc. 217-6, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Botero pp. 130-31.

[15]    See Doc. 241-1, Ex. 4 to Pl's Resp. to EpiCentre Defs.' Mot. for Summ. J., EDA Capital Subscription Agreement pp. 76-86.

[16]    See id.

[17]    Id. p. 76.

4

company in Texas on August 1, 2008.[18]

Once the agreement was signed, $11,000,000 was sent to Liliana Real, an attorney retained by EDA's Delaney and Botero, who subsequently transferred $10,000,000 to EDA on August 12, 2008.[19] The other $1,000,000 was used to pay debts incurred in an unrelated project and by other entities owned by Botero, as well as costs for initial work on the EpiCentre project.[20]

EDA used the $10,000,000 to acquire a ten-percent interest in the limited partnership which owned the 104 acres, Houston 8th Wonder ("H8W"), an entity owned by Angel/McIver.[21] This transaction was executed through EDA's payment of $9,200,000 to Fuller Cyclone, the second mortgage holder, to pay off its lien on the property and $800,000 was paid to Angel/McIver directly.[22] EDA became a limited partner in H8W but did not acquire title to the property.[23]

In conjunction with Plaintiff's investment in EDA, two

---

[18]    See Doc. 217-7, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 201-02.

[19]    See id. pp. 202-05, 226; Doc. 241-1, Ex. 4 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Wire Transfer for Capital Contribution p. 88; Doc. 241-1, Ex. 5 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Dep. of Real pp. 44, 50-52.

[20]    See Doc. 217-6, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Botero pp. 93-113.

[21]    See Doc. 217-6, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Botero pp. 63-64; Doc. 217-7, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 227-30.

[22]    See id.

[23]    See id.

contracts were signed between F&G, Vantage Financial, and EDA.[24]
The first agreement was signed some time in 2011 with an effective
date of August 1, 2008, under which F&G would provide "relationship
management services" to EDA and Vantage Financial and receive
compensation in return for F&G's bringing potential investors to
Vantage Financial for the EpiCentre project.[25] Plaintiff was listed
as a protected party under this agreement.[26] Delaney testified that
Frattini and Guiduzzi were never paid under this agreement.[27] On
July 7, 2009, Plaintiff entered into a consulting agreement with
F&G, whereby F&G would be paid a consulting fee for its services to
Plaintiff on the EpiCentre project.[28]

In early 2010, to avoid foreclosure on the Astroworld
property, H8W conveyed the property via special warranty deed to
MHB Asset, LP, a partnership owned by the Mallick Group, in
exchange for debt forgiveness on the senior loan on the property in

---

[24]    See Doc. 215-5, Ex. 4 to Pl.'s Resp. to Frattini's Mot. for Summ. J.,
Relationship Management Agreement pp. 1-5; Doc. 241-1, Ex. 9 to Pl.'s Resp. to
EpiCentre Defs.' Mot. for Summ. J., Consulting Agreement pp. 103-07.

[25]    See Doc. 215-5, Ex. 4 to Pl.'s Resp. to Frattini's Mot. for Summ. J.,
Relationship Management Agreement pp. 1-5; Doc. 217-8, App'x to EpiCentre Defs.'
Mot. for Summ. J., Dep. of Delaney pp. 448-67.

[26]    See Doc. 215-5, Ex. 4 to Pl.'s Resp. to Frattini's Mot. for Summ. J.,
Relationship Management Agreement pp. 1-5; Doc. 217-8, App'x to EpiCentre Defs.'
Mot. for Summ. J., Dep. of Delaney pp. 466-67.

[27]    See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of
Delaney pp. 460-63.

[28]    See  Doc. 241-1, Ex. 9 to Pl.'s Resp. to Defs.' Mot. for Summ. J.,
Consulting Agreement pp. 103-07.

the amount of $69,000,000.[29]  As a result, EDA lost its entire investment in H8W.[30]  In exchange for allowing the deal to proceed, EDA received an option to purchase the property and paid the taxes on the property for 2010 and 2011.[31]

On May 6, 2010, Botero, Delaney, and Iragorri sent a status report to Plaintiff.[32]  This report explained that H8W was required sell the land to prevent a foreclosure on the property and, if EDA wished to pursue an interest in the land, EDA would have to buy the land from the new owner.[33]  Accordingly, EDA was seeking new capital to purchase the land, and, although it would not get direct credit from its prior investment, it would receive a decreased purchase price.[34]

On May 27, 2010, Frattini and Guiduzzi received a memorandum from EDA soliciting additional capital for the EpiCentre project.[35] The memorandum stated that EDA was able to obtain some seller financing through the current land partner, and that EDA was

---

[29]    See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 270-71.

[30]    See id. pp. 273-74.

[31]    See id. pp. 273-77.

[32]    See Doc. 217-1, Ex. C to EpiCentre Defs.' Mot. for Summ. J., May 6, 2010 Status Report p. 24; Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Guiduzzi pp. 92, 348-49.

[33]    See id.

[34]    See id.

[35]    See Doc. 217-1, Ex. D to EpiCentre Defs.' Mot. for Summ. J., May 27, 2010 Memorandum pp. 26-28.

"poised to take over control and then ownership of the real estate in Houston."[36]

Guiduzzi testified that he first learned of the loss of Plaintiff's $11,000,000 from the May 6, 2010 memorandum sent by EDA.[37] However, in July 2010, Guiduzzi emailed Delaney stating that Plaintiff's auditor "would like confirmation that the value [of the $11,000,000 investment] has not been lost."[38] Delaney responded that it was "too early to make any conclusion as to the value of the investment" but that, despite the fact that EDA lost its interest in the limited partnership, EDA still had value due to its position as a "development stage company."[39] However, in Delaney's deposition testimony, he stated that EDA had lost its entire investment in H8W.[40]

Around this same time, Guiduzzi wrote Botero and Delaney on July 2, 2010, that Frattini had told him that "Mr. Robuschi could consider helping the deal" enhancing the purchase of the land by providing a loan from Plaintiff.[41] The "deal" to which Guiduzzi

---

[36]   Id. p. 26.

[37]   See Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Guiduzzi pp. 92, 348-49.

[38]   Doc. 241-1, Ex. 6 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., July 2010 Emails p. 93.

[39]   Id.

[40]   See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney p. 272-73.

[41]   Doc. 241-1, Ex. 46 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Smaller Loan Emails from July 2010 p. 234.

referred was news of a potential investment by two Mexican groups.[42]
On July 5, 2010, Delaney emailed Guiduzzi stating that he had
investment commitments of $25,000,000 and $15,000,000 from two
different Mexican groups, and that these funds were enough to pay
off earlier loans to another party.[43]   Plaintiff then loaned
€200,000 to Vantage Financial to pay for overhead expenses on or
about July 5, 2010.[44]

In an email dated September 8, 2010, Guiduzzi reiterated to
Delaney that Plaintiff's auditors required disclosure of any loss
in the value of Plaintiff's investment, and stated that he and
Frattini did not want anything said to the auditors about lost
value because they did not want to create inconsistencies between
the accounts of Plaintiff and Siusi S.p.A.[45]   Guiduzzi testified
that Frattini told him that "the idea was that [Siusi S.p.A.] knew"
about the $11,000,000 loss.[46]   On September 9, 2010, Guiduzzi again
asked Delaney if he could assure the auditors that the value of the
investment had not been lost, and, that if "everything [went] as

---

[42]     See id.

[43]     See Doc. 241-1, Ex. 47 to Pl.'s Resp. to EpiCentre Defs.' Mot. for
Summ. J., July 5, 2010 Emails Regarding Mexican Investors and Small Loan p. 235.

[44]     See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of
Delaney pp. 328.

[45]     See Doc. 241-1, Ex. 7 to Pl.'s Resp. to EpiCentre Defs.' Mot. for
Summ. J., September 2010 Emails p. 96.

[46]     Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of
Guiduzzi pp. 361-62.

planned . . . [,] this statement would probably be true."[47]  Letters were sent to the auditors in September 2010, May 2011, and January 2013 representing that there had been no loss in the value of the investment.[48]

On January 29, 2011, Delaney sent an email to Guiduzzi with an update about potential investors from Mexico City and Singapore.[49] Delaney said that the investor from Mexico City was "99% committed" and only needed one more vote in favor of the transaction from his investment group to move forward with the deal.[50]  Delaney also mentioned that another investor from Mexico City was interested in the project.[51]  Delaney stated that an investment group in Singapore offered to invest $15,000,000 in the project, and EDA would receive a deposit from the group by February.[52]

On May 8, 2011, Delaney emailed a status report to Guiduzzi stating the management of EDA was "in close negotiation with other financially involved parties for a contract that permits taking

---

[47]  See id. p. 95.

[48]  See Doc. 241-1, Ex. 10 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., May 2011 Auditor Letter p. 108; Doc. 241-1, Ex. 33 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., September 2010 Auditor Letter p. 192; Doc. 243-1, Ex. 26 to Pl.'s Resp. to PLG & Guiduzzi's Mot. for Summ. J., January 2013 Auditor Letter p. 103.

[49]  See Doc. 241-1, Ex. 31 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., January 29, 2011 Status Report p. 187.

[50]  Id.

[51]  See id.

[52]  See id.

title to the land over a stipulated schedule."[53]  Delaney stated
that the first closing was planned for the end of May whereby they
would acquire thirteen acres of the property, twenty-one acres 120
days later, twenty-five acres 240 days later, and the remainder of
the property would be conveyed one year after the closing.[54]
Plaintiff was cited as the primary source of capitalization for the
first closing.[55]

In a status report dated June 4, 2011, Delaney reiterated to
Guiduzzi and Frattini that EDA was going to acquire the land in
four different phases, with Plaintiff providing a bank guarantee
towards the first acquisition.[56]  Delaney also discussed potential
investors from China and Mexico City who had expressed interest in
the project.[57]  In closing the status report, Delaney requested
additional capital to keep EDA running with a short-term, high-
priority loan that would be repaid after the first closing took
place.[58]

In early 2011, the EDA parties held a directors meeting in
Miami, Florida, where the possibility of Plaintiff's putting

---

[53]    Doc. 241-1, Ex. 11 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ.
J., May 8, 2011 Status Report p. 109.

[54]    See id.

[55]    See id.

[56]    See Doc. 241-1, Ex. 12 to Pl.'s Resp. to Defs.' Mot. for Summ. J.,
June 4, 2011 Status Report p. 110.

[57]    See id.

[58]    See id.

additional capital into the project was discussed.[59]   Frattini suggested the utilization of a collateral or a bank guarantee to provide funding.[60]   Delaney first asked that Plaintiff provide funding of around $10,000,000.[61]   It was later decided that the funding would be in the amount of $13,650,000.[62]

The plan was to obtain a bank guarantee for $13,650,000, but the bank did not have a credit rating in the United States.[63] Therefore, Frattini discussed with Robuschi the possibility of Siusi S.p.A. providing Plaintiff with the money for a loan.[64] Robuschi agreed, and EDA and Plaintiff signed a credit facility agreement and promissory note in the amount of $13,650,000 on July 28, 2011.[65]   The credit facility agreement stated that it was only to "be used to obtain title to a portion of the land and a contract to acquire the balance of the land."[66]

After the loan was made, $568,180.82 was transferred to

---

[59]     See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 282-83.

[60]     See id.

[61]     See id.

[62]     See id. p. 283-84.

[63]     See id. pp. 287-90.

[64]     See id.

[65]     See Doc. 217-1, Ex. E to EpiCentre Defs.' Mot. for Summ. J., Promissory Note pp. 30-35; Doc. 217-1, Ex. G to EpiCentre Defs.' Mot. for Summ. J., Credit Facility Agreement pp. 40-42.

[66]     Doc. 217-1, Ex. G to EpiCentre Defs.' Mot. for Summ. J., Credit Facility Agreement p. 41; Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 318-19.

Vantage Financial in conformity with the escrow agreement between the parties.[67]  The instructions to the escrow agent were signed by Guiduzzi, Delaney, and Botero.[68]  Delaney testified that some of this money went to Botero, Iragorri, office rent and other overhead costs, and himself.[69]  These overhead costs consisted of travel, car rentals, hotel stays, repayment of loans from Botero's family members, payment to Delaney's ex-wife, and payment into an account shared by Delaney and his son.[70]  Delaney testified that Guiduzzi gave authorization to use some of the money for overhead, as evidenced by his signature on the escrow agreement, and that Guiduzzi and Frattini were aware that a portion of the funds were to be applied to overhead costs.[71]  Notes from a phone call between Frattini and Guiduzzi confirm that Frattini was told that $568,180.82 was going to Vantage Financial at closing.[72]

Another portion of the borrowed funds was used to purchase

---

[67]     See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 284-85, 315-19; Doc. 241-1, Ex. 13 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Instructions to Escrow Agent pp. 111-13.

[68]     See Doc. 241-1, Ex. 13 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Instructions to Escrow Agent p. 111.

[69]     See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 284-85, 315-19, 322-25.

[70]     See Doc. 217-9, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 557-58, 574-76, 582-83.

[71]     See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney p. 324-27.

[72]     See Doc. 241-1, Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Note from July 27, 2011 Phone Call pp. 112-13.

11.34 acres of the AstroWorld property.[73]   On July 29, 2011, the Mallick Group conveyed 11.34 acres of the Astroworld property via special warranty deed to EDA.[74]

On January 19, 2012, the 11.34 acre parcel was used as collateral for a loan in the approximate amount of $1,000,000.[75] After paying title and insurance fees in the amount of $125,000, the loan proceeds were placed into the Vantage Financial account.[76] In his testimony, Delaney was unable to definitively explain what happened to the funds.[77]   On March 26, 2012, EDA took out another loan against the 11.34 acre parcel in the amount of $2,555,000.[78] Delaney testified that a portion of the money was used to pay off the first loan, and the remainder was deposited into the Vantage Financial account to make payments for contract deposits, taxes, overhead, retainer agreements, and architectural consulting.[79] Delaney testified that Frattini and Guiduzzi gave authorization for these liens against the 11.34 acre parcel.[80]   The EDA board of

---

[73]   See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney p. 310.

[74]   See id. p. 333.

[75]   See id. pp. 342-43.

[76]   See id.

[77]   See id.

[78]   See id. p. 343.

[79]   See id. pp. 343-44.

[80]   See id. pp. 345-46.

directors, consisting of Botero, representing Vantage Financial, Delaney, representing Vanguard Equity, and Plaintiff, represented by Guiduzzi, unanimously approved this second loan on March 5, 2012.[81]

In May 2012, a report was sent to Robuschi and the shareholders of Siusi S.p.A. on Frattini's letterhead.[82] Frattini testified that he authored this report, in Italian, but Delaney's signature appears at the bottom of the report, a fact which Frattini could not explain in his deposition.[83] This report purportedly updated Robuschi on the investment opportunities that EDA was considering for the EpiCentre Houston project.[84]

On October 23, 2012, Plaintiff was told that Siusi S.p.A. would lend Plaintiff €40,000,000 for the EpiCentre project.[85] The letter appears to be signed by Robuschi, but Frattini testified that he forged Robuschi's signature on the letter.[86] Frattini additionally testified that he believed Guiduzzi wrote the letter,

---

[81]    See Doc. 218-12, Ex. K to PLG & Guiduzzi's Mot. for Summ. J., Unanimous Written Consent pp. 1-2.

[82]    See Doc. 215-14, Ex. 13 to Pl.'s Resp. to Frattini's Mot. for Summ. J., May 2012 Report pp. 1-9.

[83]    See Doc. 215-11, Ex. 10 to Pl.'s Resp. to Frattini's Mot. for Summ. J., Dep. of Frattini pp. 290-94.

[84]    See Doc. 215-14, Ex. 13 to Pl.'s Resp. to Frattini's Mot. for Summ. J., May 2012 Report pp. 1-9.

[85]    See Doc. 241-1, Ex. 16 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., October 23, 2012 Letter p. 123.

[86]    See Doc. 241-1, Ex. 3 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., Dep. of Frattini pp. 166-68; Doc. 241-1, Ex. 16 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., October 23, 2012 Letter p. 123.

but the metadata reveals that "Al" was the creator of the document,
an indication that Delaney may have actually been its author.[87]  The
Mallick Group, owner of the remainder of the Astroworld property,
canceled the transaction because of lack of funding.[88]

On December 3, 2012, Delaney forwarded to Guiduzzi and
Frattini a contract that was "sufficient in both timing and amount
to close the complete purchase of the Astroworld property."[89]
Delaney also stated that "EDA [was] proud and ecstatic to finally
be fully capitalized to acquire and properly develop this important
property."[90]

On December 4, 2012, the 11.34 acre parcel was transferred for
no consideration from EDA to EDA II, a newly-formed, wholly-owned
subsidiary of EDA.[91]  That same day, EDA II obtained a title loan
for $4,750,000, and paid off the earlier loan.[92]  The remainder,
$1,736,084.99, was distributed for various purposes, including as
a severance payment to Oscar Jimenez, an accountant who was

---

[87]    See Doc. 241-1, Ex. 3 to Pl.'s Resp. to EpiCentre Defs.' Mot. for
Summ. J., Dep. of Frattini pp. 167-72; Doc. 241-1, Ex. 17 to Pl.'s Resp. to
EpiCentre Defs.' Mot. for Summ. J., Draft of October 23, 2012 Letter p. 125.

[88]    See Doc. 215-10, Ex. 9 to Pl.'s Resp. to Frattini's Mot. for Summ.
J., November 29, November 2012 Emails pp. 1-2; Doc. 243-1, Ex. 25 to Pl.'s Resp.
to PLG & Guiduzzi's Mot. for Summ. J., October 31, 2012 Emails pp. 101-02.

[89]    Doc. 241-1, Ex. 34 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ.
J., Email Dated Dec. 3, 2012 p. 193.

[90]    Id.

[91]    See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of
Delaney pp. 352-53.

[92]    See id. pp. 347-48.

formerly employed by the EpiCentre Defendants, and to Stephen
Kaepeli, a banker in Switzerland, to repay a loan owed to Botero's
cousin.[93]  Plaintiff was not repaid any proceeds from this loan to
its earlier loan of $13,650,000.[94]  On March 18, 2013, EDA II sold
the 11.34 acre parcel via general warranty deed to an entity named
Kirby at West Bellfort, LLC for $4,750,000, and EDA II retained an
option to buy back the property.[95]  Guiduzzi testified that he was
unaware of this series of transactions.[96]

A board meeting of EDA took place on May 13, 2013, in Miami,
Florida, with Botero, Delaney, Guiduzzi, and Frattini in
attendance.[97]  At the meeting, they discussed the status of the
EpiCentre project.[98]  Guiduzzi testified that, either at this
meeting or another meeting in Miami in 2013, Botero represented
that EDA still owned the property.[99]  A draft of the board minutes
from the meeting was edited and "the portion we already own" was

---

[93]    See Doc. 217-9, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of
Delaney pp. 613-19.

[94]    See id. pp. 625.

[95]    See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of
Delaney pp. 356-59; Doc. 218-14, Ex. M to PLG & Guiduzzi's Mot. for Summ. J.,
Limited Call Option Agreement pp. 1-10.

[96]    See Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep.
of Guiduzzi pp. 268-72.

[97]    See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of
Delaney p. 409-10.

[98]    See Doc. 241-1, Ex. 37 to Pl.'s Resp. to EpiCentre Defs.' Mot. for
Summ. J., May 13, 2013 Board Minutes pp. 197-98.

[99]    See Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep.
of Guiduzzi p. 261-62.

changed to "the portion we bought."[100]   Delaney signed the second version and stated that the first version was an internal document and was not distributed.[101]

On July 16, 2013, Delaney, on behalf of EDA, sent a memorandum to F&G discussing the status of the property.[102]  Delaney said that EDA was working on a sale of six to nine acres to a developer who planned to build an office and lease it to the City of Houston.[103] Delaney additionally represented that EDA was facilitating a sale of fifteen acres to a local hospital, and that the closing from the sale would give EDA the money to acquire the land for the hospital.[104]  The memorandum also mentioned a potential sale of five acres to Aramco Energy.[105]  Delaney wrote that the parties that had signed letters of intent wanted to close in order to finish their projects before the 2017 Super Bowl, with these letters of intent "represent[ing] approximately thirty more acres of sold land."[106] It was also presented to F&G that there was another potential investor who would close and provide funding in the next two

---

[100]    Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 485-87.

[101]    See id.

[102]    See Doc. 241-1, Ex. 18 to Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J., July 16, 2013 Status Report pp. 129-30.

[103]    See id. p. 129.

[104]    See id.

[105]    See id.

[106]    Id. p. 130.

weeks.[107]

Delaney admits that there were a number of misrepresentations made in 2014.[108]  For example, a misrepresentation was made in April 2014 that a hospital was going to purchase some of EDA's land, and the board of the hospital had approve the proposed purchase, none of which was true.[109]  Additionally, Delaney sent out a memorandum on May 6, 2014, stating that the 11.34 acre parcel was secured and the land had "seen an increase in value due to the realization [sic] of external infrastructures such as a small electrical power station plus a bridge."[110]  Guiduzzi sent Delaney an email that day stating he wanted a copy of "the purchase agreement for the land EDA _owns_" and Delaney did not inform Guiduzzi he was mistaken in his impression that EDA still owned the land.[111]

In June 2014, Delaney called Guiduzzi and admitted that EDA no longer owned the eleven-acre parcel of the Astroworld property.[112]

---

[107]    See _id._

[108]    See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney p. 468 (In [] 2014 . . . there are a number of misrepresentations, whether they come from misunderstandings or come from an intent to lie, I can't tell you that.")

[109]    See _id._ pp. 437-38.

[110]    Doc. 218-21, Ex. T to PLG & Guiduzzi's Mot. for Summ. J., May 6, 2014 Memorandum pp. 1-2.

[111]    Doc. 218-22, Ex. U to PLG & Guiduzzi's Mot. for Summ. J., May 6, 2014 Email from Guiduzzi p. 1; Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 469-74 (emphasis added).

[112]    See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 468-74; Doc. 217-10, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Guiduzzi pp. 173-76.

Delaney also met with Siusi S.p.A.'s attorney, a representative from Siusi S.p.A., and Frattini in Houston to discuss the status of the investment, and he disclosed that EDA had no ownership interest in the property and all of Plaintiff's money was gone.[113]

**B.   Procedural Background**

Plaintiff filed its complaint on July 22, 2014.[114]   Plaintiff filed a third amended complaint on October 6, 2015.[115]   On July 29, 2016, Frattini filed a motion for summary judgment, and Plaintiff responded on September 7, 2016.[116]   On September 12, 2016, the Epicentre Defendants and Guidduzi and PLG filed their motions for summary judgment.[117]   Frattini filed a notice of joinder on September 16, 2016, adopting and incorporating the motions filed by the EpiCentre Defendants, Guiduzzi, and PLG.[118]   Plaintiff responded to these motions on December 9, 2016.[119]   The EpiCentre Defendants,

---

[113]   See Doc. 217-8, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 471-72; Doc. 217-9, App'x to EpiCentre Defs.' Mot. for Summ. J., Dep. of Delaney pp. 554-55; Doc. 241-1, Pl.'s Resp. to Defs.' Mot. for Summ. J., Dep. of Frattini p. 25.

[114]   See Doc. 1, Pl.'s Orig. Compl.

[115]   See Doc. 149, Pl.'s 3$^d$ Am. Compl.

[116]   See Doc. 208, Frattini's Mot. for Summ. J.; Doc. 215, Pl.'s Resp. to Frattini's Mot. for Summ. J.

[117]   See Doc. 217, EpiCentre Defs.' Mot. for Summ J.; Doc. 218, PLG & Guiduzzi's Mot. for Summ. J.

[118]   See Doc. 220, Frattini's Notice of Joinder in EpiCentre Defs.' Mot. for Summ. J. & PLG & Guiduzzi's Mot. for Summ. J.

[119]   See Doc. 241, Pl.'s Resp. to EpiCentre Defs.' Mot. for Summ. J; Doc. 243, Pl.'s Resp. to PLG & Guiduzzi's Mot. for Summ. J.

Guiduzzi, and PLG filed replies on December 14, 2016.[120]

## II.  Legal Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which

---

[120]    See Doc. 246, EpiCentre Defs.' Reply to Pl.'s Resp.; Doc. 247, PLG & Guiduzzi's Reply to Pl.'s Resp.

the nonmoving party bears the burden, the movant will be entitled
to summary judgment.  Celotex Corp., 477 U.S. at 322.  In response
to a showing of lack of evidence, the party opposing summary
judgment must go beyond the pleadings and proffer evidence that
establishes each of the challenged elements of the case,
demonstrating that genuine issues of material fact do exist that
must be resolved at trial.  Id. at 324.

When considering the evidence, "[d]oubts are to be resolved in
favor of the nonmoving party, and any reasonable inferences are to
be drawn in favor of that party."  Evans v. City of Houston, 246
F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co.
v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court
should not "weigh evidence, assess credibility, or determine the
most reasonable inference to be drawn from the evidence."  Honore
v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some
metaphysical doubt as to the material facts."  Meinecke v. H & R
Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995).  Conclusory
allegations, unsubstantiated assertions, improbable inferences,
unsupported speculation, or only a scintilla of evidence will not
carry this burden.  Brown, 337 F.3d at 541; Ramsey v. Henderson,
286 F.3d 264, 269 (5th Cir. 2002).  The court must grant summary
judgment if, after an adequate period of discovery, the nonmovant
fails "to make a showing sufficient to establish the existence of

22

an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### III. Analysis

Defendants PLG, Guiduzzi, Frattini, and the Epicentre Defendants move for summary judgment arguing that some of Plaintiff's claims are barred by the statute of limitations or are unsupported by the evidence.

### A.  Statute of Limitations

Defendants challenge Plaintiff's claims related to its initial investment of $11,000,000, arguing that they are barred by the applicable statutes of limitations.  Plaintiff argues that there is a genuine issue of material fact because Guiduzzi's knowledge of the fraud should not be imputed to Plaintiff because Guiduzzi was not an innocent third party.  Additionally, Plaintiff argues that the Defendants' acts to fraudulently conceal the loss of the $11,000,000 investment should toll the statute of limitations.

Under Texas law, fraud claims have a four-year statute of limitations.  Tex. Civ. Prac. & Rem. Code § 16.004(a)(4).  The statute of limitations for fraud claims "does not begin to run until the claimant knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act."  Little v. Smith, 943 S.W.2d 414, 420 (Tex. 1997); see also Exxon Corp. v. Emerald Oil & Gas Co., L.C., 348

23

S.W.3d 194, 216 (Tex. 2011)("The statute of limitations for fraud begins to run from the time the party knew of the misrepresentation.").

Ordinarily, the knowledge of a corporate representative is imputed to the corporation itself. Askanase v. Fatjo, 130 F.3d 657, 666 (5th Cir. 1997). This rule of imputation does not apply "when the agent is acting fraudulently toward his principal. In that situation, the agent's knowledge is not binding on the principal." Crisp v. Southwest Bancshares Leasing Co., 586 S.W.2d 610, 615 (Tex. Civ. App.–Amarillo 1979, writ ref'd n.r.e.). "If the plaintiff can show that the officer/director was acting adversely to the corporation and entirely for his own or another's purpose, then limitations will be tolled." Askanase, 130 F.3d at 666.

Fraudulent concealment equitably estops a defendant from utilizing the statute of limitations to bar a plaintiff's claim. Borderlon v. Peck, 661 S.W.2d 907, 908 (Tex. 1983). "Where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the defense of limitations until the party learns of the right of action or should have learned thereof through the exercise of reasonable diligence." Id. (citations omitted).

Here, Guiduzzi testified that he knew the $11,000,000

24

investment was lost in May of 2010, based on a memo EDA sent to him on May 6, 2010.  Although the letter does not explicitly state that the entire $11,000,000 was lost, it does inform Guiduzzi that the limited partnership was going to convey the land to a new owner, clearly placing Guiduzzi on notice that the land was gone. However, the court finds that there is an issue of fact whether the knowledge of Guiduzzi should be imputed to Plaintiff because Guiduzzi's actions after May 2010 evince an intent to fraudulently conceal the loss of the $11,000,000 to Siusi S.p.A.  It is unclear from the evidence whether Siusi S.p.A. was ever adequately informed that the $11,000,000 had been lost; Guiduzzi testified that Frattini told him that the "idea was that they knew."  The emails from July and September 2010 reveal that Guiduzzi and Frattini wanted Delaney to report that there had been no loss in the investment to the auditors.  The auditors received letters in 2010, 2011, and 2013 reporting that there had been no loss in the investment, despite Guiduzzi's stated knowledge that there had been a total loss in May 2010.  Therefore, the court finds that there are genuine issues of material fact whether the knowledge of Guiduzzi should be imputed to Plaintiff related to its $11,000,000 investment.  Summary judgment on this issue should be denied.

**B.  <u>Fraud</u>**

The Epicentre Defendants, Frattini, Guiduzzi, and PLG challenge Plaintiff's fraud claims, arguing that Plaintiff cannot

prove the elements of fraud.

To state a prima facie case for fraud, a plaintiff must establish:

> (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001).

**1. Frattini**

Frattini argues that Plaintiff's fraud claim against him should fail as a matter of law, contending that his statements were made to Robuschi, not Plaintiff. Plaintiff responds that Frattini made fraudulent misrepresentations and is liable for the fraudulent misrepresentations of his partner, Guiduzzi.

Frattini's argument ignores the fact that he made misrepresentations to Robuschi to induce Plaintiff to act. For example, Guiduzzi and Frattini requested Delaney to tell the auditors of Siusi S.p.A. that the value of the $11,000,000 investment was not lost. And, even though Frattini knew the entire $11,000,000 investment was lost, he encouraged Robuschi to continue to loan money for the project through Plaintiff. Frattini suggested the possibility of additional funding from Plaintiff in a board meeting in early 2011 after the $11,000,000 investment had been lost. Frattini forged Robuschi's signature on a letter from

Siusi S.p.A. stating that it would loan Plaintiff €40,000,000 for the EpiCentre project.  In addition, Guiduzzi, on behalf of F&G, Guiduzzi and Frattini's partnership, signed an agreement with EDA in 2008 whereby F&G was to receive a finder's fee for the investment that Plaintiff made in EDA, even though the investment was already in place.  These alleged acts and others raise an issue of material fact whether Frattini committed fraud against Plaintiff.  Frattini's motion for summary judgment on these claims should be denied.

### 2. EpiCentre Defendants

The EpiCentre Defendants challenge Plaintiff's claims of fraud arising out of three different transactions: (1) the $11,000,000 sent to EDA as part of the subscription agreement in July 2008; (2) the 2011 loan for $13,650,000; and (3) the €200,000 loan from July 5, 2010.  The court will address each one of these transactions separately.

### a. $11,000,000 Subscription Agreement

The EpiCentre Defendants challenge Plaintiff's fraud claims related to the $11,000,000 transaction, arguing that Plaintiff has not met the elements of a fraud claim.  The EpiCentre Defendants argue that because Plaintiff knew that it was not the last investor in the property and EDA was acquiring interests in H8W, not directly in the land, it cannot prove fraud.  The EpiCentre Defendants also contend that Plaintiff cannot show reliance because

27

it has not offered evidence that anyone connected to Plaintiff believed its version of the facts.   Additionally, Defendants argue that they properly used the $11,000,000 to acquire an indirect interest and to pay for EDA's expenses.

Plaintiff asserts that EDA misrepresented that the $11,000,000 would be used to acquire the land, not merely an ownership interest in H8W, and that it did not know that a portion of its investment would pay for some of the EpiCentre Defendants' business and personal expenses.   Plaintiff also argues that Defendants misrepresented that the other ninety percent of EDA had been subscribed, and that the ownership grid unclear about what had been contributed to the EpiCentre project at the time of the meeting in Parma.   Plaintiff contends that it relied on these misrepresentations made by the EpiCentre Defendants in making the subscription agreement.

Plaintiff has provided evidence to raise a genuine issue of material fact the representations that induced it to invest the $11,000,000.   Frattini and Guiduzzi both testified that they were told that Plaintiff's investment in EDA would make up the last ten percent of the capital subscribed.   Delaney's testimony demonstrates that this was a false belief, as most of the potential investors in the project never actually invested any money.

The EpiCentre Defendants argue in their reply that the ownership grid made the status of the potential investment clear to

28

Guiduzzi and Frattini because certain portions were marked as "reserved."  However, looking at the ownership grid, only small portions of Vantage Reality Holdings were marked as "reserved." Overall, the court finds that the chart does not clearly distinguish between capital that was already invested and potential capital.  Delaney's testimony shows that many of these potential investors failed to put up any capital for the EpiCentre project. This grid, along with the testimony of Guiduzzi and Frattini, raises a genuine issue of material fact about whether the EpiCentre Defendants misled Guiduzzi and Frattini into believing that Plaintiff's contribution to the project would be the final ten percent of the deal.

For example, Delaney's testimony reveals that $1,000,000 of the investment went to cover unrelated expenses of the EpiCentre Defendants, despite the fact that the contract stated that the funds were to go to "acquire title" to the real estate.  The court finds this raises a genuine issue of material fact whether the contract misrepresented the purpose of providing funds to the EpiCentre Defendants.

### b.   $13,650,000 Loan and Subsequent Actions

The EpiCentre Defendants challenge Plaintiff's fraud claims related to the $13,650,000 loan, contending that Plaintiff knew of the risky nature of its investment and none of the documents were fraudulent.  Plaintiff responds that misrepresentations related to

this loan and the status of Plaintiff's earlier investment induced Plaintiff into making the loan.  Plaintiff also argues that the EpiCentre Defendants' representations after the loan was made were to conceal the fraud.

Guiduzzi's testimony indicates that he knew that the $11,000,000 loan was lost in May 2010.  Yet, despite this piece of information, he still signed a promissory note on behalf of Plaintiff lending another $13,650,000 to EDA for the EpiCentre project.  Also, emails from Delaney before and after the loan took place left the impression that there were many other investors willing to invest in the project.

Delaney took actions beginning in December 2012 to conceal, even from Frattini and Guiduzzi, what was being done with the property.  Delaney admitted in his own testimony that misrepresentations were made about the property in 2014.  Despite his testimony that he talked to Guiduzzi on a regular basis, Delaney failed to disclose to Guiduzzi until mid-2014 information about the transfer from EDA to EDA II, the mortgage for $4,750,000, or the subsequent sale of the property.  Additionally, Delaney sent out a memorandum on May 6, 2014, that left the false impression that EDA still owned the property and was working on a sale of six-to-nine acres.  Guiduzzi sent Delaney an email that same day that requested a copy of "the purchase agreement for the land EDA owns," and Delaney admitted that he did nothing to correct Guiduzzi's

mistaken belief that EDA still owned the property until June 2014.
Plaintiff has raised a genuine issue of material fact with respect
to its fraud claims related to the $13,650,000 loan.

### c.  €200,000 Loan

Plaintiff's fraud claim related to the €200,000 loan is
challenged on the basis that there was no evidence of fraud.  The
EpiCentre Defendants argue that Plaintiff's only evidence is an
email from July 5, 2010, discussing a potential investment
opportunity with investors from Mexico City, an investment that
they did not decide to pursue because the investors were not
credible.  Plaintiff argues that the July 5, 2010 email from
Delaney contained false information because he stated that there
were "enough funds to close and repay the Helmsleigh loans," and
Plaintiff relied on this statement in making the loan.

The emails between Guiduzzi and Delaney related to this
smaller loan raise genuine issues of material fact about whether
misrepresentations were made related to the failed investment by
the Mexican groups, because in Delaney's emails, he implies that
those investments were finalized deals and they would result in an
influx of $40,000,000 towards the project.  There is an issue of
fact whether Plaintiff relied on Delaney's statements in deciding
to make the loan.  Therefore, the EpiCentre Defendants' motion is
denied on this claim.

### 3.  PLG and Guiduzzi

PLG and Guiduzzi challenge Plaintiff's fraud claims, arguing that Plaintiff knew that the first investment of $11,000,000 had been lost in May 2010, and that Plaintiff knew, in making the $13,650,000 loan, that only eleven acres of the property would be purchased, pursuant to the agreement between the parties.  PLG and Guiduzzi argue that Plaintiff has not shown that it relied on any alleged misrepresentations and many of the allegedly false statements were made after Plaintiff invested the $11,000,000 and provided the $13,650,000 loan.  Plaintiff argues that Guiduzzi made and participated in misrepresentations that Plaintiff relied on to its detriment.

As the court has already discussed, the evidence raises genuine issues of material fact about what Plaintiff knew, and when, because it is possible that the finder of fact may not impute Guiduzzi's knowledge to Plaintiff.  There is also evidence that Guiduzzi and Frattini signed an agreement to receive what may be considered kickbacks from investments Plaintiff made in EDA, an agreement creating conflicts of interest for Guiduzzi as director of Plaintiff.  And, after Guiduzzi became aware that the $11,000,000 was lost, he and Frattini induced Delaney to misrepresent to Plaintiff's auditors that the value of the investment had not been lost.  Therefore, there are genuine issues of material fact whether misrepresentations were made by Guiduzzi and whether Plaintiff relied on these misrepresentations.  The

court declines to dismiss Plaintiff's fraud claims against Guiduzzi and PLG.

### 4. Statutory Fraud

Plaintiff additionally makes claims of statutory fraud, which Guiduzzi and PLG challenge, arguing that Plaintiff's claims do not fall under Texas Business and Commerce Code § 27.01 because no real estate or stock transaction occurred and because EDA is a limited liability company, not a corporation, and did not issue stock. Plaintiff argues that limited liability companies come under the purview of the statute.

Texas Business and Commerce Code § 27.01 establishes a cause of action for statutory fraud in real estate or stock transactions. Tex. Bus. & Com. Code § 27.01(a). Under this section, fraud occurs in a real estate or stock transaction if: a false representation of material fact or a false promise is made to induce someone to enter into the contract and it is relied upon. Tex. Bus. & Com. Code § 27.01(a). These provisions "only look at the time up to and including the execution of the contract for the fulfillment of any of their elements." In re Skyport Global Communications, Inc., Br. No. 08-36737, 2011 WL 111427, at *49 (Bankr. S.D. Tex. 2011)(unpublished).

The "elements of statutory fraud in the sale of stock are substantially the same [as common law fraud] except that to recover actual damages, a plaintiff does not have to prove that the

defendant knew the statement was false." O'Hare v. Graham, 455 Fed. App'x 377, 380 (5th Cir. 2011)(citing Perenco Nigeria, Ltd. v. Ashland, Inc., 242 F.3d 299, 306 (5th Cir. 2011)(interpreting Tex. Bus. & Com. Code § 27.01). For Texas Business and Commerce Code § 27.01 to apply, there must be an actual conveyance of stock, not merely a breach of contract to convey stock. U.S. Quest Ltd. v. Kimmons, 228 F.3d 399, 406 (5th Cir. 2000). "This narrow reading of Section 27.01(a) is consistent with the Supreme Court of Texas' interpretation that the statute is penal in nature and thus must be strictly construed." Id.

Here, the court agrees with Guiduzzi and PLG that no real estate transaction occurred between EDA and Plaintiff. However, a stock transaction occurred when Plaintiff signed the subscription agreement wherein it purchased a 10% subscription in EDA. The court is not persuaded by Guiduzzi and PLG's argument that LLCs do not fall under the purview of this statute. See Energy Maintenance Servs. Grp. I, LLC v. Sandt, 401 S.W.3d 204 (Tex. App.-Houston [14th Dist.], 2012). In Energy Maintenance, the court upheld a statutory fraud claim against an LLC, its director, and its members. See id. pp. 214-15.

There is evidence that Frattini and Guiduzzi signed an agreement as F&G with the EpiCentre Defendants to receive kickbacks for bringing investors to the project. Additionally, Frattini and Guiduzzi testified that they believed that Plaintiff's subscription

would make up the final 10% of the investment in EDA.  It is reasonable that they would have relied on this information in deciding to invest in EDA.  Therefore, the court declines to dismiss Plaintiff's statutory fraud claims.

## B.  <u>RICO and Civil Conspiracy</u>

Congress enacted RICO to prohibit conduct involving a pattern of racketeering activity.  <u>See</u> <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 453 (2006); <u>Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer</u>, 90 F.3d 118, 122 (5th Cir. 1996).  "One of RICO's enforcement mechanisms is a private right of action, available to '[a]ny person injured in his business or property by reason of a violation' of the RICO's substantive restrictions."  <u>Anza</u>, 547 U.S. at 453 (quoting 18 U.S.C. § 1964(c)).

RICO makes it unlawful for "any person employed by or associated with any enterprise engaged in, or in the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Additionally, a conspiracy to commit acts under subsection (c) is unlawful under section (d).  18 U.S.C. § 1962(d).  The substantive requirements of 18 U.S.C. § 1962 are the same regardless of whether the suit is civil or criminal.  <u>St. Paul Mercury Ins. Co. v. Williamson</u>, 224 F.3d 425, 446 n.15 (5th Cir. 2000).

A pattern of racketeering activity is created by two or more predicate acts that are related and constitute or pose a threat of continued criminal activity. 18 U.S.C. § 1961(5); Brown v. Protective Life Ins. Co., 353 F.3d 405, 407 (5th Cir. 2003). Continuity of criminal activity may refer to either a closed period of repeated conduct or an open-ended period that threatens repetition. Zastrow v. Hous. Auto Imports Greenway Ltd., 789 F.3d 553, 561 (5th Cir. 2015)(quoting Word of Faith World Outreach Ctr. Church, Inc. 90 F.3d at 122)).

In the context of a RICO claim, the term "predicate acts" refers to either state or federal crimes. St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009) cert. denied, 557 U.S. 920 (2009). In this case, Plaintiff's remaining alleged predicate acts consist of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, the Travel Act under 18 U.S.C. § 1952, and money laundering under 18 U.S.C. §§ 1956(a)(1)(A)(I) and (a)(2). See 18 U.S.C. § 1961(1)(listing mail fraud and wire fraud as predicate acts under RICO).

A pattern of racketeering activity is created by two or more predicate acts that are related and constitute or pose a threat of continued criminal activity. 18 U.S.C. § 1961(5); Brown v. Protective Life Ins. Co., 353 F.3d 405, 407 (5th Cir. 2003). Continuity of criminal activity may refer to either a closed period of repeated conduct or an open-ended period that threatens

36

repetition.  Zastrow v. Hous. Auto Imports Greenway Ltd., 789 F.3d 553, 561 (5th Cir. 2015)(quoting Word of Faith World Outreach Ctr. Church, Inc. 90 F.3d at 122)).

In the context of a RICO claim, the term "predicate acts" refers to either state or federal crimes.  St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009) cert. denied, 557 U.S. 920 (2009). In this case, Plaintiff's remaining alleged predicate acts consist of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, the Travel Act under 18 U.S.C. § 1952, and money laundering under 18 U.S.C. §§ 1956(a)(1)(A)(I) and (a)(2).  See 18 U.S.C. § 1961(1)(listing mail fraud and wire fraud as predicate acts under RICO).

The elements of civil conspiracy are: (1) two or more persons; (2) have an objective to be accomplished; (3) a meeting of the minds on the objective or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.  Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005); Meineke Discount Muffler v. Jaynes, 999 F.2d 120, 124 (5th Cir. 1993).  "Civil conspiracy is a derivative tort" under Texas law, so a plaintiff must "state a separate underlying claim on which the court may grant relief," or the claim fails.  Meadows v. Hartford Life Ins. Co., 492 F.3d 634, 640 (5th Cir. 2007).[121]

---

[121]   As RICO has its own conspiracy provision, the court interprets Plaintiff's complaint to raise civil conspiracy allegations related to Plaintiff's state law claims only.

### 1. Frattini and the EpiCentre Defendants

Frattini and the EpiCentre Defendants argue that because Plaintiff's fraud claims fail, Plaintiff cannot maintain claims for civil conspiracy or RICO. Plaintiff argues it has provided evidence to show that the defendants made misrepresentations and conspired and aided and abetted in the RICO enterprise.

Because the court has allowed Plaintiff's fraud claims against these Defendants to proceed to trial, the EpiCentre Defendants and Frattini's arguments that their conspiracy and RICO claims should be dismissed are without foundation. Plaintiff has provided evidence of mail and wire fraud, including communications from Defendants containing misrepresentations, such as the memorandum from May 2014 that stated that Defendants were working on a sale of six to nine acres of the property, even though they did not own the land any more. Additionally, the emails from July and September of 2010 raise an issue of material fact of whether Guiduzzi wanted Delaney to cover the loss of the initial investment to Siusi S.p.A.'s auditors. As discussed above, Plaintiff has raised material issues of fact that it was defrauded. The court therefore declines to grant summary judgment on these claims.

### 2. Frattini, Guiduzzi, and PLG

Frattini, PLG, and Guiduzzi challenge Plaintiff's RICO and conspiracy claims on the basis that there is no evidence demonstrating that they entered into an agreement to commit an

unlawful act.  Plaintiff argues that it has provided evidence to show that there was a pattern of racketeering activity that Guiduzzi participated in through his misrepresentations made to Plaintiff.

Here, the evidence provided shows emails between Guiduzzi, a director of PLG, to Delaney, stating that he and Frattini wanted Delaney to conceal the $11,000,000 loss to Plaintiff's auditors. Additionally, F&G, Guiduzzi and Frattini's partnership, signed agreements with EDA to receive kickbacks for bringing EDA potential investors.  And, despite the fact that the entire value of the first investment had been lost, Guiduzzi and Frattini continued to seek money from Robuschi to keep funding the project through Plaintiff.  Frattini argues that the influx of funding from Robuschi benefitted Plaintiff and therefore Plaintiff cannot show damages.  However, the court finds that Frattini's argument is without merit because the evidence clearly shows that this entire investment of $25,000,000 was lost.  Therefore, there are genuine issues of material fact whether there was a meeting of the minds to defraud Plaintiff, overt acts in the furtherance of the conspiracy, and damages and Frattini's and PLG and Guiduzzi's motions should be denied.

## D.  **Breach of Fiduciary Duty**

Frattini, Delaney, Botero, and Iragorri contend that they did not owe fiduciary duties to Plaintiff.

Under Texas law, the elements of breach of fiduciary duty are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach by the defendant of his fiduciary duty to the plaintiff; and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach to the plaintiff. <u>Lundy v. Masson</u>, 260 S.W.3d 482, 501 (Tex. App.–Houston [14[th] Dist.] 2008, no pet.)(citations omitted).

**1. Frattini**

Frattini challenges Plaintiff's breach of fiduciary duty claims, contending that he did not have a special relationship with Plaintiff because the relationship did not begin before the underlying agreement in the lawsuit and was the result of an arms' length transaction.  Additionally, Frattini argues that, as a shareholder of F&G, he owed no fiduciary duty to Plaintiff. Plaintiff contends that the evidence provided raises a genuine issue of material fact whether Frattini and Plaintiff had a prior relationship via Guiduzzi and the F&G partnership that created an informal fiduciary duty.  Plaintiff argues that it is a question for the jury whether a fiduciary relationship existed.

Under Texas law, an informal fiduciary duty can originate from relationships that are moral, social, or personal and built on trust and confidence. <u>Associated Indem. Corp. v. CAT Contracting Inc.</u>, 964 S.W.2d 276, 287 (Tex. 1998).  "The law recognizes the existence of confidential relationships in those cases in which

40

influence has been acquired and abused, in which confidence has been reposed and betrayed." Id. (citations and internal quotations omitted).   Fiduciary duties are only created in the context of business transactions if the confidential relationship existed before and separate from the underlying agreement in the lawsuit. Meyer v. Cathey, 167 S.W.3d 327, 331 (Tex. 2005)(citing Associated Indem., 964 S.W.2d at 288).

Plaintiff has provided evidence that Frattini asked Guiduzzi to be the director of Plaintiff, and that Frattini had control over Guiduzzi's actions in his role as director of Plaintiff.  Frattini and Guiduzzi had a partnership that began prior to and separate from the series of transactions underlying this lawsuit.  The court finds that there is a genuine issue of material fact whether Frattini owed an informal fiduciary duty to Plaintiff because of his direction and control over Guiduzzi as Plaintiff's director. Therefore, the court declines to grant summary judgment on this issue.

### 2.  Defendants Delaney, Botero, Iragorri, and Vantage Realty

The officers of EDA, Defendants Delaney, Botero, and Iragorri, (collectively, "EDA officers") argue that they owed no fiduciary duty to Plaintiff because it was a separate company and a shareholder of EDA.  Defendants reply that Plaintiff has not shown that Vantage Realty breached its fiduciary duty.  Plaintiff argues that EDA's officers owed a duty to Plaintiff that they breached,

citing _Allen v. Devon Energy Holdings, LLC_, 367 S.W.3d 355 (Tex. App.–Houston [1ˢᵗ Dist] 2012, pet. granted, judgm't vacated, w.r.m.).

While it is true that "[n]o Texas court has held that fiduciary duties exist between members of a limited liability company as a matter of law" and that Texas does not "recognize[] a broad formal fiduciary relationship between majority shareholders in closely-held companies that would apply to every transaction among them," Texas courts have recognized a fiduciary relationship in the context of LLCs, stating that the recognition of such a fiduciary relationship is "typically a question of fact." _Entertainment Mechandising Technology, LLC v. Houchin_, 720 F. Supp.2d 792, 797 (N.D. Tex. 2010); _Allen_, 367 S.W.3d at 391.

In _Allen_, the court discussed the similarities between an LLC and a partnership, stating that "courts in many jurisdictions have recognized a fiduciary duty between members of an LLC on that basis." _Id._ at 392. The court found that the manager-owner of the LLC owed a fiduciary duty to the non-participating minority owner, stating that their relationship was similar to that of a general and limited partner in a limited partnership. _See id._

There is evidence to raise a fact question whether a fiduciary duty was owed by the EDA officers to Plaintiff and whether this duty was breached. EDA was a manager-managed LLC, managed by

42

Vantage Realty.[122]  Per the operating agreement, Vantage Realty was to "have the full and exclusive right, power and authority to manage the affairs of the Company, to make all decisions with respect thereto and to do or cause to be done any and all acts or things deemed by [Vantage Realty] to be necessary, appropriate, or desirable to carry out the business objectives of [EDA]."[123]  This is similar to the operation of a limited partnership, where the general partner has control over the decisions.  Like in <u>Allen</u>, Plaintiff, as the minority member, did not have control over the decisions of EDA.  Therefore, there is a genuine issue of material fact whether the EDA officers and Vantage Realty owed a fiduciary duty to Plaintiff.  Additionally, the actions by the EDA officers, as discussed in the sections above, raise issues of material fact of whether, if they did owe a fiduciary duty to Plaintiff, they breached it.  Therefore, the court declines to grant summary judgment on this issue.

**E.  <u>Breach of Contract and Veil Piercing</u>**

Defendants VPC, Vantage Financial, Botero, and Delaney move for summary judgment on Plaintiff's breach of contract claims because they were not parties to the EDA contracts because they signed on behalf of EDA, not individually.  These Defendants argue that veil piercing should not occur in this case because there is

---

[122]   <u>See</u> Doc. 217-2, Ex. H to EpiCentre Defs.' Mot. for Summ. J., Operating Agreement p. 8.

[123]   <u>See</u> <u>id.</u>

no evidence of fraud.   Plaintiff argues that the corporate veil should be pierced under both tort and contract theories because Botero freely moved the money between the corporate forms of EDA, EDA II, Vantage Financial, and VPC and because the entities were used commit fraud against Plaintiff.

Generally, the corporate veil prevents personal liability for tort or contract obligations of the corporation.   Castleberry v. Branscum, 721 S.W.2d 270, 271 (Tex. 1986).   However, under Texas law, "there are three broad categories in which a court may pierce the corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetuate fraud." Rimade Ltd. v. Hubbard Enterprises, Inc., 388 F.3d 138, 143 (5th Cir. 2004).

To pierce the corporate veil under a tort dispute, a tort claimant is only required to show constructive fraud, under which "[n]either fraud nor an intent to defraud need be shown as a prerequisite to disregarding the corporate entity; it is sufficient if recognizing the separate corporate existence would bring about an inequitable result."   Castleberry, 721 S.W.2d at 272-73 (alteration in original)(citations omitted).   Inequitable results occur "when the corporate structure has been abused to perpetuate a fraud, evad[e] an existing obligation, achieve or perpetuate a monopoly, circumvent a statute, protect a crime, or justify wrong."

SSP Partners v. Gladstrong Invs. (USA) Corp., 275 S.W.3d 444, 451
(Tex. 2008).

For contractual disputes, veil piercing may only occur if the
defendant "caused the corporation to be used for the purpose of
perpetrating and did perpetrate an actual fraud on the obligee
primarily for the direct personal benefit of the holder, beneficial
owner, subscriber, or affiliate."  Tex. Bus. Org. Code Ann. §
21.223(b).  Piercing the corporate veil under a breach of contract
theory is held to a more stringent standard because the plaintiff
must show actual fraud, which is not the same as the tort of fraud;
actual fraud requires "dishonesty of purpose of intent to deceive."
Matter of Ritz, 832 F.3d 560 (5th Cir. 2016)(citations omitted).

The court does not need to decide which of these two standards
applies.  Plaintiff has provided evidence that Defendants committed
actual fraud.  Delaney and Botero's testimony revealed that these
entities shared an office space, directors, and officers.  Money
was freely moved between these entities and the money provided by
Plaintiff for EDA and the EpiCentre project was used to pay off
debts owed by other entities, such as Vantage Financial.  Plaintiff
has raised genuine issues of material fact that fraud was committed
by these entities.  Therefore, there is a genuine issue of material
fact whether the corporate forms of EDA, EDA II, Vantage Financial,
and VPC should be pierced.

**F.  Personal Liability**

45

In its response to the EpiCentre Defendants' motion for summary judgment, Plaintiff argues that Texas Tax Code § 171.255 makes the directors and officers of EDA personally liable for EDA's debts because EDA forfeited its corporate privileges on January 29, 2016. Therefore, Plaintiff contends, there is a genuine issue of material fact whether the officers and directors of EDA are personally liable for its debts. The EpiCentre Defendants do not dispute that EDA forfeited its corporate privileges on January 29, 2016, but argue that the debt was incurred while the LLC was active, giving them protection from personal liability.

The relevant provision of § 171.255 of the Texas Tax Code reads:

> "If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is *created or incurred* in this state *after* the date on which the report, tax, or penalty is due and before the corporate privileges are revived. The liability includes liability for any tax or penalty imposed by this chapter on the corporation that becomes due and payable after the date of the forfeiture." Tex. Tax Code § 171.255 (emphasis added).

A corporation's charter may be forfeited if the corporate privileges were forfeited due to failure to pay franchise taxes, and the corporation does not pay the amount required to revive its privileges. Tex. Tax Code § 171.301. Texas Tax Code § 171.255 has been strictly construed because, although it creates civil liability, it is penal in nature, meaning that the court must

46

"strictly construe any ambiguity in favor of the party penalized by it." Hovel v. Batzri, 490 S.W.3d 132, 136 (Tex. App.–Houston [1st Dist.], 2016)(citations and internal quotations omitted).

In applying this provision, Texas courts have "focused on when a debt was 'created or incurred,' read those terms broadly, and applied the 'relation-back' doctrine to link post-forfeiture judgments to pre-forfeiture conduct and agreements." Id. In Hovel, the court found that the Plaintiff's default judgment, while it occurred post-forfeiture, the court found that because "[a]ll of the conduct underlying their claim, as well as the agreement, occurred preforfeiture," and therefore the defendant was not personally liable for the entity's debt. 490 S.W.3d at 145.

Plaintiff argues that directors and officers are liable for the debt on the promissory note because at the time EDA filed its response to Plaintiff's earlier motion for summary judgment, agreeing to partial summary judgment on the promissory note on December 4, 2015, EDA had already lost its corporate privileges. Plaintiff also cites the court's opinion entered on May 2, 2016, that granted partial summary judgment in favor of Plaintiff on the promissory note. Looking at the letter from the Secretary of State,[124] it is clear that EDA's charter was forfeited on January 29, 2016. That means that EDA lost its corporate privileges at least 120 days before January 29, 2016, pursuant to Section 171.309

---

[124]   See Doc. 241-1, Ex. 45 to Pl.'s Resp., Forfeiture of EDA's Charter p. 233.

of the Texas Tax Code.

The court is not persuaded by Plaintiff's arguments.  The court finds that the debt was not incurred at the date of the court's opinion, but rather, as in <u>Hovel</u>, the conduct underlying their claims and the signing of the promissory note all occurred prior to EDA's forfeiture.

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Frattini's motion for summary judgment be **DENIED**, the EpiCentre Defendants' motion for summary judgment be **DENIED**, and PLG & Guiduzzi's motion for summary judgment be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 3rd day of March, 2017.

48

U.S. MAGISTRATE JUDGE